IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Kim Smith | : | |
| Plaintiff | : | Civil Action No. 1:01-0817 |
| | : | |
| | : | |
| vs. | : | Judge Caldwell ) |
| | : | |
| James Morgan, et al., | : | Magistrate Judge Mannion ) |
| | : | |
| | : | |

FILED
SCRANTON
NOV - 5 2002
PER
DEPUTY CLERK

## BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER
## AND INTERROGATORIES AND COMPLAINT

AND NOW comes Kim Smith a lay person not lettered in legal matters and without the aid of counsel prays a less stringent standard be applied to this pro-se pleading and brief in support of.

## STATEMENT OF CASE

Since Jan. 1998 petitioner was denied certain and adequate health care by a standard that is to be projected as if petitioner was on the street. Petitioner was told a number of different reason for the failure to treat and any and all delays in treating any and all illnesses while at State Correctional Institution Smithfeild. Petitioner was also told that Wexford Health Services did not approve treatment for illness that was requested by Dr. Long. At least that was what Dr. Long stated to petitioner a number of times, when requesting information about treatment. The Department of Correction also stated that treatment for said illness was not a necessity, that required treatment. This level of abuse has since continued by the correctional health care services, and Wexford Health Systems, or Service.

Petitioner has been subjected to the abuses of the co-pay policy for a number of

Petitioner has been subjected to the abuses of the co-pay policy for a number of years at State Correctional Institution Smithfeild when petitioner would ge t or renew medication for condition that he was once treated for, and was charged for. Ever time petitioner would request the renewing of medication he was charged a co-pay for each medication and the visit. Medical staff at this institution has went on to state that Dr. Long has the authority to determine what condition were chronic and what would be a charge for medication and visit. These statment come from Nurse Kathy Allen, Dr. Long, Hazel Zimmerman, Pat Yarger, Wendy Wright. Nurse Allen has went on to state that degenerative joint disease, arthritis, slipage at the L-5, S-1, L-4, foot fungus, sleep apena were current and they go away, and this being the reason why petitioner was charged a co-pay for these condition, and the renwing of chronic medication, that Dr. Long has determined that these condition were not chronic. Policy Statment Policy number DC-ADM 820, effective date May 18, 1998. Section VI Procedure A Fees number 2 The following services will not result in a charge to the inmate.\a)\b)\d)\e) medical service provided to an inmate during a follow up appointment \g) Medical treatment for chronic illnesses \j)\k) \p) medication perscription subsequent to the initial medication perscription provided to an inmate for the same illnesses or condition See section B Explanation of the prison medical service program.

For 5 years Dr.Long knowingly and intentionally delayed treating petitioner Hepatitis C, and watched this condition get worser until Sept. 2000 and claimed the delay in treating this condition was that the Department of Correction prohibited him from treating such illnesses until Sept. 2000 when petitioner was treated for this illness. That was what Dr. Long used to support the 5 year delay in the treating of this illness. Their was also a 4 year delay in the treating of petitioner sleep apena in which petitioner during a hour of sleep will stop breathing 16 or more time at 16 or more seconds each time, after a bumber studies and being taken out of institution for over night testing for this illness, petitioner was given treatment Feb. 2000. A C-pap resporatory to treat this illness. Petitioner was also denied test for asbestois contained diseases, or illnesses.

Most of the illness the Department of Corrections deemed they were not a necessity for treatment reason.

March 2000 Pa. Hoffman denied petitioner treatment for a right shoulder problem, then went on to state that if petitioner would not take medication that made him ill and had a reaction to he would not treat his shoulder problem, after some delay an x-ray was taken and it was determined that petitioner had osteo-arthritis with bone spurs in right shoulder, and the only treatment that was given was Tylenol that did not

address the pain and petitioner has since experienced pain in the movement of his right
shoulder for some time after the said treatment was given.

In March 2000 a Correctional Officer C.O. Ersek knowingly and intentionally with
held petitioner health care device when the medical staff at S.C.I.S told him to turn
over such to petitioner and return him to medical, this officer refused to turn over
such and then went on to order petitioner to return to medical and sign a refusal form.
Since this officer refused to turn over petitioner health care device to petitioner
he saw no reason to return to medical without such, and he was not refusing treatment
but being hindered by this correctional officer from his health care even after he was
instructed to turn over such to petitioner buy Ms. Bular a medical nurse at S.C.I.S.
Then this officer and C.O. Whysong went on to conspire and fabercate a false note and
place it on this device that medical stated not to issue such to petitioner. After
check with the C.H.C.A. Mr. Weaver he stated he or the medical staff did not place such
a note on the device. Then C.O. Ersek issued a misconduct stating petitioner refused
to return to medical and sign a refusal form, as long as this officer was delaying
interferring hindering and delaying petitioners health care he had no standing to order
petitioner to sign a refusal form. This act was knowingly and intentionally done
to bring petitioner harm or injury, since the medical staff called this officer and
instructed him to turn over such, and for him not to do such was done with an intent
to bring him harm, or injury and to hinder and deprive petitioner of his approved
health care.

For a number of years petitioner has not seen a skin Dr. for sore that wont go
away and if they did they would soon return, and become sores again, petitioner never
had this condition adequately addressed or treated, and they have since left black
spots on skin. The same with petitioner foot care problem dry fungus feet that in 5
years has not cleared up.

After a request for the night shift cook school at State Correctional Institution
Smithfeild petitioner was denied such educational programs and his ability to advance
in a trade, and discriminated against by Mr. Weaver, and DR. Johns, who denied such
placement because of petitioners sleep disorder and refused to treat such by stating
that the Department of Correction was not oblegated to treat such a disorder. Mr.
Weaver then goes on to state that petitioner must sustain regular sleep hours before
given consideration, which is hard when petitioner has insomia and sleep apena and to
discriminate against petitioner and his ability for reason of sleep and as it was
petitioner did not get much sleep in nights and the trade program was right for this
condition, and the fact that these parties stated that the Department of Correction

did not have to treat such a illness, discriminated against a disabled person form the advancement of trades, and educational programing.

After a boil operation on petitioner anus petitioner was given dressing to dress the open wound that was draining, for 3 weeks then a Kathy Allen determined and acted as a policy maker for the Department of Correction knowingly and intentionally took petitioners dressing making claim that this dressing was a security issue and petitioner could not have in his cell. This placed petitioner at risk for infection as he had to dress this open wound with tolet paper to catch the drainage. Then Ms. Burks claim that none of the three Dr. petitioner saw ordered a dressing for this open wound, this was her reply to a grievance she claimed, and if this was the case then the treating Dr. were grossly neglent for not ordering a dressing for an open wound that was draining. Or did Kathy Allen knowingly and intentionally interferr with petitioners health care, with intent to bring him harm or other injury. After such it was ordered that petitioner come to medical and let the medical staff dress the wound three time a day. A Dr. ordered sit baths to aid in the healing and drainage, and Pa. Hoffman coupled with Nurse Groove took sit baths from petitioner then went on to order and tell block officers that petitioner should stand in shower an extented which hindered any and all healing processes. This was knowingly and intentionally done to hinder and deny adequate health care, by these two parties.

In June 2000 petitioner was given a misconduct for calling C.O. Whysong a Fuckin Dick Head, this comes after this C.O. told petitioner he felt he had no right to go to his call out to law library, and for him to get away from the bubble nigger. Petitioner was given 30 days in the hole then a Sgt. Henning claimed petitioner threaten this officer, and petitioner was given another 60 days in the hole.

During strip search after misconduct hearing a C.O. Officer knowingly and intentionally used excessive force by forcing petitioner face first into the wall causing him to lose his left front tooth, this officer had no reason to apply such force, and petitioner presented no threat to anyone that would warrant such force from this officer, or did petitioner put anyone in fear for their safety, at the time petitioner was bending over putting on shoes that was issued by the institution for inmates in the hole. Lt. Simpson, and unknown officers knowingly and intentionally issued excessive force that resulted in the lose of petitioner front tooth. These officers had not reason or cause to act in this manner and violated petitioner federally protected rights to be free from this level of abuse.

A Angela Zimmermand asked petitioner what his entent was towards this correctional officer Whysong petitioner claimed he untainted to sue this officer, and then Ms.

Zimmerman goes on to state that petitioner would not cooperate with her and that was
why petitioner was placed on control unit for 60 days after he did 90 days in the hole
and at this point petitioner started to fear for his safety. Sgt. Henning spit in
petitioner food, then went on to lie on petitioner about a claimed threat. Petitioner
then was placed in Administrative Custody for 4 months until he was transferred, during
that period Ms. M. Baker claimed that petitioner refused health care namely the C-pap
device, and since all holes in state institution have no power petitioner could not
use, and since petitioner was on the top bunk the device could not safely be used.
More over all plug sockets  on D block were so damaged that they could not be used,
and instead of fixing these sockets it was easier for Ms. Baker to make a false claim
and claim that petitioner on top bunk could safely use this device. Ms. Baker as well
as Dr. Long knowingly and intentionally interferred with petitioner treatment and also
denied petitioner the approved health care, as well as Capt. Glenny, and Mr. Weaver
making claim to a security issue and other false claims, since they can not produce
a sign refusal form from petitioner how could they claim he knowingly and intentionally
refused health care. When inmates goes to the hole in most state institution they are
often deprived their health care as most holes are substandard and not up to code.
Since most holes are none smoking when inmates get smokes they more then likely use
plug sockets to provide them with a light, and this being the case in this institution
in June 2000, as their was no useable sockets in these cells or in that block at no
time during petitioner confinement their nor were any arrangemnts made to correct the
problem, it was easier to deprive petitioner his health care. In the 5 years in this
institution petitioner never projected or presented a behavioral problem or was one
that would in danger anyon inmate.

Upon transfer to State Correctional Institution Coal Township after complaining
about shoulder pain x-rays were taken and petitioner was told that their was nothing
wrong with his shoulder that the x-rays that were taken revealed no problem, and that
the diagnoses was not arthritis or bone spurs but petitioner has since had pain in
right shoulder and some problems moving it without and pain, and no treatment has been
given since x-rays were said to show no problem. It is hard to believe that in less
then a year this condition went away. Dr. Brein has since stated that petitioner will
not get the C-pap device because of what Dr. Long and Pa. Baker stated in their report
that I refused such but can not produce a sign refusal form. After having an ulter
sound and x-rays it was diagnosed that the lump behind petitioner leg was something
then Dr. Brein goes on to state that this lump in benine that is his opinion and that
if I did not like what I was told I could sue him. It is hard to believe a learned

medical professional would make such a statement before having or taking test, shows deliberate indifference, and the knowingly and wantonly infliction of harm injury and pain, and if this lump is not addressed it could develope into something worse that may result in the lose of leg or use of knee. He knew or he should have known that to make such a statement about such a condition would result in a serious injury.

A Dr. Kort then will not give petitioner his back support claiming their was no injury, petitioner has slipage at the L-5, S-1, L-4 and such is well documented at S.C.I.S. and on the streets, for 5 years petitioner had a supportive back brace at this institution and is now being denied such, and has to endure the pain in both legs and lower back. Petitioner knee sleeve was also taken and petitioner was cut off his heptitis C treatment prematurely and based on a false claim that if petitioner did not show a drop of 50 % in viral load they were to be terminated, when petitioner was terminated he did not have the treatment for 6 month as require by institutional policy in as much petitioner showed a drop and vurial load and that he was responding to treatment, none the less Dr. Kort terminated. This treatment was given back and then the condition worsen since when petitioner was given treatment back his virual load was 202,000 and after less then 6 month this level jumped to 530,000 more then when petitioner started the treatment, and injury was sustained with petitioner was prematurely terminated from his treatment and any treatment given after that only worsen the condition.

Then as a type two diabetic petitioner is being denied regular accu-ceks  claiming the Department of Correction has a policy that prohibited inmates with this illness from having such, claimed MS. Sewell, Dr. Kort, Nurses, Wolfgang. Burnas,.Ambrose. And now petitioner is still being denied such. In April 2001 after seeing a Dr. Adamsom petitioner diabetic medication was increased on med-line 3, and Nurse Burnas on her own without Dr. Authority or the professional knowledge to do so cut petitioner medication on med-line one, when showing this nurse her error she then states that this is the way things are done in this institution, then leaves medical and goes and conspire with a Lt. Jordan to issue a misconduct to justify her cutting my diabetic medication without authority. Then Nurse Wolfgang,Ambrose,Bernas goes on to state that petitioner had no reason to be in medical and petitioner was to take a blood test. Lt. Jordan ordered petitioner to leave and before petitioner could get his pass this officer put on the hand cuffs. Petitioner was given 45 days in the hole by a Mr. Breon at this time petitioner was placed in a hard cell under Lt. Gooler authority, based on a false claim and this Lt. claimed that petitioner projected a behavioral problem that is why he was being punished, last I heard having an attitude was not a punishable

offense subjected to cruel punishment.  Then this Lt. comes up with a false claim that petitioner had a behavorial problem that was why he was placed in a hard cell.  Their is nothing on the tape of this day in question that would support placing petitioner in a hard cell, or that he had a behavorial problem, or was their anything that would support subjecting petitioner to this level of abuse.  Then petitioner was held in RHU the hole and additional period of time with a claim that their was no cell space in the institution to place petitioner on a block.  Then July 4, 2001 while petitioner was on the tolet he put up a curtesy curtain for privacy while in a personal act, and block officer on this day requested petitioner take such down, petitioner advised him that he was on the tolet and would do such when he was done.  Then this officer goes and get a Lt. Weltz who asked petitioner to take down the paper, petitioner stated he was on the tolet and would do such when he was done.  This Lt. could not wait open petitioners door and took down the paper then stood in the door and harassed petitioner talking about he did not know how to talk to people, this comes from a man who knowingly and intentionally was standing in petitioners door disrespecting him and sexually harassing him because he covered his door to go to the tolet.  Because of the amount of time in which they stood in petitioners door while he was on the tolet petitioner feels this is a level of sexual harassment.  More over these officers should have just closed the door after taking paper down  not stand their and harass petitioner while he was on the tolet.  Because of this act petitioner feels he was being sexually harassed and it was knowingly and intentionally done to hinder deprive and punish petitioner, as the knew or should have known that to stand in petitioners door for an extented period of time while he was on the tolet would and could result in a level of sexual harrassment.  A misconduct was iussed and petitioners was given cell restriction for this act of the correctional officer to justify their abuse and acts.  Then a C.O. Henning during a shake down of cell knowingly and intentionally took petitioners markers giving him a opperunity to either send such home or have them destoried, then went on to make a false claim that these markers were state issued, and they were not as it is petitioner brought them at the institution commissary and his paper work for the commissary would show such, then the institution stated petitioner opted to have these items destoried.  the problem is that petitioner should not have been forced to either have property destoried or sent home when he brought them in the institution and to support this abuse this officer claimed these items were state issued and they were not.  The staff here has since enforced non-existent Department of Correction policy on petitioner like a inmate who comes out of the hole must wait 90 days before given allowance.  That when a inmate is layed in for medical reason he can not go to work, and he will not be paid for that day.

# QUESTION FOR REVIEW

Is the denial of adequate health care an extraordinary situation ?

Would petitioner be at risk for serious injury when not adequately treated ?

Is their a showing of specifically and personally risk for irreparable harm ?

Will petitioner be harmed by the denial of relief ?

Would and could petitioner succeed in his claim for the denial of adequate health care for his illnesses ?

Will petitioner suffer irreparable harm if the injunctive relief is not granted ?

How can a petitioner prove such if he is not afforded the record or can afford to copy the evidence he has to support his claim ?

How can petitioner make a statement of fact if the defendants failed to obey court order and depose petitioner ?

Can Dr. Long and Ms. M. Bailey be held liable for injury sustained because of the falsifing of records ?

Can Wexford Health be held liable for Dr. Long, and Ms.M. Bailey acts, if they are part of a continued denial of health care.

It should not matter that petitioner was incarcerated at S.C.I. Smithfield and was transfered another institution, the claim for injunctive relief regarding the C-Pap device should be considered as it is the decision for the denial of treatment is based on Dr. Long and Ms. M. Bailey even though it is false in it nature.

How could it be considered that petitioner refused the health care of the C-pap device while in the RHU at S.C.I. Smithfield when in those cells their was no power for the use of this device at that time ?

If their is not power for the use of this device how could it be considered that petitioner refused treatment ?

By their being no power in the cells at S.C.I. Smithfield June of 2000 could this be considered a denial of health care ?

Because of the in adequte nature in which the Department of Correction has turned all power of in all institution in their holes be considered an health risk, or put inmates at risk for serious illnesses or injury ?

Because their is no power in the holes in the state institution does it give medical personel the right to claim that a inmate refused health care because their was no power?

Because petitioner is not at S.C.I. Smithfield does not give Pa.
Hoffman the ability or right to deny health care and refuse to treat and he can stand accountable for his action, since petitioner illnees has never since been addressed ?

Why should a claim be moot when injury was sustained by the act or failure to act by health care professional in a professional manner ?

As professional heath care personel these parties knew or should have known that the failure to treat would place petitioner at risk for serious injury ?

If petitioner was injuryed because of the act of Wexford Health empolyee his action against those parties should not be moot, because of a transfer ?

Why should petitioner not be granted the right to see out side specialists for his illnesses ?

Would petitioner be put at risk for injury by having a general practioner diagnose his illnesses that is not letter in that field ?

Is petitioner health care to be given to a standard of health care as if he was on the street ?

If petitioner was on the street would he not have the ability to see and orthopedic Dr.

for his astelarthritis, and bone spurs ?

If petitioner was on the street would he not be able to see and orthopedic Dr. for the lump behind his knee that affect his ability to walk, and cause him pain ?

Would he not be able to see a specialist for his sleep disorder ?

Would he not be able to see a specialist for his foot and skin problem ?

Would this not be denial of health care when petitioner is being forced to except the determination of his health condition by a person not lettered in these certain health problems ?

Could this be the reason that petitioner is still having health problems and pain because he is being treated by a general practioner who in not lettered in certain health condition or orthoppedic training ?

Is their a state law that put limitation on the exercise of state officials in their discretion ?

Does petitione have a legitimate claim for adequate health care that he is entitled  ?

Does the prison regulation violate equal protection ?

Is the Department of Correction dening access to adequate medical care that will result in deliberate indiffernece to inmates serious medical needs ?

Is the medical direction and Correctional Health Care Administrator, Nurses Care Manager and General Practitioner work under the color of law ?

Is this a question for a jury in a civil rights action ?

Is their sufficient nature to proceed to jury trial ?

Is their sufficient cause for concern of injury to proceed to jury trial ?

Dose petitioner have a right to have his theories present to a jury ?

How can petitioner support his claim if he can not be seen by a specialist, if he is at state health care professional mercy who do not adequate treat ?

How can he prevail if he is being deprived his right to health care ?

How could a general practitioner determine the nature of the lump behind petitioner knee without first doing a biopsy of the lump ?

Was or did institutional Dr. Brien deny petitioner adequate health care when he determined that the lump behind petitioner knee was benie ?

In State Correctional Institution and Fac. section § 93.12 Prison Medical Service Program attached what a inmate is to exspect for health care ?

Is the dening of health care a preventive care ?

Is it preventive care not to treat petitioner right shoulder, or left knee and watch the condition get worser ?

Would apnea be considered a serious illness, ads it is state could result in death  ?

Is it 8 th amendment violation rights to deny treatment or operation for petitioner right shoulder and left knee when x-rays show something wrong ?

Is it 8 th amendment violation to delay any treatment ?

Are these parties acting under the color of law causing an injury to personal rights that are secured by the federal constitution and laws ?

Is it law that all person can be free from the unwarranted infliction of pain and injury, is petitioner being subjected to such for the denial of health care ?

Is this state threw state actor and contracted health care service depriving petitioner adequate health care ?

Dose that attached create a state liberty interest ?

Can the denial of health care be based on a administrative regulation condition to inmate health care ?

Is Dr. Brien decision maker ?

Can his decision be considered  or deny a protective interest in inmate health care ?

The protected interested for petitioner lays in his ability to seek specialist treatment for his illnesses and his ability, and for a general practitioner to determine that a specialist is not required is a showing of deliberate indifference to health care as he is not trained in the fields to determine the cause and nature of illnesses ?  This is why sores on petitioner body have not went away and have since left big black scars, and foot fungus, as well as back problem without a support ands to the deteration of the bone and disc, as well as the knee condition and right shoulder in which failure to adequately treat would result in the condition worsing and put a person at risk to sustain injury because of the decision of a Dr. who is not trained adequately to make such decision ?

Dose these act of denial show a sound medical practice ?

Can a request to se a specialist be an objective criteria ?     See Spruytte 753 F2d. at 508  and Greenholtz at 442 U.S. 1, 11, 99 Sct. 2100, 2105, Led 2d. 668

Protected rights under Compare McFarland 779 F2d at 1428

Because of petitioner segergation at S.C.I.Smithfield in the RHU did not give Dr. Long and Ms. M. Bailey the right to claim petitioner denied health care when their was no power in cells to use the device ?

Is it denial of health care or interfearing with such when C.O. Ersek withheld health care device, and refused to turn over such when instructed to do so ?

Does the C.O. Ersek have the authority to order petitioner to sgin a refusal form of

health care when he was with holding health care device when instructed to turn over such to petitioner

Is it cruel punishment for Lt. Gooler to place petitioner in a hard cell without reason or provocation, or any supportive evidence of a behaviorial problem ?

Was it curel punishment for nurse to cut petitioner diabetic medication without Dr's orders to do so ?

Was Dr. Lnog reasoning for the delay in the treatment of petitioner Hepititis C a 8 th amendment violation, and the basing of his decision on a non existing Department of Correction Policy, stating that this agency prohibited him form treating such ?

Did Dr. Long violate petitioner protected rights when he delayed treatment for more then 5 years, and watched this condition worsen ?

Was petitioner rights violated when treatment was terminated by a Dr. KKort claiming a non existent Department of Correction policy ?

If the treatment that petitioner was getting and record showed a drop in the virual load of this illness and that petitioner was reacting to treatment and it was having a positive affect, to terminate treatment stating petitioner was not reacting to treatment deprived him of a federally protected right ?

When petitioner was terminated his virual load was 202,000 and when treatment started it was 282,000. After the termination of treatment petitioner was given treatment back some 90 days later, and at this point was it when petitioners condition worsen, and he sustained an injury, as petitioner liver condition worsen with every injection for hepititis C and at this point when treatment was terminated the virual load was 528,000 more then when petitioner started treatment. Did petitioner sustain a injury due to the premature termination of this treatment, or when treatment started again ?

Could it be stated because of Dr. Korts action petitioner sustained injury to his liver, to the point that the virual load doubled after treatment was terminated, the reinstated

Could it be stated cruel punishment when a correctional officer acted in a manner that

resulted in injury to petitioner when smashing his face into a wall ?

Was this correctional officer just in doing so when their was no threat to anyones safety

How could it be just for a Dr. to terminate treatment based on a non existent policy ?

Is it sound health care to terminate treatment when a inmate shows a positive reaction to the treatment, and base such termination on a false policy ?

If petitioner was to get this treatment for 6 months when starting such, was it just for Dr. Kort to stop treatment before hand, and base such on a false policy ?

)                                    )

## PROCEDURAL DUE PROCESS

See Hewitt v. Helms 495 U.S. at 466 protectable liberty interest may arise from the Constitution itself when a prisoner is subject to an aspect of confinement that is so severe or so different from the normal condition of incarceration that it must be considered outside the preview of the imposed sentence, See Montanye v. Haymes 427 U.S. 236, 242 (1976) as long as the condition or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the due process clause dose not in itself subject an inmate's treatment by prison authorities to judicial oversight.

Condition of confinement was so severe or qualitatively different from punishment normally suffered by prisoner, the
Constitution itself will give rise to a protectable liberty interest.
(1) Liberty interest was when petitioner was confine in the hole for 7 months. When C.O. Whysong called petitioner a name and petitioner replied with a name, 30 days in the hole petitioner was given. Then a Sgt. Henning claimed petitioner made a threat, petitioner given another 60 days in the hole, this same Sgt. spit in petitioners food and hindered his legal mail form leaving the institution.
(B)  Angelo Zimmerman claimed that petitioner would not cooperate with her and tell her his intent towards the officer. Petitioner did and told her he intented to file suit against this officer, the Angela Zimmerman claimed not to believe petitioner and after his 90 days in the hole was done he was placed on the control unit with a false claim that staff wanted to see if petitioner would cause a problem if released into population. After 60 days petitioner then was placed back in the hole on administrative custody awaiting a transfer.  Angela Zimmerman knowingly and intentionally and with deliberate indifference continued to inflict her own opinion and form of justice in petitioners continued confinement in the hole for 4 month without adequate reasoning why for 4 month additional months.  The language of an unmistakable mondatory character, shall will or must be employed in combination with specific substantive predicates which limit official discertion see Hewitt, 459 U.S. 471-472, and it could be said that when Officer knowingly and intentionally forced petitioner face first into the wall causing the loss of left front tooth could be the reason for this continued confinement to cover up this level of abuse and also the transfer would not permit petitioner to bring claim for this violation and abuse of power, when this officer had no reason to act in this manner and petitioner was not threat to anyone when hand cuffed to have his face forced into a wall

for no reason.

No prisoner should be punished unless he has been informed of the offense alleged against him and given and opportunity to present his defense, the third Circuit held that a state created liberty interest was at stake.  See Todaro v. Bowman 872 F2d. 43 (3rd Cir. 1989) As petitioner was punished when Angela Zimmerman took petitioner off the control unit based on a false claim and in the 5 years that petitioner was in that institution he was not a problem or created any problem for staff or institutional security.

The segergation for an additional 4 months was not justified and the named official discretion that points to state law:  no prisoner shall be punished unless he has been informed of the offense alleged against him and given an opportunity to present his defense.  Surely cooperating or not cooperating with a counselor, and the putting inmate on a control unit, in attempts to adjust a non-existent behavioral problem is not an offense punishable  by administrative segergation see Todaro v. Bowman, 872 F2d. 43 and Sandin v. Conner 115 S.ct. 2293, 2300 (1995) nonetheless imposed atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. id .  unquestionably a landmark change in due process jurisprudence SANDIN will generate review if not out right reversal of several well established third circuit precedents concerning prisoners due process rights.  State liberty interest protected by the due process clause, see Board of Pardons v. Allen 482 U.S. 369 (1987); Vitek 445 U.S. at 493.  And the confinement in question did present a type of atypical significant deprivation in which state can conceivably create a liberty interest in the nature and reasoning in which petitioner was confine in the hole for 7 months before transfer, and the transferring him form Administrative custody to control unit the back to administrative custody before transfer.

Wolff v. Mc Donnell 418 U.S. 539 has real substance and is sufficiently embraces within the 14 th. amendment liberty interest to entitle him to thus minimum procedures opprooriate under the circumstances and required by the due process clause to insure that the state created right is not arbitrarily abrogated id at 557, as the liberty interest was created by the program review board at S.C.I. Smithfeild when they continued confinement in the hole without a legal stand to support this confinement Board of Pardons v. Allen.

I have been refused to see orthopedic Dr. about arthritis in left knee with a lump behind

knee, and arthritis in right shoulder with bone spurs, by Dr. Breen as he is relating the arthritis he claims to have with the arthritis of petitioners. And at S.C.I. Smithfield x-rays showed arthritis in shoulder with bone spurs and at S.C.I. Coal Township the same X-rays are claimed to show no problem, even though Dr. Breen states their is a condition or problem he also states that their is no treatment for such. This Dr. also went on to claim the lump behind petitioners knee was bynin and that he could tell from his knowledge. And this is impossible to state without first getting a tissue sample. And not treatment has been given that would adequately address the pain and these condition.

Since prisoners cannot obtain their own medical service, the Constitution requires prison authorities to provide them with reasonable adequate medical care. Newmann v. Alabama 559 F2d. 283, 291; Hoptowit v. Ray 682 F2d 1237, 1246; Bell v. Wolfish 441 U.S. 520; Langley v. Coughlin 888 F2d 252, 254 official must provide reasonable necessary medical care... which would be available to the prisoner if not incarcerated.

Courts have defined adequate medical service as service at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standard, Fernandez v. United States 941 F2d. 1488, 1493; United States v. DeCologero 821 F2d. 39 43; Tillery v. Owens 719 F. Supp. 1256, 1305.

In practice providing care to prisoners generally means paying for the care, since most prisoners have little money and no medical insurance and are ineligible for public assistance. The fact that the care maybe expensive does not excuse prison officials from providing it.

Prisoners who are denied adequate medical care may use 42 U.S.C. § 1983 to sue prison medical care providers, including personel and corporation who work as private contracters, some court have held that you can sue a medical care corporation under § 1983 but only for injuries that resulted from policies of the corporation, and petitioner claims pain and suffering should be connected to the injury claim or any delays in treating such. Howell v. Evans 922 F2d 712,723-25, 931 F2d. 711; McIlwain v. Prince William Hospital 774 F Supp. 986,989-90, this means that if you were injured  by deliberate indifference of doctors or other employees of such corporation: Hicks v. Frey 992 F2d. 1450. 1456-58. And damages can be sought for malpractice under state law.

DELIBERATE INDIFFERENCE

The supreme Court has stated that deliberate indifference to serious medical needs of a
prisoner constitutes the unnecessary and wanton infliction of pain... proscribed by the
8 th amendment, see Estell v. Gamble 429 U.S. 97, 104, 97 S.ct. 285 (1976). Petitioner
denial of health care for C-Pap device for his apnea when in the hole their was no power
in cell to use the device, and on H block at S.C.I. Smithfeild the plug sockets were so
damaged they could not be used, how could it constitute a refusal by petitioner if the
their was no way to power the device, the fact that petitioner could die or sustain other
injury because of the denial of the use of this device based on a false claim that
petitioner refused its use when it is not supported by a signed refusal and the only means
to support that claim is by the parties named in this civil action at no time has the
defendants presented evidence to support this claim, and petitioner request maintence
reports of the S.C.I. Smithfeild and Photo's of plug sockets in which these parties claimed
petitioner could use this device, and if the evidence shows that their was not power and
that the plug sockets were so damaged that they could not be used supports petitioner claim
that these parties knowingly and intentionally and with deliberate indifference falsify
records to deny health care, to inflict harm or injury or even death. How could this court
exspect petitioner to use this device when their was no power for its use, and all request
for the use of this device went unaddressed and met with a level of indifference based
on a false claim that petitioner refused its use. If a person is in the hole that in its
self dose not give institutional staff the right or authority to falsify records to deny
treatment and because of the place of confinement does not in its self give the right to
deny adequate health care for a serious illness that may result in death.

Such as the arthritis in right shoulder with bone spur, that Dr. Breen advised petitioner
that their was not treatment for or treatment that he was willing to offer or give, along
with the lump behind knee that he claimed was benie and refused to treat claiming his
knowledge of this condition and his own arthritis and comparing it with a inmate who has
tow work 12 hour days 2 days a week and the aggervation and pain sustained for this period.
And the manner in which they are treating petitioner diabetes and making claim that the
Department of Correction and Wexford Health has a policy that prohibits inmates with type
2 diabetes from getting regular ACCU-CHEK for their diabetes. And the aspect of skin care
that has since left petitioner with black spots on his skin and the delay in foot care that
has since left petitioner with fungus and dry feet to the point that it may not go away
for the pro-longed period in which no adequate treatment was given. And the taking of back

brace for slipage at the L-5, S-1, L-4 in petitioner lower back with a claim that their is no problem when such is well document from a work related injury when a side of beef was dropped of a truck onto petitioner in 1983 and petitioner was in a taylored brace for almost 5 years.

Under the deliberate indifference standard courts will not take sides in disagreements with medical personel's judgement or technigues. Varnado v. Colins, 920 F2d. 320, 321 (5th Cir.1991): Smith v. Marcantonio, 910 F2d. 500, 502. (8th Cir. 1990) failure to provide treatment is not deliberate indifference if their is no accepted form of treatment, 112 S.ct. 1516 (1992). Negligence or medical malpractice generally do not violate the Constitution, with one important exception. Several courts have held that the repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff may add up to deliberate indifference. Ramos v. Lamm, 639 F2d 559, 5/5; Harris v. Thigpen 941, F2d 525, 533 (8th Cir 1990) consistent pattern of reckless or negligent conduct establishes deliberate indifference: Todaro v. Ward 565 F2d 48, 52 (2nd Cir. 19//) acts that appear negligent in isolation may constitute deliberate indifference if repeated; William v. O'Leary 805 F. Supp. 634, 638 (N.D.ILL. 1992) deliberate indifference could be inferred from negligent treatment of long duration. Robert E. v. Lane 530 F. Supp 930, 940, (N.D.ILL. 1981) A Pattern of similar instances presumptively indicates that prison administrators have, through their programs and procedures created an enviornment in which negligence is unacceptably likely see also Kelley v. McGinnis 899 F2d 612, 616 ( /th Cir. 1990). Deliberate indifference can be shown in various ways, sometime it is demonstrated by acts or statements by prison personel directly showing an indifferent or hostile attitude toward prisoners medical needs. Or professional judgment was either not exercised or was not followed after it was exercised, like the boil in which it was claimed that no Doctor ordered a dressing for an open wound on the anus that was draining, and Kathy Allen and Mrs. S. Burks go on to state that not doctor made such order, and that petitioner was not entitled to dressing in this area, as it was a security issue and inmates were not permitted to dress their own wounds, and the fact that this area was draining a light green colored fluid and petitioner had to dress this area with tolet paper because it was claimed a security issue. Hughs v. Joliet Correctional Center 931 F2d. 425, 428 (/th Cir 1991).

Delay or denial of access to medical attention or adequate treatment Estelle v. Gamble 429 U.S. at 104, how much delay is tolerated of course depends on the seriousness and urgency of the medical need. See e.g. Bass by Lewis v. Wallenstein /96 F2d. 11/3, 11/8 1183 (/th Cir 1985). If an informed judgment has not been made the court may find that an 8th

amendment claim has been stated Tillery v. Owens 719 F. Supp 1256,1308 (W.D.Pa. 1989) and this court errored in its decision claiming petitioner dose not have a right to specialist treatment for illnesses, and if not how could a general practionor make judgment calls for health condition that he is not lettered in would this not go to a level of malpractice, or negligence to inmate health care, as in the knee and shoulder condition in which no treatment was given how could the Dr. in question make a call for treatment for a condition he is not lettered in or a foiid he is not trained. For this Dr. to make a orthopedic diagnoses is gross negligence and put an person at risk for serious illnesses and other harm if not adequately treated see Tillery v. Owens which will result in the failure to adequately diagnose a condition see, Brown v. Borough of Chambersburg 903 F2d. 274 278 (3d. Cir. 1990) the failure to byopsey lump on Kim Smith leg and diagnose correctly the nature and reason for this lump and the consistent pain when walking that run into hamstring Brown v. Bearm 896 F2d 848, 853 (4th Cir 1990); Medcalf v. State of Kansas; Weaver v. Jarus 661 F. Supp 40, 44 (N.D. Ga. 1985)failure to act on recomendation or other specialized care Hughs v. Joliet Correctionl Center 931 F2d 425, 428 (7th Cir 1991), in adequate treatment see Howell v. Evans 922 F2d 712, 7191 as the contemporary standard relvent in determining what constitutes deliberate indifference, as would be the examination and report of a special to establish the level of deliberate indifference, for treatment and diagnoses. Smith v. Jenkins 919 F2d 90 plaintiff should be afforded or permitted to prove that treatment so deviated form professional standard that it amounted to deliberate indifference Rosen v. Chang 811 F. Supp 754, 760-61 (D.R.I. 1993); grossly incompetent and reckless inadequate examination by licensed physician may constitute deliberate indifference, deliberate indifference claim stated when and by allegation that doctor intended to inflict pain on prisoners without any medical justification and shows number of specific instances in which the doctor allegedly insisted on continuing course of treatment that the doctor knew would be painful, like right shoulder pain with bone spurs, and left knee lump, ineffective or entailed substantial risk of serious harm to the prisoner, White v. Napoleon 897 F2d 103 (3rd. Cir 1990) like the manner in which Kim Smith was denied the C-pap device, when doctor knew or should have known that to falsify record would result in serious injury or even dealth, when such is well documented and any delay in connection with treating this condition as failure to adequately treat see Howell v. Burden 12 F2d, 190, 192 -94 (11th Cir. 1994); Johnson v. Lockhart 941 F2d 705, 707 (8th Cir. 1991) and superintendents and administrative could support liability.

Injunction requires prison officials to give Kim Smith proper medical care for present condition; Arnold on behalf of H.B. v. Lewis 803 F Supp 246, 258-57 (D. Arz. 1992) Yarbaugh v. Ruoch 736 F. Supp, 318, 320 (D.D.C 1990) and damage for injury sustained, Aswegan v.

Bruhl 965 F2d. 676, 677 (8th Cir 1992);  Helling v. Mc Kinney _____ U.S._____
113 S.ct. 2475, 2480-81(1993).

Interference with medical judgment by non-medical factors, when C.O. Ersek Knowingly
and intentionally with deliberate indifference interferred with health care when
adviced by medical staff to tune over the C-pap device and refused to do so even after
instrcuted to do so, and then went on to instruct petitioner to sign a refusal of
treatment or he would issue a misconduct. West v. Atkin 487 U.S. 42, 56 n. 15, 108
S.ct. 2250 (1988) acknowledging that the nonmedical function of prison life inevitably
influence the nature, timing and form of medical care provided to inmates; Hamilton
v. Endell 981 F2d. 1063 1066-67 ((th Cir 1992) holding that prison officials
disregarding a surgeon's recommendation on non-medical grounds could constitute
deliberate indifference , as in this case when C.O. Ersek was instructed to turn over
the health care device to petitioner by medical staff and he refused to do so, and
then goes on to order petitioner to sign a refusal form, or he would issue a
misconduct. Delker v. Maass, 843 F. Supp. 1390, 1398, 1401 (D.Or.1994).

Has been diagnosed by a physician asmandating treatment or..... is so obvious that
even a lay person would easily recongnize the necessity for a doctors attention.
Mc Guckin v. Smith 974 F2d 1050 1059-60 (9th Cir. 1992) the existence of an injury
or condition that a reasonable doctor or patient would find important and worthy of
comment or treatment supports a finding of seriousness, Davis v. Jones 936 F2d 971,
972 (7th Cir. 1991) and Mc Guckin v. Smith.   The taking of back brace and the refusal
to re-issue it or provide back brace, based on a false claim is actionable see
Monmouth County Correctional Institution Inmates v. Langaro 834 F2d. at 347 medical
need is serious if it imposes a life long handicap or permanent loss leg shoulderback
and the C-pap and the problem it will cause from not using it, and the damage to heart
liver, brain lungs and respatory system, sore on body and the scaring of the skin
with black spots.  Condition that cause pain discomfort or threat to good health.
Like when a Nurse Burnas knowingly and intentionally with deliberate indifference
and with a wanton desire to casue pain, cut petitioner off of his med-line 1 diabetic
medication without the Dr. orders or authority to do so.  When Dr. Adamson ordered
a increase in diabetic medication on med-line 3 and at no time was this nurse
instructed to cut med-line 1 medication and when showing this nurse her error she
calimed that this is the way we do things around here and then went on to conspire
with Lt. Jordan, C.O. Learn, and Nurses Wolfgang and Ambrose to issue a misconduct

these parties exspected petitioner to use the device when their was no power for its us and the plugs were so damaged that a lay person could have seen that these sockets were not usable, and this act violated petitioner 8 th. amendment rights and ban on cruel and unusual punishment 452 U.S. at 347. Also see Hutto v. Finney. nd this was a single identifiable human need as this device to aid petitioner in breathing during sleep, in which test showed that petitioner would stop breathing 16 or morde time an hour during sleep at 16 or more seconds each time depriving his body of the required level of oxyegen and prison officials were deliberately indifferent to the seriousness of this illness that they went on to falsify the record to support their abuse 111 S.ct at 2328, and these prison official had knowledge of this area and the power being cut off in RHU and this to be unconstitutional to a person who may require this power for life support .device, Wilson 111 S.ct. at 2327and Parmer v. Brennan 114 S.ct. 1970 (1994) and this condition alone or in combination has since deprived petitioner his health care device, and has since continued to deprive petitioner his health care device, and these condition alone needed improvement, and failure to correct this problem operated to deprive petitioner of his health care for his apena. And these officals failure to act on that knowledge and remedy the situation that was depriving petitioner of his health care.

All the issues of health care are center around petitioner obtaining an outside doctor opinion of his health care problems end the manner is which treatment is being given.

If these parties were acting in the care and control of inmates they would knowingly and intentional assure a prisoners that he would get adequate health care for his illness,and these professional have a standard that all medical professional must follow, and to side step the normal realm is done and knowingly and intentionally applied a standard not consistent with policy. How long is long enough for seeking health care with one condition when you are met with levels of indifference or told their is nothing wrong with you, but these pills for pain. This is to be considered with the body sores, bakc pain and left knee and shoulder pain, apena and Hep-C, and diabetes treatment whcih petitioner needs and the said treatment.

When considering the factor petitioner has the need to see outside Dr. and to use him as an exspert witness to petitioners illness for the supporting of his calim before this court or time must be set aside in order for petitioner to obtain the medical evidence and expert witness need to show cause and claim upon which relief can be granted.

long as Dr. Breen states that their is no treatment for petitioner knee and shoulder
problem their will be know treatment forth coming even though petitioner has repeatedly
went to sick call complaining about shoulder pain and knee pain and the treatment give
is not even up to standard or code for these types of condition, and the claim that
x—rays show nothing and x—ray before show a condition and not being afforded the right
to see a specialist for these condition and the on going pain is a form of cruel
punishment.    In Boring v. Kozakiewicz 833 F2d. 468 (3d. Cir 1987) the third Circuit
resolved this matter by holding that expert testimony was necessary to show that
prisoners illnesses was serious within the meaning of Estell id at 473.    without expert
mediacl opinion the jury would not be in the postition to decide whether any of the
conditions described by petitioners could be classified as serious.    These cases make it
clear that the eighth amendment is violated when prison officials confronted with a
serious medical need, refuse to provide prisoners with adequate medical attention to the
standard of law, because a person is incarcerated does not give the officials the right
to treat this person less then or apply a standard of health care that is not consistent
with any known medical practice, and the make claim to non existent policy to support
their abuse and still go on to falsify records to make their abuses look correct and
justifiable. which raise to a level of deliberate indifference see West v. Keve.

Mandel v. Doe 888 F2d. 783 as medical assistent proscribed tylinol to address the pain
in lift knee and shoulder, which says they see something is wrong within its self and
failed to adequately treat.    The court should conclude that the record amply will show
deliberate indifference id at 787.    Whem the need for treatment is so obvious mediacl
care which is so cursory as to amount to deliberate indifference id. at 789 see also
Robinson v. Moreland 655 F2d. 887 providing a ice pack for broken hand deliberate
indifference.

Durmer v. O'Carroll 991 F2d. 64 (3rd. Cir. 1993) there a prison doctor ignored the
recommendation of a prior physician and neurologist that a prisoner who had suffered a
stroke   receive therapy.    and the failure to treat adequately is deliberate and
motivated by non medicall factors, then Durmer has a viable claim.

However that prison condition alone or in combination may deprive inmates of minimal
civilized measure of life's necessities, like when Dr. Long and M. Baker claimed that
petitioner refused to use his health care device,but the condition of the RHU. H block
at S,C.I. Smithfeild so deprived petitioner of his health care and the condition in which

The Supreme Court has interpreted the words cruel and unusual as prohibiting punishment which although not physically barbarous, involved the unnesessary and wanton infliction of pain See Gregg v. Georgia 428 U.S. 153 173 (1976) and are incompatible with the evolving standards of decency that mark the progress of a maturing society. Trop v. Dulles 356 U.S. 86 101 (1958) made applicable to the states in Robinson v. California 370 U.S. 660 (1962) the 8 th. amendment ban against cruel and unusual punishment serves as the primary source of constitutional protection for prisoners subjected to inhumane conditions of confinement.  Like the fact that petitioner is prohibited from getting regular accu-cheks for his diabetes, and the claim that the Department of Correction prohibited inmates with type 2 diabetes form having such.  This could be said to be the cause and resulting factor in which petitioner diabetes is not being controled, had he been able to monitor such daily then the condition would not have worsen abd the treating doctor would have been inform instead of a 6 month delay in attempts to control.  In as much if doctor Breen would not have cut petitioner diabetic medication in the first place without have a daliy and regular check of blood sugaR levels he would have seen that the curent medication was addressing the condition, then cut medication and the condition worsen to the point that petitioner is now taking insulin 2 time a day, at the hands of Doctor Breens professional idealism into the treatment of petitioner diabetic condition. Helling v. Mc Kinney 113 S.ct. 2475, 2480 (1993) the treatment of prisoner receives in prison and the condition under which he is confined are subject to scrunity under the eighth amendment.  And the same when petitioner was denied the use of C-Pap resproator when in RHU. on high block at S.C.I. Smithfeild the cell had no power and all the plug sockets were so damaged that they could not be used, and instead of fixing the problem, it was easier for Dr Long, and M. Baker to claim petitioner denied the use of this device.  And the same can be said about the taking of petitioner baclk brace, the manner in which his Hep-C treatment was terminated and then the condition worsen when given the treatment back, and the sores on body, and lump on left knee that is painful and swollen, and the arthritis in right shoulder with bone spurs that is painful and it hurt to move at times, and these institution refusal to adequately treat these condition and claiming of non existent policy that prohibite them from treating these condition.

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the eighth amendment, the third circuit has joined other courts in generally defining a serious medical need as one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for treatment or a doctors attention.  As

petitioner blood sugar levels have not been below 200.  Also the fact that the medical staff at this institution claim that the department of correction has a policy that prohibits inmates with type two diabetes from having regular and often Accu-cheks, which because of this practice at this institution it may and can be said the failure to adequately monitor petitioner blood sugar level could be the result for the prolong and delay in which the medical staff has taken to control this diabetes.  And a Rule 706 expert has been appointed in at least one prison medical case; Crabtree v. Collins v. 900 F2d. 79, 81 see also Smith v. Jenkins 919 F2d 90, 94.

Prison official must provide a medical staff that is competent to examine prisoners and diagnose illnesses.  It must be able to treat medical problems or refer prisoners to others who can.  Hpotowit v. Ray 682 F2d. 1237, 1253 The rending of medical service by unqualified personnel is deliberate indifference, Toussaint v. McCarthy 801 F2d 1080, 1112 as is the failure to provide access to specialist care that a particular prisoner's condition may require. Howell v. Evans, Smith v. Jenkins.

Prisons rarely provide the complete range of necessary medical service within their walls.  If a prisoner requires care that is not available in the prison, the failure to obtain it elsewhere may constitute deliberate indifference , Kaminsky v. Rosenblum 929 F2d. 922, 927; Milter v. Beorn 896, F2d. 848, 853, nor may they deny necessary outside consultation or treatment on grounds of cost. Monmouth County Correctional Inst. Inmates v. Lanzaro 834 F2d. 326, 336-37, 347; Ancata v. Prison Health Service Inc. 769 F2d 700, 704 and necessary outside appointment must be provided without delay and that is why petitioner is requesting rule 706 expert witness as institutional health care providers have proven that they will not treat petitioner condition adequately and what treatment they have offered is as if petitioner did not get  any treatment at all and petitioner must endure the pain when moving his arm and walking on left knee.

Health care  that is deliberate indifferent to serious medical need of prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the 8 th amendment. The government has a obligation to provide adequate health care based on known standards for health care.  And petitioner has claimed and alleged act of omissions sufficiently harmful to evidence of deliberate indifference to warrant this court to request an expert witness under rule 706, for petitioner serious medical needs.

If the fail to carry out their responsibilities to provide adequate medical care, Howell v. Burden 12 F3d. 190, 192-94 (11th Cir. 1994). Under the deliberate indifference standard you may seek either an injunction requiring prison officials to give proper treatment or medical care in the future, or damages for their past failure to provide proper care, Aswegan v. Bruhl 965 F2d 676, 677; Hill v. Marshall 962 F2d 1209, 1215-17 ; Mandel v. Doe 888 F2d. 783. Some courts have held that a medical need is serious if it has been daignosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor attention. Duran v. Anaya 642 F. Supp. 510, 524; Johnson v. Busbee 953 F2d. 349, 351; Mc Guckin v. Smith 974 F2d 1050 1059-60 the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness.

A more general definition of serious medical needs and we think a better one refers to conditions that cause pain, discomfort, or threat to good health. Dean v. Coughlin 623 F. Supp. 392m 404, chronic and substantial pain indicates that a medical need is serious; Boretti v. Wisconb 930 F2d 1150, 1154-55 needless pain is actionable eve if their is no permanent injury. Moreland v. Wharton, Johnson El v. Schoemehl, Parinaro v. Coughlin. The definition is consistent with the Supreme Court decisions holding that the 8 th amendment prohibits the unnecessary and wanton infliction of pain. Estelle v. Gamble 429 U.S. at 104 and many courts have cited pain in finding a medical need serious, Ellis v. Butler 890 F2d. 1001, 1003 swollen knee must be considered serious; Washington v. Dugger 860 F2d 1018 1021; West v. Keve; Kaminsky v. Rosenbush.

Courts have held and recognized that there can be serious cumulative effect from the repeated denial of care with regard to even minor needs Jones v. Evans 534 F. Supp.769, 755 n.4 .

Petitioner respectfully request that this honorable court that this court knows how painful petitioner right shoulder and left knee is from the arthritis and bone spurs, coupled with petitioners low back problem, fungus feet, sores on body, apena when waking gasping for air, petitioners liver from the Hep-C treatment and termination of this treatment that resulted in a higher virual load, and petitioner wishes to ask the court to appoint a medical expert witness under rule 706 Fed. R, Ev. as this case is serious and a investigation into petitioner complaints should be addressed and the manner in which petitioner diabetes is being treated as it is for over 6 months

PROOF OF SERVICE

I hereby certify that I Kim Smith this _10_ day of _May_, 2002 turned over to D Block Officers at S.C.I. Coal Township a envelope containing a T.R.O. aand Brief in Support of to mail by way of institutional mail process to forward to the United States Postal Service to be mailed first class to the below listed parties, and this service should satisfy the requirements of the rules of court.


Mary D'Andera
Office of The Clerk
U.S.District Court
Middle District Of Pennsylvania

James Young Esq.

William E. Fairall Jr Esq.

Kim Smith

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Kim Smith                          :

    Plaintiff                  :Civil Action No. 1:01-0817

                               :

                               :

    V.                         :(Judge Caldwell)

                               :

James Morgan, et al.,              :(Magistrate Judge Mannion)

    Defendants                 :

## VERIFICATION

I Kim Smith pro-se petitioner in this case hereby verify that the information is true and correct to the best of my knowledge, information and belief.  I knowingly make this verification according to 28 U.S.C. § 1746 relating to unsworn statements.

Kim Smith CT-2162

1 Kelley Dr.

Coal Township Pa. 17866-1021

Date   5-10-02

Ch. 93

STATE CORRECTIONAL INSTIT. AND FAC.

37 § 93.12

The provisions of this § 93.11 adopted October 22, 1971, effective October 23, 1971, 1 Pa.B. 2017; amended March 9, 1973, effective March 10, 1973, 3 Pa.B. 447; amended February 17, 1984, effective February 18, 1984, 14 Pa.B. 534. Immediately preceding text appears at serial page (10851).

### Notes of Decisions

#### Source

#### Administrative Confinement

In this civil rights action, plaintiff, inmate, did not allege denial of due process in connection with assignment to administrative confinement. In fact, the inmate indicated that a hearing was held where the inmate's rationale for returning to the general prisoner population was expressed. Plaintiff's assertion that a favorable response to the appeals was not received failed to represent that there was denial of an opportunity for appellate review. Plaintiff does not have a constitutional right to be satisfied with the decision of prison officials, made pursuant to applicable prison regulations, where the inmate must retain in administrative confinement for the inmate's own protection. Oden v. Caison, 892 F. Supp. 111 (E.D. Pa. 1995).

#### Authority

The Department of Corrections could not delegate authority to the State Police to make promises on an inmate housing assignment. The State Police were not authorized agents of the Department of Corrections. Fay v. Ryan, 818 F.Supp. 882 (1993).

#### General Comment

New prison restraint policy, which mandated behind-the-back handcuffing for all out-of-cell movements of all death-sentenced inmates, did not violate regulation, where the regulation does not address the use of restraints. Commonwealth v. Price, 705 A.2d 933 (Pa. Cmwlth. 1998).

An inmate does not have a right under the U.S. Constitution of Pennsylvania State laws or regulations to any specific custody status. Oden v. Caison, 892 F. Supp. 111 (E.D. Pa. 1995).

### § 93.12. Prison Medical Services Program.

(a) Every institution will establish procedures to permit inmates to have access to health care professionals, prescribed treatment for serious medical needs, appropriate nutrition, exercise and personal hygiene items.

(b) The following words and phrases, when used in this section, have the following meanings unless the context clearly indicates otherwise:

Department—The Department of Corrections of the Commonwealth.

Fee—The portion of the actual cost of a medical service provided to an inmate which the Department has determined shall be charged to the inmate.

Health care professional—Any physician, physician assistant, nurse, dentist, optometric professional or other person licensed to provide health care under the laws of the Commonwealth.

Inmate—A person confined to a correctional institution, motivational boot camp, community corrections center or other facility operated by the Department, its agent or contractor.

Medical service—The diagnosis, evaluation, treatment or preservation of the health of the human body, including its organs, structures and systems. The term includes diagnostic testing; prescribing and administering medication, sur-

---

Pt. III

DEPARTMENT OF CORRECTIONS

37 § 93.12

for the medical service. An inmate will not be denied access to medical services because of an inability to pay the required fee. If an inmate lacks sufficient funds to pay a medical service fee, the inmate's account will be debited and the fee recouped as soon as sufficient funds are deposited in the inmate's account.

(3) The Department may seek to recover any amount owed for medical services fees by an inmate upon release under section 5 of the Prisoner Medical Services Act (61 P.S. § 1015).

(g) An inmate who has medical insurance shall pay for his own medical needs through that insurance by submitting the proper paperwork to the insurance carrier.

(h) The Department will include an explanation of the program in the Inmate Handbook.

#### Authority

The provisions of this § 93.12 amended under section 30 of the Prison Medical Services Act (61 P.S. § 1030); and section 903-B of the Administrative Code of 1929 (71 P.S. § 310-2).

#### Source

The provisions of this § 93.12 adopted October 22, 1971, effective October 23, 1971, 1 Pa.B. 2017; amended March 9, 1973, effective March 10, 1973, 3 Pa.B. 447; amended February 17, 1984, effective February 18, 1984, 14 Pa.B. 534; amended May 29, 1998, effective 60 days after all current inmates receive written notice of the implementation of the program, 28 Pa.B. 2501. Immediately preceding text appears at serial page (211341).

### Notes of Decisions

#### Assessment

The Department of Corrections had the authority to withdraw funds for medical restitution from an inmate's account, where the inmate was found guilty of misconduct for his involvement in a fight with another inmate. Anderson v. Horn, 723 A.2d 254 (Pa. Cmwlth. 1998).

#### Constitutionality

The Prison Medical Services Act and regulations (policy bulletins) do not violate the constitutional prohibition against ex post facto laws, where neither the Act nor the regulations are penal in nature because they do not criminalize any type of conduct that was legal before their enactment nor do they deprive a criminal defendant of any defense that was available to him at the time of the alleged crime, and, even assuming arguendo that the Act and regulations could be considered penal in nature, they did not become enforceable until published and apply only prospectively, not retrospectively. Sita v. Ridge, 728 A.2d 394 (Pa. Cmwlth. 1999).

The Prison Medical Services Act and regulations do not violate the constitutional prohibition against bills of attainder, where they do not determine guilt or impose punishment on the inmates, but rather they simply require that inmates pay a small fee for the provision of certain medical services, and the $2.00 fee is imposed regardless of whether an inmate is legitimately seeking medical treatment or is abusing the prison's sick call procedure. Sita v. Ridge, 728 A.2d 394 (Pa. Cmwlth. 1999).

Copyright © 2000 Commonwealth of Pennsylvania

37 § 93.12    DEPARTMENT OF CORRECTIONS    Pt. III

gical procedures, dental care, eye care, the furnishing of prosthetics and any other type of treatment or preventative care, whether performed on an inpatient or outpatient basis.

(c) The Department will charge a fee to an inmate for any of the following:

(1) Nonemergency medical service provided to an inmate at the inmate's request.

(2) Medical service provided to the inmate as the result of a self-inflicted injury or illness, including emergency medical service provided to the inmate as the result of a self-inflicted injury or illness.

(3) Initial medication prescription except as provided in subsection (d)(2), (14), (16) and (17).

(4) Medical service provided to another inmate as a result of assaultive conduct engaged in by an inmate to be charged the fee.

(5) Medical service provided to an inmate as a result of an injury or illness arising from the inmate's participation in a sport.

(6) Medical service provided to an inmate to determine whether his physical condition is suitable for participation in a sport unless the medical service is provided as part of an inmate's initial, annual or biennial physical examination.

(d) The Department will not charge a fee to an inmate for any of the following:

(1) Physical, dental or mental health screening provided to an inmate upon intake.

(2) Immunization, tuberculosis test, Hepatitis B vaccination or other treatment initiated by the Department for public health reasons.

(3) Institution transfer screening.

(4) Annual and biennial physical and dental examination.

(5) Medical service provided to an inmate during a follow-up appointment scheduled by a health care professional employed by the Department or its contractors.

(6) Mental health treatment.

(7) Medical treatment for a chronic disease or illness.

(8) Infirmary care in a Department of Corrections facility.

(9) Hospitalization outside of a Department of Corrections facility.

(10) Long-term care to an inmate not in need of hospitalization, but whose needs are such that they can only be met on a long-term basis and who needs the care because of age, illness, disease, injury, convalescence or physical or mental infirmity.

(11) Medical referral ordered by a health care professional employed by the Department or its contractors.

(12) Medical service provided to an inmate during a medical emergency unless the medical emergency resulted from a self-inflicted injury or illness as determined by the health care professional providing the medical service.

Ch. 93    STATE CORRECTIONAL INSTIT. AND FAC.    37 § 93.12

(13) Laboratory test, electrocardiogram, dressing change or other treatment ordered by a health care professional employed by the Department or its contractors.

(14) Prenatal care.

(15) Medical service provided as a result of an injury or illness arising from an inmate's institutional work assignment.

(16) Medication prescription subsequent to the initial medication prescription provided to an inmate for the same illness or condition.

(17) Social service program including, but not limited to, substance abuse groups and counseling.

(18) Psychotropic medication.

(19) Medication prescribed for an inmate for public health reasons.

(20) Physical, dental and mental health screening performed at the request of the Department.

(21) Medical service provided to an inmate to determine whether his physical condition is suitable for an institutional work assignment.

(22) Eyeglass prescription.

(23) Dentures.

(24) Prosthetic devices excluding customized items.

(e) The fee for any medical service in subsection (c) is $2, except that an inmate is required to pay a fee equivalent to two-thirds of the total cost of medical services provided to another inmate as a result of the inmate's assaultive conduct.

(1) The fee will be assessed each time a medical service in subsection (c) is provided to an inmate.

(2) Each inmate shall receive 60 days written notice of the implementation of the Prison Medical Services Program.

(3) Each inmate shall receive written notice of any changes in medical service fees and payment procedures at least 60 days after the effective date of a regulation that modifies the fee for medical services and payment procedures.

(f) Payment for any medical service in subsection (c) shall be accomplished according to the following procedures:

(1) At the time any medical service is to be provided to an inmate, the inmate will be informed by the Department or a health care professional contracted by the Department whether a fee will be charged for the medical service and will be provided with an authorization form. The authorization form will describe the medical service to be provided and authorize the institution to deduct the fee from the inmate's account.

(2) An inmate who wishes to receive a medical service after being advised that a fee will be charged for the medical service, shall sign the authorization form acknowledging that his inmate account will be debited for the fee. A non-emergency medical service will not be provided to an inmate who refuses to sign the authorization form after having been advised that a fee will be charged

health care needs.  Medclaf v.  State of Kansas 626 F Supp. 1179, 1186, (D.kan. 1986) and access to specialist care, Howell v. Evans 922 F2d 712, 723; Smith v. Jenkins 919 F2d. 90, 93; West v. Keve 571 F2d, 158, 162.

Failure to carry out medical orders Payne v. Lynaugh 843 F2d.177,178 denial to recommendation to life saving equipment; Jones v. Evans 544 F. Supp 769, 774-76 confiscation of perscribed back brace, the failure to act on medical recommendation for surgery or other specialized care; Johnson El. v. District of Columbia 579 A2d. 163, 169, failure to take prisoner to dermatologist.

Or that extreme cases of bad judgment by medical personel constitutes deliberate indifference, treatment so grossly incompetent inadequate or excessive as to shock the conscience or inappropriate as to evidence intentional maltreatment violates the 8 th Rogers v. Evans 792 F2d. 1052, 1058 the contemporary standard and opinions of the medical profession are highly relevant in determining what constitutes deliberate indifference 931 F2d. 711, petitioner should be permitted to prove that treatment so deviated from professional standards that it amount to deliberate indifference Rosen v. Chang 811 F. Supp 754 760-01 (D.R.I. 1993) and how could petitioner prove his case when the court write that petitioner has no right to specailized treatment for his illnesses, Grossly incompetent and recklessly inadequate examination by a licensed physician may constitute deliberate indifference, or a doctor intented to inflict pain on inmate without justification and the sheer number of specific instances in which doctor denied treatment and the continue course of non treatment that the doctor knew would be painful ineffective or entailed substantial risk for serious harms to a prisoner White v. Napoleon 897 F2d. 103, 109 (3rd. Cir. 1990) Most case of this nature involved not just bad care but also very serious medical condition, often leading to death, disability or disfigurement, whether an instance of medical misdignoses resulted in deliberate indifference or negligence is a factual question requiring exploration by expert witness, suggest that district court will or may appoint an independent expert or obtain an opinion from the prisoner pre-incarceration doctors. Smith v. Jenkins: Rogers v. Evans, expert affidavit describing a prisoners medical care as severly mismanaged supported a deliberate indifference claim, petitioners description of medical care as gross negligence raise factual question for a jury Howell v. Evans 922 F2d at 722, expert affidavit stating that prison doctor deviated from established standards but not that his action were grossly inadequate or plainly wrong did not support a deliberate indifference claim vacated as settled 931 F2d. 711.

need is serious, Barite v. Wiscomb 930 F2d 1150, 1154-55 needless injury, Moreland v. Wharton 899 F2d 1168, 1170; Johnson v. Shoemehl 878 F2d 1043, 1055 and the unnecessary and wanton infliction of pain in the failure to treat back, leg, shoulder, knee, sores on body, apena based on a non-exsistent refusal when the true fact is when in RHU at S.C.I. Smithfeild their was no power to use the device, and the plug sockets were so damaged that the device could not be used, and this is the reason for the continued denial and the delay in the issue this device based on Dr. Long and M.Bakers claimed that petitioner refused such and he did not when this device could not adequately be used under the condition that petitioner was presented with for the use of this device, and at S.C.I. Coal Township this standard should not apply for the denial of the use of this device.  And subjecting petitioner to the claim of the above parties based on inadequte condition for the use of this device and making false claim that he refused several times, if that was the case why did petitioner repeatedly request his unit manager at S.C.I. Smithfeild to attempt to get petitioner the use of this device if he was refusing the use.  Standard of review in this issue should be based on whether or not plug sockets were useable at S.C.I. Smithfeild or not , not the statement of parties named in this claim.  Upon the investigation of such if it is clear that the plug sockets and the fact that their was no power in the cells at this institution support petitioners claim that Dr. Long and M. Baker knowingly and intentionally with deliberate indifference and wanton infliction of pain inflicted injury upon petitioner by the denying him the use of the C-Pap device and done so with the intent to deprive petitioner of his health care, if this was the case how could a learned medical professional expect a person to use such a device when their was no power for its use, then to go on and falsify the record and make claim that petitioner refused shows the intent to bring about an injury and then to go on after making this claim, and claim that they should not be held liable if petitioner sustained an injury based of their deprivation of health care and the knowingly and intentionally acting in a manner that was not professional and inflicting harm on a person that has since continued to this day as petitioner is still being denied this health care device based on the false claims of Dr. Long and M. Baker. Estells v. Gamble 429 U.S. at 104

Prison medical staff must complete examine and diagnose illness and treat medical problem of refer to someone who specializes in the feild and have the knowledge to address and diagnose the condition correctly.  And to put prisoner at risk for serious illness and pain by the misdignose of inadequate medical staff who is not lettered in certain health care illness, would be cruel and a clear showing of deliberate indifference to inmates

for this abuse.  This nurse left the medical department and went into the jail to find Lt. Jordan and brought him back to medical where he issued a misconduct based on petitioner would not obey his order and leave the medical building, petitioner was to have blood drawn and still did not get his diabetic morning medication and before petitioner could get his pass this nurse and other parties claimed they did not want petitioner their and at this point Lt. Jordan put his hands on petitioner and cuffed him before petitioner had a chance to get his pass and leave the medical building.  This act interferred with petitioner health care for his diabetic condition and may be the resulting factor in why petitioner diabetes and blood sugar levels are out of control and it has since worsen to the point petitioner is now taking insulin.

This also goes to the act of discrimination by Dr. Johns and Mr. Weaver when the denied petitioner placement in the night shift cook school program at S.C.I.Smithfield and refused to treat petitioner sleeping problem based on a claim that they were not obligated to treat such an illness, and that petitioner had to obtain regular sleeping hours before he would be considered for placement in this program, and that the department of correction has no reason or will treat such a sleep disorder.

Also when given Hep-C treatment at S.C.I. Smithfeild which had a 5 year delay in treating such, based on Dr. Longs, statement that the department of correction prohibited him from treating this illness, then when transferred to S.C.I. Coal Township where Dr. Kort terminated this treatment base on a non-existent policy claiming petitioner was not responding to treatment.  When record clearly showed a 30 % drop in viural load and showed petitioner was in fact responding to treatment.  After the termination of this treatment petitioner was given treatment back some 90 days after the fact and this condition worsen with ever treatment their after, that petitioner sustained an injury when Dr. Kort terminated treatment and his liver condition worsen when treatment was given back, petitioner viural load almost doubled from the first treatment and since has had liver pain and other problem.  That Dr. Kort knowingly and intentionally with deliberate indifference, and wanton infliction of harm terminated petitioner on going Hep-C treatment base on a false claim causing petitioner to suffer and injuryed petitioner to a point the condition worsen, and after treatment the viural load was 502,000, more then the 288,000 when treatment started showing the condition worsen due to the act of Dr. Kort.

Mc Guckin v, Smith 974 F2d. at 1060 chronic and substantial pain indicated that a medical

The abuse continues regarding medical treatment, as in this issue about the cyst behind left knee, were P.G. Gregory M.D reviewed ultersound and x-ray and stated that Kim Smith should do a concult with an orthopedic specialist, for the 2 adjacent cyst with some internal debris along the lateral aspect of the left popbiteal forsa in this doctor dignoses, and Dr. Breen states no treatment will be given and that their is no avaible treatment for this condition, and if I did not like what he said to sue him. The same with right shoulder, at S.C.I. Smithfeild x-rays shoowed mild erosive changes at the distol end of the clavicle at AC joint as well as a slight tublrosity of the humeral head, and this same Doctor claims no treatment will be given. Then x-ray taken at S.C.I. Coal Township months later claimed their is nothing wrong with right should H.K. Smith M.D. claims.  In which these condition would be better determined by an orthopedic specialist not Dr. Breen who is a general practicenor.   The Hep-C treatment that was terminated that resulted in the condition worsening, and the claim of the denial of the C-PaP device by Kim Smith never made and the fact that DR. Long, M. Baker and medical staff at S.C.I. Coal Township has since held it against Kim Smith because he was in the hole and their was no power in which to use this devise at S.C.I. Smithfeild, and the abuse and denial of this health care was based on practice or policy when these institutions turned all power in plug sockets in the hole off discriminated against Kim Smith and his health care when they went on to falsify record.  They even went on to state in medical record that  their was no power in these cells for the use of this device.  As Kim Smith health condition continue to worsen from the denial of the C-pap and any and all damages to his health sustained from the denial of its use to his heart, lungs, liver, brain, etc. when oxygen levels in blood stream goes low during sleep.

At present I'm being prohibited from obtaining medical record by the medical records office at S.C.I. Coal Township, with a claim the have to check with counsel for consideration of the records to be copied for Kim Smith.

### ABUSE OF POWER FIRST AMENDMENT

After C.O. Whysong called petitioner a nigger and felt petitioner had no right to go to his law library call out, petitioner called his a Fucken dick head and walked away and then this office yelled out of the bubble at petitioner.  A misconduct was issued in which petitioner was given 30 days in the hole that resulted in petitioner being in the hole 7 months and then later transferred.  Sgt Henning the went on to

claim that petitioner threaten this officer, which he did not and then petitioner was given another 60 days in the hole based on an alleged threat. When asked by counselor A. Zimmerman what my intention towards this officer was I told her I intended to sue him. Then this counselor then stated she did not believe petitioner, and continued confinement because petitioner would not go along with her, and make claims to issues that were not his intent, as if petitioner had not right to bring a claim for the abuse of the officer when requesting to go to law library for his call out.

Petitioner was in the hole for 90 days then transferred to the institutional control unit and told that staff wanted to see if I would cause any trouble if released to population. After some 53 days petitioner was placed in administrative custody pending transfer. And none of petitioners act in this institution for the 5 years he was their would reflect he had intended to harm any of the staff, A. Zimmerman claim was unfounded, and not supported by record. See. e.g. Thomas v. Review Board 450 U.S. 707, 718 (1981) and threw this act their was no reasonable relative act legitimate penalogical interest. See Turned v. Saflry 482 U.S. 78 (1987) and in the 6 years in that institution nothing was in petitioners file that would support this level and form of abuse. C.O. Whysong was encouraged by prison staff to apply self determined standard reflecting their individual prejudices and opinion id., these named prison officials failed to show that the board restriction were in any way necessary to further a governmental interest related to the suppression of expression that would result in 7 months in the hole for a name calling thing. Decision of S.C.I. Smithfeild demonstrated the restriction were broader then necessary to achieve governmental interest. Whether or not a prison regulation is reasonably related to ligitimate penological interest is determined by four factors (1) there must be a rational connection between the prison regulation and the ligitimate interest advanced to justify it (2) courts should review the availability of alternative means of exercising the asserted right. deferring to the judgment of prison official where alternative means are available (3 courts must consider the impact accommodation of the asserted right would have on prison operation (4) courts should consider the existence of easily implemented alternatives that would accommodate prisoners right at de minimis cost to the penological interest at stake id. at 89-91.

### RIGHT TO PRIVACY ABUSE OF POWER

On July 4, 2001 at about 8:00 a.m. petitioner was using tolet at which time yard

was called petitioner put up a courtesy curtain for privacy while on the tolet, a C.O. comes to petitioner door and states take down the paper.  Petitioner told him he was on the tolet and would as soon as he was done, this officer walks away and in second he's on the speaker stating take down the paper. petitioner was not done so he did not reply.  Second later a Capt. Wetlz, and C.O Patusak was at petitioners door stating take down the paper and petitioner advised them he was on the tolet and would do so when he was done, these officer could not wait till petitioner was done and opened his door and took down the paper on windows, then went on to stand in petitioner door stairing at him and disrespecting him to a point it came to a level of sexual harassment when the officer stated let me get a better look at petitioner when he was on the tolet and the period of time that they stood their with petitioner cell door open showed they had other intention other then taking the paper down.  After they took the paper down they should have left petitioner alone to do his business without being harassed by these officers, because they stood their it look as if they were sexually harassing petitioner, as what professional would want to stand in the door of a man on the tolet and disrespect him and making other statements and demanding petitioner get off the tolet right then and their.  Then issue an misconduct to justify their abuse.  The means that prison attendants can ride roughshod over inmate property rights with impunity id at 530; intentional harassment of even the most hardened criminals cannot be tolerated by a civilized society id at 528; Hudson Harassment, the eighth amendment proscription against cruel and unusual punishment when their was several other cell with paper up on windows, and the fact after they completed the act of taking the paper door they stood and dictated a standard that was not consisted with institutional policy, by the demanding inmate getup off the tolet, or standing in door while inmate was on tolet  telling him he should learn how to talk to people.  Hudson 468 U.S. at 530 .

## CORRECTIONAL DEFENDANTS

Though his right may be diminished by the needs and exigencies of the institutional environmental protection when he is imprisoned for crime.  Their is no iron curtain drawn between the Constitution and the prisons of the Country.  Wolff v. McDonnell 418 U.S. 539 555 (1974) is now established beyond doubt that prisoners have a constitutional right of access to the Courts.  Bounds v. Smith 430 U.S. 817, 821 (1977) and this does not mean that institutional staff has the ability to hinder any and all litigational efforts by inmates threw the denying the right to mail petition

in a timely manner. The state and its officers may not abridge or impair petitioners right apply to a federal court. Bound v. Smith significant expanded the right of access to the courts recognized in Hull and Johnson. Instead of merely refraining from obstructing it. It is well settled the right of access includes the right to communicate in confidence by mail with attorney's, courts, and other legal personel. Bounds also held that indigent inmates must be provided as state expense with paper and pen to draft legal documents with notacial service to authenticate them and stamps to mail them 430 U.S. at 824-825, which petitioner has been denied such with statement of insufficient funds and to do this or to get legal mail out or sent was hindered, and a hindering access to the court, to file a timely reply to the court. Gluth v. Kangas 951 F2d. at 1509 note 2; Jones v. James 38 F2d. 943.

In Layton v. Beyer 953 F2d 839 (3d Cir. 1992) regulation governing placement in the management control unit created a liberty interest entitled to due process protection. Because the regulation used mandatory language to specify predicates for confinement in the MCU an inmate has an objectively reasonable expectation that if he does not meet any of these predicates he cannot be assigned to MCU or prehearing MCU id at 846. Macky v. Dyke 29 F3d 1086 (6th Cir 1994); Toussaint v. McCarthy 801 F2d 1080 1986); Clark v. Brewer 776 F2d 226 (8th Cir 1985); Drayton v. Robinson 719 F2d 1214 (3d Cir 1983); Kulaw v. Nix 28 F3d 855 (8th Cir 1994), process challenge employed by S.C.I.Smithfeild see also Saubeer v. Poliunson 791 F2d 1094 (3d Cir. 1986) id at 1101-1102 denying a prisoner a meaningful review of his status, if periodic reviews were preformed in a perfunctory or rote fashion and thereby denied the prisoner a meaningful review.

Negligence and Malpractice that occures while in state custody, damage claim in civil rights suit against state personnel or state tort, and able to show state law tort claim under supplement jurisdiction of the federal Court. A doctor commits malpractice if she causes injury by failing to have and use the knowledge skill and care ordinarily possessed and employed members the profession in good standing W. Page Keeton et al and Keeton on the law of tort §32 at 187 (5th Cir 1984); Chamber v. Ingram 858 F2d 351, 355; Yosuf v. U.S. 642 FSupp. 415, 428 (M.D. Pa. 1986).

See Stephany v. Wagner 835 F2d 497 (3d Cir 1987) Although the prison rules under question in Stephay did list specific critera for confinement in administrative serregation 835 F2d at 500 the court held that absence of explicitly mandatory language compelled the

conclusion that no protected entitlement was at stake. To determine whether substanctive limitations were placed on discretion of prison officials to confine prisoner in sergation for nonpunitive reason. See Sandin

115 S.ct. at 2298-2299. As in the case of April 2001 misconduct in which a nurse Bernas after a Dr. Adamson increased diabetic medication on line 3, and at no time ordered diabetic medication on line one be taken, then this nurse goes into the compound and gets a Lt. Jordan and conspired with him to issue a misconduct to justify her incompedence in treating petitioner diabetic condition, and even when showed her the error she made she claims that this is the way things are done in this institution, and if I wanted to get treated sign up for sick call. After the misconduct was issued Lt. Jordan. Lt Gooler and other parties inflicted punishment and knowingly and intentionally done so with a wanton desire to inflict harm and injury when they placed petitioner in a hard cell based on a false claim that he had an attitude, or that he had a behavorial problem which none of this is supported by the tape taken during the strip search that day to support this level of abuse. These parties also went on to deny and interfer with petitioners ability to file a grievance and hinder such process until he was released from this level of abuse with no justification for this level of form of punishment for disobeying a order to leave medical, and before petitioner could do so in a timely manner Lt. Jordan put his hands on petitioner and cuffed him before petitioner could get his pass to leave, even though petitioner was to give blood for testing that day Nures Ambrose, Wolfgang, Bernas, C.O. Learn, stated that I was do wanted their and that I had not blood test.

See Wilkerson v. Utah 99 U.S. 130 (1879) in recent years however the Supreme Court has interpreted the words cruel and unusual as prohibiting punishment which, although not physically barbarous, involve the unnecessary and wanton infliction of pain See Gregg v. Georgia 428 U.S. 153 173 (1976) and are incompatible with the evolving standards of decency that mark the progress of a maturing society. Like in June of 2000 when during a strip search at S.C.I. Smithfeild after a misconduct a officer knowingly and intentionally with little regard to petitioner safety force petitioner face first into a wall causing him to lose his left upper front tooth. This act was not supported by petitioner behavior or was petitioner a threat to any one or anyones safety at the time that this use of excess force was used. Trop v. Dulles 356 U.S. 86, 101 (1958) applicable to the state in Robinson v. Calif. 370 U.S. 660 (1962) the eighth amendment's ban against cruel and unusual punishment serves as the primary source of constitutional protection for prisoners subject to inhumane conditions of confinement. See Helling v. McKinney 113 S,ct. 2475, 2480 (1993). the treatment a prisoner receives in prison and the

condition under  which he is confined are subject to scrunity under the 8th amendment.

Claiming a eighth amendment violation a petitioner must prove that they are deprived the minimal civilized measure of life's necessities Rhodes 452 U.S. at 347 such as protection and medical care See Farmer v. Brennan 114 S.ct. 1970, 1977 (1994).

As at S.C.I. Smithfield confinement and condition in RHU were sufficiently serious enough to trigger eighth amendment scrutiny, and the component which shows is a Department of Correctional Policy across the state and in all state institution that their is no power in plug sockets in the RHU's and shows sufficiently culpable state of mind on part of responsible prison officials that they had no concern if an inmate in RHU  had a need for the use of power or plug socket while in RHU for a health care devise then for the parties to justify this abuse by claiming petitioner refused the use of his device when their was no power for its use, see Wilson v.  Seiter [1] Sct. 2321, 2323 (1991) the degree of culpability however varies depending on the type of conduct challenge.  Wantonness does not have a fixed meaning but must be determined with due regard for difference in the kind of conduct against which an eighth amendment objection is lodged.  In the June 2000 issue the officer acted maliciously and sadistically for the very purpose of causing harm, (loss of front tooth) Whitley v. Albers 475 U.S. 312, 320-321 (1986), and the action to cut power in the RHU cells in all state institution is a showing of deliberate indifference, to inmate health care and the need for power in these cells.

Good faith effort to maintain or restore discipline and is not used maliciously and sadistically for the very purpose of causing harm id. at 320-321.  In determining whether prison officials acted in good faith or maliciously and sadistically depends upon such factors as : (a) the need for the application of force (b) the relationship between the need and amount of force used (c) the extent of injury inflicted (d) the extent of the threat of the safety of prison personnel and other prisoners; and (e) efforts made to lessen the severity of the use of force id. at 321.  The core judicial inquiry is whether force was applied in good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm id at 999 McMillian 112 S.ct. 955 (1992).  When force is used maliciously and sadistically to cause harm Aldape v. Lambert 34 F3d 619 (8th Cir 1994)  Prater 30 F3d. 982 (8th Cir 1994); Thomas v. Stalter 20 F3d 298 (7th Cir 1994); Gibeau v. Nellis 18 F.3d 107 (2nd Cir 1994); Flowers v. Phelps 956 F2d 488 (1992).

Whether force is used maliciously and sadistically to cause harm or is used in good faith effort to restore discipline depends on the application of the Hudson factor to each case.  The courts will examine the need for the application of force, the relationship between that need and the amount of force used, the threats facing prison officials and whether any efforts were made to temper the severity of the force applied.

In June 2000 after a misconduct hearing during strip search their was no need or reason for the officer to put his hands on petitioner and shove him face first into a wall causing him to lose left front tooth, their was no threat or reasoning for such an act other then a sadistic nature to inflict harm unjustifiable and wantonly.  Farmer that the prison official being sued had knowledge of such a risk and yet failed to take reasonable safety measure to abate it 114 S.ct. at 1980 --1984, and Lt. Simpson know or should have known that the officer who was strip searching Kim Smith on that day had a history for abusing inmates and appling unnecessary force to inmate to inflict harm or injury.

Since prison officials will be held laible under the 8 th amendment only if he knows of a substantial risk to inmate safety and disregards that risk when brought to his attention by the inmate, and fails to take reasonable measures to abate it Farmenr S.ct. at 1984.

We hold instead that prison official cannot be found liable under the 8 th amendment for denying an inmate humane condition of confinement unless the official knows of and disregards an excessive risk to inmate health safety, like no power in cells in RHU. Like complaints to Lt. Simpson about the force a officer was using unwarrantly, these official were aware of the facts from which the inference could be drawn that a substantive risk of serious harm exists, and he must also draw the inference.

Stokes v. Delcambre 710 1120 (5thCir 1983) where prison officials have knowledge of and, did not investigate or correct the defect in the power or abuse of staff 8 th amendment violation will lie.

However that prison condition alone or in combination may deprive inmate of the minimal civilized measure of llife's necessities, and thus violate the 8 th amendment's ban on cruel and unusual punishment 452 U.S. at 347,  in Hutto v. Finney the condition of confinement can constitute cruel and unusual punishment because they resulted in

unquestioned and serious deprivation of basic human needs.  Condition other than those in Gamble and Hutto, alone or in combination, may deprive inmates of minimal civilized measure of life necessities.  Like the statement of Dr. Breen in the treatment of the 2 cyst behind Kim Smith left knee, also the claim at S.C.I.S. regarding Kim Smith right shoulder, and the pain, seeing skin Dr. for sore on body,low back problem, sleep apena and the manner in which treatment was denied, and the continued denial of treatment.

Subsequent to the Rhodes decision prison condition that resulted in serious deprivation of basic human needs or which deprived inmates of the minimal civilized measure of life's necessities were held to violate the cruel and unusual punishment clause.  452 U.S. at 347.  First the prisoner must prove that the condition of confinement are objectively serious in the sense that he or she has been deprived of a single identifiable human need such as food, warmth or exercise, and power in cells is a human necessity, 111 S.CT. 2327.  Nothing so amorphous as overall condition can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists, and their is a showing of deliberate indifference to health care at S.C.I.S.  and at S.C.I.C. in both petitioner was denied adequate health care, and such denial is intolerable and product of deliberate indifference of prison official to the health care needs of inmates, and had knowledge of the unconstitutional act. See Tillery v. Owens 907 F2d 418 (3d. Cir 1990) petitioner can present sufficient evidence linking prison medical staff and condition to the deprivation of basic human needs, like the orthopedic doctor, and C-pap for sleep apena, and the denial of power in RHU cells.

Medical care and personal safety represent the core elements of the 8 th amendment. See Lea  v. Wilkinson 604 F Supp. 130 136 (M.D. Pa. 1984).

Wherefore petitioner prays that this honorable court will grant his petition and set a date for a jury trial form damages for the denial of health care and order the court under rule 706 to have petitioner seen by the require specialist as expert witness and have his health care condition adequately addressed.

RESPECTFULLY SUBMITTED

Kim Smith