IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIM SMITH,                          :
                                    :
          Plaintiff,                :
                                    : Civil No. 1:01-0817
                                    :
     v.                             : (Judge William W. Caldwell)
                                    :
JAMES MORGAN, et al.,               : (Magistrate Judge Malachy E. Mannion)
                                    :
          Defendants.               :  Electronic Case Filing

## THE CORRECTIONS DEFENDANTS'
## STATEMENT OF MATERIAL FACTS

The Corrections Defendants, by and through their undersigned attorney and in accordance with Local Rule 56.1 of the United States District Court for the Middle District of Pennsylvania, hereby set forth the following statement of material facts believed not in dispute between the parties:

**Plaintiff Kim Smith:**

1.    Plaintiff Kim Smith ("Smith") was born in October 1956 at the Sharon Monessen Hospital, Pennsylvania.  At the time of this action was filed, he was 47 years old.  (Deposition of Kim Smith dated May 17, 2002 ("Smith Deposition"), p. 9, attached to the Corrections Defendants Supporting

Documents to Their Motion for Summary Judgment ("Supporting Documents"), Volume I, Exhibit C).

2.     Smith is a high school graduate, with some college education, possessing certificates for accounting, air conditioning, refrigeration, tutoring, and counseling. (Smith Deposition at pp. 9-10; Plaintiff's Response to the Corrections Defendants' Interrogatories, Response 1, p.4, attached to the Supporting Documents, Volume II, Exhibit D).

3.     In 1988, Smith was convicted of three counts of possession of heroin with intent to deliver and sentenced to eleven and one half (11 ½) to twenty-three (23) months and one year probation; however, through aggregation, Smith began serving this Allegheny County sentence at the State Correctional Institution at Smithfield ("SCI-Smithfield") located in Huntingdon County, Pennsylvania. (Smith Deposition, p. 12.).

4.     Smith served this sentence from 1988 until 1990 when he was paroled. (Smith Deposition, p.12).

5.     Smith is currently serving a 1994 eight (8) to twenty (20) year Third Degree Murder conviction imposed in Allegheny County, with a minimum sentence date of May 15, 2002, and a maximum sentence date of May 5, 2014. (Smith Deposition, p.13).

6.    Smith has also been convicted of armed robbery and burglary.  (Smith Deposition, p. 15).

7.    Smith's litigation experience includes filing a habeas corpus action in the Allegheny County Court of Common Pleas, a Habeas Corpus action in the United States District Court for the Middle District of Pennsylvania, and two (2) Mandamus actions in the Commonwealth Court of Pennsylvania.  (Smith Deposition, p. 19; Plaintiff's Response to the Corrections Defendants' Interrogatories, Response 2, p.5).

8.    Smith does not posses medical training as a nurse, physician's assistant, or physician.  (Plaintiff's Response to the Corrections Defendants' Interrogatories, Response 1, p.4).

9.    Smith does not have an expert witness to testify on his behalf regarding his medical claims in this matter.  (Plaintiff's Response to the Corrections Defendants' Interrogatories, Responses 11 and 12, pp. 14 and 15).

**Overview of DOC Health Care Services:**

10.    The DOC has a constitutional duty in its delivery of health care to provide inmates with access to care, care that is ordered, and professional medical judgment.  The DOC is committed to providing quality health care consistent with community standards.  (Unsworn Declaration of Dr. Berel B.

Arrow ("Dr. Arrow Declaration") p.4, ¶18, attached to the Supporting

Documents, Volume II, Exhibit B).

11.    Efficient and effective health care is delivered to inmates under the care,

custody, and control, of the DOC through quality improvement processes,

administrative supervision of contract medical vendors, comprehensive

policies and procedures, adequate staffing, preventive and specialty services,

dental services, chronic care clinics, and infection control.  (Dr. Arrow

Declaration, pp. 4,5, ¶19).

12.    The DOC contracts medical services for its twenty-five (25) institutions.

Contracted medical services reduces the Department's fiscal liability

because costs are set at a constant daily rate per inmate regardless of the

level of care needed.  Additionally, a private contractor has greater ease and

flexibility to recruit competent clinical staff, and is able to negotiate large

discounts with hospitals and vendors, resulting in reduced costs to the

contractor.  (Dr. Arrow Declaration, p.5, ¶20).

13.    The DOC closely monitors the contracted vendors to ensure that the care

provided is consistent with community standards.  (Dr. Arrow Declaration,

p.5, ¶21 (citing Quality Improvement Policy Statement 13.1.3, dated June

30, 1995, attached thereto as Exhibit F; see also Quality Improvement

Bulletin 13.1.3-1, attached thereto as Exhibit G)).

14.    Inmates are routinely provided access to physicians that rival if not excel

access provided to a non-incarcerated inmate.  For example, in fiscal year

2000, there were 277,102 inmate doctors visits, with 180,444 of these visits

initiated by the inmate through normal sick call procedures, with the

remaining 96,658 visits initiated by DOC staff.  (Dr. Arrow Declaration, pp.

5,6, ¶22).

15.    Inmates are also given preventive health care with physical examination

given to inmates when they are first incarcerated, and the comprehensive

medical examinations annually for inmates of fifty (50) years, and bi-

annually for inmates under fifty years old.  (Dr. Arrow Declaration, p.6,

¶23).

16.    The DOC also uses "telemedicine" practices using modern technology

primarily for psychiatric, dermatology, and infectious disease consultations

with outside physicians while the inmate remains safely incarcerated.  (Dr.

Arrow Declaration, p. 6, ¶24).

17.    In the area of disease management, inmates are tested for HIV/AIDs, given

annual tuberculosis tests, and are screened for the Hepatitis C virus.  As of

early 2002, all inmates in the DOC have been screened for the Hepatitis C

virus, with new inmates receiving the Hepatitis C test at the beginning of

their incarceration.  (Dr. Arrow Declaration, p.6, ¶25).

18.    Each year about thirty thousand (30,000) Americans contract Hepatitis C which is a frequent cause of chronic liver disease.  As many as four (4) million people are believed to be infected with Hepatitis C.  Nationally, about ten thousand (10,000) people will die from the Hepatitis C virus, with that number expected to triple by 2010.  In 2001, seventeen percent (17%) of the DOC's one-hundred twenty four (124) inmate deaths were related to complications for Hepatitis C.  (Dr. Arrow Declaration, pp. 6,7, ¶26).

19.    In the Pennsylvania DOC, about twenty-three percent (23%) of the inmate population (approximately 37,000) are Hepatitis C positive.  This percentage is comparable to the incidence rate in other state prison systems throughout the nation: Virginia (39%); Maryland (38%); California (35%); and Massachusetts (31%).  (Dr. Arrow Declaration, p.7, ¶27).

20.    The cost of one time treatment, which may slow down the progress of the virus, is between six-thousand ($6,000) and twelve thousand dollars ($12,000) per inmate.  However, the costs to treat liver failure are approximately fifty-thousand ($50,000) to two hundred and fifty thousand ($250,000) per inmate.  (Dr. Arrow Declaration, p.7, ¶28).

21.    Currently in the Pennsylvania DOC, about one thousand two hundred (1,200) inmates are at some stage in the Hepatitis C treatment at an annual

cost to taxpayers of approximately $8.7 million dollars.  (Dr. Arrow Declaration, p.7, ¶29).

## Overview of the Department of Corrections Grievance System

22.　The Department of Corrections ("Department") has a Consolidated Inmate Grievance Review System.  (Unsworn Declaration of Tshanna Kyler dated March 3, 2003 ("Kyler Declaration"), pp. 1-2, attached to the Supporting Documents, Volume I, Exhibit A).

23.　The Grievance Policy provides an administrative procedure through which inmates can seek resolution of problems. (Kyler Declaration, ¶3.).

24.　If informal resolution fails, the Grievance Policy provides a three-step process for resolution of inmate grievances; the initial grievance, the appeal to the Superintendent, and the final appeal to Central Office.  (Kyler Declaration, ¶4.)

25.　The Department's Inmate Handbook provides prisoners with notice of the Grievance Policy, and the requirements they must meet in grieving their issues through the Grievance Policy.  (Kyler Declaration, ¶5).

26.　Records of inmate grievances are made at or near the time of the occurrence of the matters at issue by people with knowledge of those matters.  (Kyler Declaration, ¶8).

27.    Further, the grievance records are maintained in the course of regularly

conducted business activities in accordance with the Department's

Grievance Policy.  (Id.)

28.    As stated below, *infra* ¶29 to ¶114, the Secretary's Office of Grievance

Appeals has records of grievances involving Plaintiff Kim Smith's claims.

(Kyler Declaration, pp. 3-6)

**Smith's Medical Treatment Grievances:**

**A.    Specialist and C-Pap Device (Grievance No. SMI-0030-00):**

29.    At issue in this grievance were Smith's request to be seen by a specialist for

his diabetes condition, and his request for a C-Pap device for his sleep

apnea.  (Kyler Declaration, p. 3, Exhibit 3-18)

30.    Smith was informed, "all requests for a specialist must be first approved by

the Medical Director through Utilization Review.  Just because a patient has

requested to be seen by a specialist does not make it happen.  There must be

documented medical necessity in order for a specialist to be approved."

(Kyler Declaration, p.3, Exhibit 3-17).

31.    Smith was also informed that his request for a C-Pap machine was addressed

in a previous grievance.  (Id.)

32.    Smith appealed the decision to Superintendent of SCI-Smithfield, Defendant

James M. Morgan who in affirming the above-noted response stated, in part,

that "[m]edical decisions must be reviewed by our medical director and then there is a utilization review process. This is the same process any citizen with a HMO has to go through in order to receive care . . ." (Kyler Declaration, p.3, Exhibit 3-15).

33.  The Secretary's Office of Grievance Appeals affirmed the decision with its final review decision date of March 14, 2000. (Kyler Declaration, p.3, Exhibit 3-1.)

**B.  C-Pap Device (Grievance No. SMI-0005-00):**

34.  Smith filed this grievance on January 12, 2000, questioning the length of time related to the C-Pap machine. (Kyler Declaration, p. 6, Exhibit 23-17).

35.  Defendant Corrections Health Care Administrator Weaver responded to Smith's Grievance noting a meeting he had with him on February 1, 2000 in which they "discussed the security concerns of the C-Pap and went over special instructions that have been agreed upon between Major Norris and myself. You indicated no major concerns with the special instructions; therefore, the C-Pap machine should be issued to you later this week.' (Kyler Declaration, p.6, Exhibit 23-17).

36.  Smith appealed the decision to Superintendent Morgan who sustained the Grievance Officer's Response on February 10, 2000 (Kyler Declaration, p. 6, Exhibit 23-13).

37. Smith appealed the decision to the Department's Chief Hearing Examiner who, on March 14, 2000, sustained the decisions of both the Grievance Officer and Superintendent Morgan. (Kyler Declaration, p. 6, Exhibit 23-1).

**C.    C-Pap Device (Grievance No. SMI-0032-01):**

38. At issue in this grievance was Smith's claim that he was improperly denied use of a C-Pap device. (Kyler Declaration, p. 3, Exhibit 4-10).

39. Defendant George Weaver responded to Smith's grievance. (Kyler Declaration, p.3, Exhibit 4-8).

40. Defendant Weaver stated that when Smith was placed in the Restricted Housing Unit at SCI-Smithfield, the medical staff observed that Smith had a sufficient length of electrical cord on the device to plug it into the electrical socket and use the device. (Id.)

41. Further, Defendant Weaver stated that Smith chose not to utilize the device for several months. and upon order of Dr. Long, Smith's treating physician, it was determined that the C-Pap device was not necessary for Smith's condition. (Id.)

42. Smith failed to follow the procedural steps in the Department's Grievance Policy, and accordingly, the grievance was not properly appealed for purposes of final review to the Secretary's Office of Inmate Grievances and Appeals. (Kyler Declaration, p.3, Exhibit 4-1).

**D.    Back-Support Device, Eye Treatment, Headaches, Arthritis, Bone Spurs, C-Pap Device, and Knee Sleeve (Grievance Nos. COA-0071, 0072-01):**

43.    Smith failed to follow the procedural steps in the Department's Grievance Policy, and accordingly, the grievance was not properly appealed for purposes of final review to the Secretary's Office of Inmate Grievances and Appeals.  (Kyler Declaration, p.3, Exhibit 5-1).

**E.    Diabetes Condition (Grievance No. COA-0282-01):**

44.    At issue in this grievance was Smith's claim that he was improperly denied adequate health care regarding his "accu-checks" for type 2 diabetes.  (Kyler Declaration, p.4, Exhibits 6-5 to 6-7).

45.    Smith admits that a physician examined him on this date for his diabetes condition.  (Id.)

46.    In response to this grievance, by Defendant Corrections Health Care Administrator Sewell, it was noted "[o]n 4-4-01, [he was] seen by Dr. McGlaughlin, who review [his] medical records with [him] at length and answered all of [his] questions.  Your diabetes is monitored often with doctor visits, nurse visits, extensive lab tests and a therapeutic diet order."  (Id.)

47.    Defendant Superintendent of the State Correctional Institution at Coal Township ("SCI-Coal Township") Frank Gillis, affirmed CHCA Sewell's

11

response to this grievance on May 4, 2001.  (Kyler Declaration, p.4, Exhibit 6-4).

48.  Smith failed to follow the procedural steps in the Department's Grievance Policy, and accordingly, the grievance was not properly appealed for purposes of final review to the Secretary's Office of Inmate Grievances and Appeals.  (Kyler Declaration, p.4, Exhibit 6-1).

**F.   Pain in Liver, Abdomen, Back Pain, Stiffness in legs, Sores on Arms, Wrist, Bone Spur, Fungus on Feet, and C-Pap Device (Grievance No. COA-161-01):**

49.  In response to this grievance, by Defendant Corrections Health Care Administrator Sewell, it was noted "[a]fter careful review of your medical records, I found that you became very angry and refused to see the Physician's Assistant when he asked you to limit your complaints.  He did not refuse to see you, nor did he refuse to address your most important problem.  It is clearly reflected in your medical records that you refused to be examined by this Physician's Assistant.  If you are still concerned or affected by your illness, you must follow DOC protocol, namely, sign up for Sick Call and be cooperative during your examination."  (Kyler Declaration, p 4, Exhibit 7-10).

50.  Smith properly appealed the decision of Defendant Sewell to Superintendent Gillis who informed Smith "[t]he matter concerning the possible

continuation of your treatment for Hepatitis C infection is presently being assessed by the Bureau of Health Care Services.  As soon as a determination is made, you will be advised of the results."  Further, Superintendent Gillis informed Smith "[t]he Corrections Health Care Administrator has been directed to closely monitor your progress with medical treatments in order to assure your medical needs are met."  (Kyler Declaration, p. 4, Exhibit 7-6).

51. The Secretary's Office of Grievance Appeals affirmed the decision with the final review date of June 19, 2001.  (Kyler Declaration, p.4, Exhibit 7-1.)

**G.    Pain in Liver (Hepatitis C), C-Pap, Back, Shoulder, and Left Knee (Grievance Nos. COA-0062-01 and 0108-01):**

52. Defendant Corrections Health Care Administrator Sewell, in responding to Smith's grievances, noted that his "hepatitis treatment was discontinued because his blood tests did not meet DOC criteria for the treatment to be continued, namely, a 50% reduction in your virus concentration with treatment.  Your virus concentration only dropped 30%."  (Kyler Declaration, p. 4, Exhibit 8-11).

53. Further, Smith was informed that it was "well documented in your chart that while at Smithfield you refused C-Pap on multiple occasions and that treatment was discontinued before your transfer."  (Id.)

54. Smith was informed that "[y]our x-rays of your back are normal and most certainly a back-brace is not indicated.  By your own words you stated, 'that

I will blow my back out while lifting weights.' Therefore this activity will not be permitted. It is well documented that you did not complain of any shoulder problem." (Id.)

55. Defendant Sewell noted from Smith's grievance that his "left knee, as a ward of the state, (sic.) certain medical device should be provided" but neglected to state his specific problem, and there was no documentation that he requested a medical device or complained of a left knee problem. (Id.)

56. Similarly, although Smith complained in the grievance of nerve damage to his right eye, Defendant Sewell stated that there was no documentation that he asked Dr. Kort or signed up for sick call concerning this problem." (Id.)

57. Smith appealed Defendant Sewell's response to Superintendent Gillis, who while noting the procedural problems with Smith's appeal was confusing; he nevertheless reviewed Smith's issues and upheld the response of Defendant Sewell. (Kyler Declaration, p.4, Exhibit 8-7).

58. Smith then appealed Superintendent Gillis' affirmation of the grievance reply to the Secretary's Office of Inmate Grievances and Appeals, who informed him by letter dated June 7, 2001, the issues raised in his grievance would be reviewed by someone in the Department's Bureau of Health Care Services. (Kyler Declaration, p.4, Exhibit 8-4).

59.    On August 7, 2001, after review by the Department's Bureau of Health Care Services, the Secretary's Office of Inmate Grievances and Appeals affirmed the decision of the grievance officer for purposes of final review. (Kyler Declaration, p.4, Exhibit 8-1).

## H.    Diabetes Condition (Grievance Nos. COA-0342-01 and COA 0269-01)):

60.    In responding to Smith's claim that he was receiving improper medical care for his diabetes condition, Defendant Sewell noted that on April 11, 2001 he was examined by Dr. Sioma, who ordered "AccuChecks" for Smith on April 13th and April 20th, and a fasting blood sugar test for April 17, the same day he had an appointment to be seen and examined by another physician." (Kyler Declaration, p.4, Exhibit 9-7).

61.    Defendant Sewell also noted that based on Smith's "established history of excellent blood sugar control . . ." the Medical Director did not feel that it was necessary to perform an AccuCheck everyday as Smith requested in the past, and was in line with the policy practiced in the community. (Id.).

62.    Defendant Sewell also informed Smith that she examined his commissary list and noticed that on March 28, 2001, Smith purchased nacho chips, cheese curls, regular potato chips, candy bars and many other high calories foods. (Id.)

63.    Accordingly, Defendant Sewell cautioned Smith that, as he was previously

educated, this type of diet would elevate his blood sugar, cautioning him that

managing a normal blood sugar requires a team effort with the patient being

very important part of the team.  (Id.)

64.    Smith appealed the decision to Superintendent Gillis who, on April 23,

2001, affirmed the response of Defendant Sewell.  (Kyler Declaration, p.4,

Exhibit 9-5).

65.    Smith appealed the Superintendent's decision to final review, which on

August 15, 2001, affirmed the decisions of the Superintendent and

Grievance Officer.  (Kyler Declaration, p. 4, Exhibit 9-1).

**I.    C-Pap Device (Grievance Nos. COA-1087):**

66.    In responding to Smith's August 4, 2001 grievance, Defendant Sewell stated

in her response "[o]n 8-2-01, you were seen by Dr. McGlaughlin and at that

time, the C-Pap Machine was discussed.  An extensive review of your

medical records was done and it notes, (inmate signed refusal to use C-pap

and was non-compliant)."  (Kyler Declaration, p. 4, Exhibit 10-7),

67.    Further, Defendant Sewell stated "[o]n 7-25-01, Dr. McGlaughlin responded

to a written request written by you to him on 7-24-01.  His response to you

at the time was, Review of your chart and it is noted that you had not used

the C-Pap for nearly one year, while incarcerated at Smithfield.  Several

signed refusals by you were found in your records regarding the C-Pap on 2-4-00 and 6-16-00.  Dr. Long clearly documented on 1-5-01 to discontinue C-Pap, patient has been non-compliant and obviously does <u>not</u> need this machine.  There is no clinical or symptomatic evidence of your need for C-Pap."  (Kyler Declaration, p.4, Exhibit 10-7)(emphasis in original).

68.   Smith appealed the decision to Superintendent Gillis who affirmed the response on August 24, 2001.  (Kyler Declaration, p. 4, Exhibit 10-9).

69.   Smith again appealed the decision of Superintendent Gillis to final review, at which time the Secretary's Office of Inmate Grievances and Appeals affirmed to decision on September 26, 2001.  (Kyler Declaration, p. 4, Exhibit 10-1),

## J.      Refusal to Permit Smith to Sick Call (Grievance No. COA-1121):

70.   Smith claims that on August 7, 2001, he was denied access to the infirmary for a surgery consultation and upon arriving an unnamed corrections officer refused to open the door for him.  (Kyler Declaration, p.4, Exhibit 11-16).

71.   Smith claims that the CO was knowingly and intentionally refusing him into the infirmary, and thus, interfering with Smith's health care.  (<u>Id</u>.).

72.   Smith appealed the decisions of the Grievance Officer and Superintendent Gillis to the Secretary's Office of Inmate Grievances and Appeals, which upon further investigation found that in Smith's Medical Progress Notes a

notation that on August 7, 2001, that Smith refused a direct order from the Corrections Officer in the waiting area and that Smith was rescheduled for the next month. (Kyler Declaration, p.4, Exhibit 11-5).

73.    Smith's health condition was not jeopardized in this incident. (Id.)

**K.    C-Pap Device (Grievance No. COA-0626-01):**

74.    In responding to Smith's Grievance, Defendant Sewell informed him that "after careful review of your medical chart and after speaking with Dr. McGlaughlin . . . : On 8-2-01, you were seen by Dr. McGlaughlin and at that time, the C-Pap Machine was discussed. An extensive review of your medical records was done and it notes, (inmate signed refusal to use C-Pap and was non-compliant). (Kyler Declaration, p.4, Exhibit 12-11).

75.    Defendant Sewell also reinterrated her response to Smith's grievance number COA-1087, *supra* ¶¶ 66, 67. (Id.)

76.    Defendant Gillis affirmed the response of Defendant Sewell, and Smith appealed the decisions to the Secretary's office of Grievances and Appeals, which affirmed the decisions on April 23, 2002. (Kyler Declaration, p.4, Exhibit 12-1).

**L.    Lump Behind Left Knee (Grievance No. COA-15086):**

77.    In responding to Smith's grievance, Defendant Sewell noted the following, "[o]n 12-10-01, you complained of a cyst on the back of your left knee. The

18

Physician Assistant, Don Miller, diagnosed your cyst as a "Baker's Cyst" and referred you to see the Medical Director.  You saw Dr. Breen on 12-17-01, at which time an x-ray, (ultrasound) of your left knee was ordered.  The x-ray was completed on 12-20-01 and the results were normal.  The ultrasound results showed 'two small cysts along the lateral aspect of the left popiteal fossa."  Dr. Moyer, surgical consultant, saw you on 1-8-02 and documented that you have a "Baker's Cyst."  (Kyler Declaration, p.4, Exhibit 13-12).

78.    Defendant Sewell also stated "Dr. Breen then determined that surgery for these cysts would be an elective procedure.  A knee sleeve was issued to your for additional knee support.  Analgesic medication and cream are supplied to you for your multiple pain areas."  (Id.)

79.    Defendant Sewell concluded the response noting, "not receiving what you requested and when you demand it, is not deliberate indifference and malpractice.  The M.D., who has years of experience and training, determines your medical needs."  (Id.)

80.    On April 10, 2002, Superintendent Gillis affirmed the response of CHCA Sewell.  (Kyler Declaration, p.4, Exhibit 13-8).

81.    Smith appealed the decision to the Secretary's Office of Inmate Grievances and Appeals, which by letter dated July 24, 2002, referred the matter to the

Department's Bureau of Health Care Services for review.  (Kyler

Declaration, p. 4, Exhibits 13-3 and 13-4).

82.    On July 29, 2002, Dr. Berel B. Arrow, D.O. responded to the Secretary's

Office noting that "Dr. Moyer, Surgical Consultant, saw inmate Kim Smith,

CT 2162, on 1/8/02, and documented that he has a 'Baker's Cysts.'  Surgery

is not usually required for a 'Baker's cyst.'  The inmate is receiving

appropriate care."  (Kyler Declaration, p.4, Exhibit 13-2).

83.    Accordingly, on August 7, 2002, the Secretary's Office of Inmate

Grievances and Appeals affirmed the decisions of Defendants Gillis and

Sewell.  (Kyler Declaration, p.4, Exhibit 13-1).

**M.    Diabetes (Grievance No. COA-0342-01):**

84.    In responding to Smith's Grievance, Defendant Sewell stated "[a]fter careful

review of your medical chart and after speaking with Dr. McGlaughlin and

the nurses you have named here this morning, (4-30-01), please allow me to

share . . . [that] [o]n 4-17-01, Dr. Adamson spoke with you at length

regarding your diabetes and you were satisfied with this discussion.  Today,

4-30-01, Dr. McGlaughlin saw you in the RHU.  He has started you on

another medication.  You will have fasting Accucheck in one week."  (Kyler

Declaration, p. 4, Exhibit 14-5).

85. Defendant Sewell concluded by stating "the Medical Department Staff here at SCI-Coal-Township, have no intention of mistreating anyone. You are being treated appropriately and we will continue to take care of your medical needs." (Id.)

86. Defendant Superintendent Gillis affirmed Defendant Sewell's response on May 4, 2001. (Kyler Declaration, p. 4, Exhibit 14-4).

87. Smith appealed the decision to the Secretary's Office of Inmate Grievances and Appeals, which by letter dated August 15, 2001, affirmed the decision. (Kyler Declaration, p.4, Exhibit 14-1).

## Smith's Cruel and Unusual Punishment Grievance

88. On June 4, 2001, Smith filed Grievance COA-0486-01, inquiring why he was placed in a "hard cell" from April 18, 2001 until June 4, 2001. Smith also took issue with this grievance regarding why six (6) previous grievances were not replied to on this issue. (Kyler Declaration, p.5, Exhibit 15-11).

89. On June 19, 2001, Defendant Kandis Dascani responded to Smith's grievance noting "[y]our placement in a hard cell was due to your behavior. If you wanted specific information on your placement, you had the opportunity to address your questions to the Program Review Committee during your review with them." (Kyler Declaration, p.5, Exhibit 15-10).

90.    Defendant Dascani also informed Smith that the reason he did not get a reply to his six (6) grievances was because, after checking the records, this was the first grievance Defendant Dascani received from Smith in this matter. Finally, Defendant Dascani informed Smith that since he was no longer housed in the RHU, the grievance was moot.  (Id.)

91.    Smith appealed the decision to Superintendent Gillis, who on July 9, 2001, informed Smith that in the interest of fairness, he was waiving the time requirements for consideration of the appeal in this matter.  (Kyler Declaration, p.5, Exhibit 15-8).

92.    Further, Defendant Gillis informed Smith that he reviewed the record in that matter, and was sustaining the response of Defendant Dascani.  (Id.)

93.    Smith then appealed to the Secretary's Office of Inmate Grievances and Appeal, who affirmed the decisions of the Grievance Officer and Superintendent Gillis stating "[y]our placement in the hard cell was due to a misconduct received on April 18, 2001 (0875160-Refusing to Obey an Order).  Your negative behavior placed you in this situation.  Staff's decision is deemed as being in accordance with Department policy."  (Kyler Declaration, p. 5, Exhibit 15-1.)

**Smith's Property Claims:**

**A.    Medical Co-pay (Grievance SMI-418-98):**

94.    Smith challenged the Department's assessment of his inmate account
relating to a co-pay for medical services with Grievance SMI-418-98.
(Kyler Declaration, p.5, Exhibit 18-11).

95.    Defendant Burks, in responding to the Grievance stated "[o]n October 13,
1998, Dr. Long has scheduled you for MD line to discuss both this problem
and the perceived problem of medical co-pay.  However, you left the
Medical Department at 0940 without being seen.  At 1015 hours, you were
called back to medical and you refused to sign a release of responsibility,
and again left medical without being seen.  Since you were offered an
opportunity to talk with the Medical Director and would not stay to do it, I
find no merit in your grievance."  (Kyler Declaration, p.5, Exhibit 18-10).

96.    Smith appealed the decision to Defendant Superintendent Morgan who, after
investigating the matter further, sustained the response of the Grievance
Officer.  (Kyler Declaration, p. 5, Exhibits 18-6 to 18-9).

97. Smith appealed to the Department's Office of Chief Hearing Examiner who reviewed the record and sustained the Superintendent and Grievance Officer's decision. (Kyler Declaration, p.5, Exhibit 18-1).

**B.    Medical Co-pay (Grievance SMI-504-98):**

98. Smith took issue with his November 15, 1998 sick call visit that indicated he went to the Medical Department for follow-up care on a boil and was then improperly charged a two-dollar ($2.00) co-pay fee. (Kyler Declaration, p.5, Exhibit 19-10).

99. Defendant Burks, in responding to the grievance, stated "[a] review of your medical record revealed that the visit of November 16, 1998 was not for the "boil" mentioned in the grievance. This was a new order written for A&D Ointment to be applied to the feet. This was the $2.00 charge. I find no merit in your grievance." (Kyler Declaration, p.5, Exhibit 19-10).

100. Smith appealed the decision to Defendant Superintendent Morgan who, on January 12, 1999, affirmed the decision of the Grievance Officer noting that "[m]edical staff advise me that the condition for which you sought treatment does not meet the condition of a chronic case; therefore, the $2 charge was imposed. I agree with their interpretation, and your grievance is denied." (Kyler Declaration, p. 5, Exhibit 19-6).

101.  Smith appealed the decision to the Department's Office of Chief Hearing
      Examiner, who on February 2, 1999, affirmed the decision of the Grievance
      Officer and Superintendent.  (Kyler Declaration, p.5, Exhibit 19-1).

**C.    Medical Co-pay (Grievance SMI-0029-00):**

102.  On January 24, 2000, Smith filed this grievance claiming that Defendant
      Corrections Health Care Administrator George Weaver failed to properly
      assess the co-pay policy regarding Smith.  (Kyler Declaration, p.5, Exhibits
      20-8, 20-9).

103.  Defendant Burks, in responding to the Grievance, noted that on February 1,
      2000, Smith and Defendant CHCA Weaver met in his Office to discuss the
      co-pay issue.  Specifically, Defendant Burks wrote, "I explained to you that
      the policy does have some gray areas.  This was understandable due to the
      vast amount of information in the medical field.  When the policy was
      enacted, questions surfaced and Dr. Lewis, the Medical Director at Central
      Office, issued a decree that the final determination of chronic versus non-
      chronic rests solely with the medical professionals on site.  There was a time
      that some refunds were permitted to the inmate population through my desk.
      As time went on, I found it wise to include a committee to make such
      decisions.  I explained to you that the committee meets on a regular basis to

discuss co-pay issues and to look at each case separately.  We are now several years into the co-pay policy, and it is true that I made a decision not to review cases that were more than 60 days old.  In the past, you have received some refunds.  Administratively, I am not going to review the entire medical scenario since the start of co-pay.  If it was not an issue earlier, it is not an issue now.  I discussed my reasoning for this and you appeared to understand." (Kyler Declaration, p.5, Exhibit 20-8).

104.    Smith appealed the decision to Superintendent Morgan on February 10, 2000, who affirmed the decision of the Grievance Officer adding that it was Smith's responsibility to bring the matter to staff's attention earlier, since he too received a copy of the policy and was aware of the deductions in 1998. (Kyler Declaration, p.5, Exhibit 20-6).

105.    Smith appealed the decision to the Department's Chief Hearing Examiner, who on March 14, 2000, affirmed the decisions of the Grievance Officer and Superintendent.  (Kyler Declaration, p.5, Exhibit 20-1).

**D.    Lack of Cable Television (Grievance COA-0250-01):**

106.    On March 26, 2001, Smith filed this grievance seeking a refund for allegedly not having cable from February 28, 2001 until March 6, 2001, although Smith was charged for the service.  (Kyler Declaration, p. 5, Exhibit 21-5).

107.    Defendant William Voeckler, the Business Manager at SCI-Coal Township, responded to Smith's grievance on March 26, 2001, seeking more information from Smith as to when the problem was reported.  (Kyler Declaration, p.5, Exhibit 21-4).

108.    Smith appealed the response to Superintendent Gillis, who on May 3, 2001, responded by noting "I do not have enough information before me, in terms of the overall investigation, to evaluate your request for appeal to this level. Therefore, I am remanding the grievance back to the initial review for further investigation so that the issues raised by you at your initial grievance may be properly addressed."  (Kyler Declaration, p.5, Exhibit 21-3).

109.    However, on May 9, 2001, Smith appealed the Superintendent's decision to remand the matter to the Secretary's Office of Inmate Grievances and Appeals, who by letter notified him on May 16, 2001 that his appeal was incomplete, and therefore, was procedurally dismissed.  (Kyler Declaration, p.5, Exhibit 21-1).

**E.    Denial of Night Shift Employment (Grievances SMI-0005-00, SMI 0029-00, and SMI 0030-00):**

110.    Smith, on January 12, 2000, grieved the issue of his denial for night shift employment at the SCI-Smithfield bakeshop.  (Kyler Declaration, p.6, Exhibits 23-17 to 23-19).

111.   Grievance Officer Weaver wrote the following in responding to this
       Grievance,"[o]n 2/1/00, I called you to my office for an interview and
       discussed the rationale of my decision on the vote sheet related to night time
       employment.  At this time, you discussed your goals of obtaining the 3,000
       hour certificate for food service and obtaining your air conditioning
       certification before you leave the Department of Corrections.  I indicated
       that I would support your educational efforts and discuss the health concerns
       with the supervisors involved, but will not change my decision."  (Kyler
       Declaration, p.6, Exhibit 23-17).

112.   Smith appealed Defendant Weaver's decision to Superintendent Morgan,
       who on February 10, 2000, upheld the decision.  Specifically,
       Superintendent Morgan wrote, "[t]his is in response to the above-mentioned
       grievance wherein you contend that you were unfairly denied employment
       on the nightshift in the bakeshop because the Medical Department would not
       clear you . . . . I support Mr. Weaver in this matter.  Determinations to
       medically clear inmates for employment are solely within the purview of the
       Medical Department, and I will not overrule them on this matter."  (Kyler
       Declaration, p.6, Exhibit 23-13).

113.   The Department's Chief Hearing Examiner, by decision dated March 14, 2000, affirmed the Grievance Officer and Superintendent Morgan's decisions.  (Kyler Declaration, p.6, Exhibit 23-1).

**Smith's Place of Confinement Grievances**

114.   Smith filed a grievances SMI-413-00 and SMI 417-00 sometime prior to December 13, 2000; however, neither grievance made it to the final review stage of the administrative process as evidenced by the December 13, 2000 letter from the Secretary's Office of Inmate Grievances and Appeals noting procedural defects.  (Kyler Declaration, p.6, Exhibits 26-1 and 27-1)

**Overview of the Department of Corrections Misconduct System:**

115.   The Department's Administrative Directive, DC-ADM 801, establishes among other things, the procedure inmates must adhere to when appealing misconduct related disciplinary proceedings.  (Declaration of Robert S. Bitner ("Bitner Declaration"), p.1, ¶3, and Exhibits 1-1 to 1-22, attached to the Corrections Defendants Supporting Documents to Their Motion for Summary Judgment ("Supporting Documents"), Volume II, Exhibit E).

116.   The Department of Correction, Office of Chief hearing Examiner reviews records of inmate misconduct proceedings for the purpose of ensuring that the inmates subjected to the misconduct sanctions are afforded a fair and impartial disciplinary proceeding.  (Bitner Declaration, p. 2, ¶4).

117.   The Chief Hearing Examiner is also responsible for processing and maintaining computer records and hard copies of all appeals to final review of misconduct decisions to his Office.  (Bitner Declaration, p.2, ¶5).

118.   Records of inmate misconducts are made at or near the time of the occurrence of the matters at issue by people with knowledge of those matters.  (Bitner Declaration, p. 2, ¶6).

119.   Further, the misconduct records are maintained in the course of regularly conducted business activities in accordance with the Department's Grievance Policy.  (Id.)

120.   As stated below, *infra* ¶121 to ¶130, the Office of Chief Hearing Examiner has records of misconducts involving Plaintiff Kim Smith's claims.  (Id. at pp. 2, 3)

## Illegal Use of Mail Misconduct (743907):

121.   On July 7, 1997, Smith was given a misconduct for theft by unlawful taking and unauthorized use of the mail by placing another inmates name and number on the envelope.  (Bitner Declaration, p. 3, Exhibit 2-29).

122.   On July 18, 1997, Smith was plead guilty of unauthorized use of mail charge and received a thirty day (30) sanction of confinement in the Restricted Housing Unit.  (Bitner Declaration, p. 3, Exhibit 2-30).

123.    Smith appealed the decision to the SCI-Smithfield Program Review

Committee, that found on July 24, 1997, since Smith plead guilty, he could

not challenge the sufficiency of the evidence and procedural issues on

appeal. (Bitner Declaration, p.3, Exhibit 2-32).

124.    Further, the Program Review Committee found that the 30-day sanction was

within the presumptive ranger for the infraction; accordingly, the PRC

sustained the hearing Examiner's decision. (Id.)

125.    Smith appealed the decision to the Department's Central Office that

affirmed the decision of the Program Review Committee. (Bitner

Declaration, p. 3, Exhibit 2-11).

**Refusing to Obey and Order and Presence in an Unauthorized Area
    Misconduct (973478)**:

126.    On February 3, 2000, Smith was issued Misconduct 973478 for refusing to

obey a direct order from Defendant Correction Officer Ersek to go to the

medical department and sign a refusal slip for the a.m. nurse line. (Bitner

Declaration, p. 3, Exhibit 3-14).

127.    The Hearing Examiner, on February 8, 2000, found Smith guilty of failing to

obey an order, while dismissing the presence in an unauthorized area charge,

and sanctioned him to thirty (30) days cell rest. (Bitner Declaration, p.3,

Exhibits 3-16 and 3-17).

128.    On February 15, 2000, the Program Review Committee sustained the decision of the Hearing Examiner.  (Bitner Declaration, p. 3, Exhibit 3-20).

129.    Smith appealed the decision to Superintendent Morgan, who on February 22, 2000, sustained the decisions of the Hearing Examiner and Program Review Committee.  (Bitner Declaration, p.3, Exhibit 3-8).

130.    Smith appealed the decision to the Department Chief Hearing Examiner, who on March 24, 2000, sustain the decisions of the Hearing Examiner, Program Review Committee and Superintendent Morgan.  (Bitner Declaration, p.3, Exhibit 3-1).

**Department of Corrections Defendants:**

    **A.    Defendant George Weaver:**

131.    Defendant George Weaver is the Corrections Health Care Administrator ("CHCA") at SCI-Smithfield.  (Smith Deposition, p.20, attached to the Supporting Documents, Volume I, Exhibit C).

132.    Smith's claims that Defendant Weaver improperly took his C-Pap device away from him.  (Smith Deposition, p.43; Amended Complaint (doc. 20), p.2, 5).

133.    Smith admits that he saw numerous physicians for his various medical conditions and the claims as they relate to Defendant Weaver.  (Smith Deposition, pp. 43-45).

134.  Smith claims that Defendant Weaver discriminated against him regarding

Smith's job placement because of his insomnia condition.  (Amended

Complaint (doc. 20), p.2)

135.  Smith claims that Defendant Weaver falsified medical records surrounding

Smith's refusal to be treated with the C-Pap device.  (Amended Complaint

(doc. 20), pp. 2,3).

136.  Defendant Weaver is also accused of improperly following the Department

of Correction's policy for medical co-payment.  (Amended Complaint (doc.

20), p.3).

**B.    Defendant Kathryn Allen:**

137.  Defendant Kathryn P. Allen, in January and February 1999, was employed

at SCI-Smithfield as a Registered Nurse Supervisor for the evening shift.

(Smith Deposition, p.20, attached to the Supporting Documents, Volume I,

Exhibit C)

138.  Smith claims that Defendant Nurse Allen, "with deliberate indifference,

knowingly and intentionally denied [him] gauze wrap for a leaky fissure that

was removed from [his] anus."  (Id.; see also Amended Complaint (doc 20,

pp. 4,8)).

139.    Smith also claims that he was subjected to sexual harassment by having to show his anus in the infirmary rather than being allowed to dress his own wound in his cell.  (Smith Deposition, pp. 22, 23).

140.    Sometime in early 2000, Smith was taken to the J.C. Blair hospital in Huntingdon, Pennsylvania, for an operation on his anus.  (Smithy Deposition, p.21).

141.    Smith admits that Defendant Nurse Allen provided him with gauze for two weeks and allowed him to dress his wound himself. (Id.)

142.    Smith does not deny that he received medical treatment for this condition; instead, he takes issue with the determination that the gauze was considered a security problem.  (Id.)

143.    Smith admits that he was examined by a physician for this condition because three times a day he had to lay on a table so that the would could be dressed by medical staff.  (Id.).

144.    Defendant Allen is also accused of improperly follow the Department of Correction's policy for medical co-payment.  (Amended Complaint (doc. 20), p.3).

### C.    Defendant Patricia Yarger:

145.    Defendant Patricia Yarger was the Corrections Health Care Administrator at the State Correctional Institution at Huntingdon ("SCI-Huntingdon") during the relevant time period of Smith's Amended Complaint.

146.    Defendant Yarger is accused of improperly follow the Department of Correction's policy for medical co-payment.  (Amended Complaint (doc. 20), p.3).

### D.    Defendant James M. Morgan:

147.    Defendant Superintendent James M. Morgan was the Superintendent of SCI-Smithfield while Smith was incarcerated therein.  (Smith Deposition, p. 36).

148.    Smith's claims against Defendant Morgan are that he failed to train Defendants Burks, Weaver, Dr. Long, C.O. Ersek, Captain Glenny, and Angela Zimmerman in the Administration of Health Care.  (Smith Deposition, pp. 36, 37; Amended Complaint (doc. 20, p.1).

149.    Smith admits that Defendant Morgan's involvement was through the Department's grievance process.  (Smith Deposition, p. 41).

150.    Defendant Morgan is also accused of improperly follow the Department of Correction's policy for medical co-payment.  (Amended Complaint (doc. 20), p.3).

151.    Smith alleges that Defendant Morgan improperly supported the abuse of him because he affirmed all appeals.  (Amended Complaint (doc. 20), p. 5).

152.    Smith accuses Defendant Morgan of having a policy that prohibited him from obtaining an accu-check on his blood sugar for Smith's diabetes condition.  (Amended Complaint (doc. 20), p. 6).

**E.    Defendant Sharon Burks:**

153.    Defendant Sharon Burks was the Superintendent's Assistant and Grievance Coordinator at SCI-Smithfield while Smith was incarcerated therein.  (Smith Deposition, p. 22, 23, and 28).

154.    Smith's claims against Defendant Burks are that she stated non-existent policies to him and refused to let him see all the DOC policies that he requested.  (Smith Deposition, pp. 23-25).

155.    Smith's claims that Defendant Burks "knowingly, intentionally with deliberate indifference denied medical care and other treatments . . . [b]ased on her opinion and being employed for the DOC."  (Smith Deposition, p. 27.)

156.    Smith admits that Defendant Burks did not provide hand on treatment to him in a medical capacity.  (Id.)

157.   Defendant Burks is also accused of improperly follow the Department of

Correction's policy for medical co-payment.  (Amended Complaint (doc.

20), p.3).

**F.     Defendant Robyn Johns:**

158.   Defendant Robyn Johns, Ph.D., was the Chief Psychologist at SCI-

Smithfield while Smith was incarcerated therein.

159.   Smith claims the Defendant Johns discriminated against him by

recommending that Smith obtain regular sleep hours before he be placed in a

cooking school.  (Smith Deposition, p. 33).

160.   Smith claims that Defendant John's supported the abuse of him and the

taking of his C-Pap respirator.  (Amended Complaint (doc. 20), pp. 2,4).

**G.     Defendant Hazel Zimmerman:**

161.   Defendant Hazel Zimmerman was employed at SCI-Smithfield as a

Registered Nurse Supervisor while Smith was incarcerated therein.

162.   Smith accuses Defendant Hazel Zimmerman of improperly taking his money

for medical co-pays in violation of Department of Correction's policy since

he had a "chronic condition"  (Amended Complaint (doc. 20), p.3).

163.   Smith claims that Defendant Zimmerman improperly took away his C-Pap

device.  (Amended Complaint (Doc. 20) p. 5).

### H.    Defendant Frank Gillis:

164.    Defendant Frank Gillis is the Superintendent at the State Correctional

Institution at Coal Township ("SCI-Coal Township") where Smith is

presently incarcerated.  (Smith Deposition, p. 50).

165.    Smith's claims against Superintendent Gillis are that he "supports abuse of

his administration" through his involvement in the grievance process.  (Id.;

Amended Complaint (doc. 20), p.1).

### I.    Defendant Harry E. Ersek:

166.    Defendant Harry E. Ersek, III, was a Corrections Officer I when Smith was

incarcerated at SCI-Smithfield.  (Smith Deposition, p. 28).

167.    Smith claims that Defendant Ersek refused to give him his C-Pap device.

(Smith Deposition, p. 30; Amended Complaint (doc. 20), p.5).

168.    Smith claims that Defendant Ersek improperly issued an institution

misconduct to him because Smith failed to obey an order.  (Amended

Complaint (doc. 20), p. 5).

### J.    Defendant Gerald Whysong:

169.    Defendant Gerald W. Whysong, was a Corrections Officer I when Smith

was incarcerated at SCI-Smithfield.  (Smith Deposition, p. 41).

170.    Smith's claims against Defendant Whysong "conspired and forged a note,

stuck it on the C-Pap device claiming that George weaver put a note on the

device telling them not to issue it . . . ."  (Smith Deposition, p.42; Amended Complaint (doc. 20), p.5).

171.  In June 2000, Defendant Whysong gave Smith an institutional misconduct that resulted in Smith being placed in the Restricted Housing Unit ("RHU") for thirty (30) days.  (Amended Complaint (doc. 20), p.5).

### K.    Defendant Nancy Ambrose:

172.  Defendant Nancy Ambrose is a Registered Nurse at SCI-Coal Township where Smith is presently incarcerated.  (Smith's Deposition, pp. 53-54).

173.  Smith accuses Defendant Ambrose of having a policy that prohibited him from obtaining an accu-check on his blood sugar for Smith's diabetes condition.  (Amended Complaint (doc. 20), p. 6).

174.  Smith admits that he saw Dr. Adamson on April 17, 2001 regarding his diabetes.  (Smith Deposition, p.54).

175.  Smith accuses Defendant Ambrose of conspiring to deprive him of his right to health care on April 18, 2001.  (Amended Complaint (doc. 20), pp. 6,7).

176.  Smith admits that he only missed his diabetes medication in the morning of April 17, 2001 because Defendant Ambrose did not give it to him.  (Smith Deposition, p.57).

**L.    Defendant Lynn Wolfgang:**

177.    Defendant Lynn Wolfgang is a Registered Nurse at SCI-Coal Township where Smith is presently incarcerated.  (Smith Deposition, p. 67).

178.    Smith accuses Defendant Wolfgang of having a policy that prohibited him from obtaining an accu-check on his blood sugar for Smith's diabetes condition.  (Amended Complaint (doc. 20), p. 6).

179.    Smith accuses Defendant Wolfgang of conspiring to deprive him of his right to health care on April 18, 2001.  (Amended Complaint (doc. 20), pp. 6,7).

**M.    Defendant Mary K. Bernas:**

180.    Defendant Mary K. Bernas is a Registered Nurse at SCI-Coal Township where Smith is presently incarcerated.

181.    Smith accuses Defendant Bernas of having a policy that prohibited him from obtaining an accu-check on his blood sugar for Smith's diabetes condition. (Amended Complaint (doc. 20), p. 6).

182.    Smith accuses Defendant Bernas of knowingly and intentionally not giving him his medication on April 18, 2001.  (Amended Complaint (doc. 20), pp. 6,7).

**N.    Defendant Timothy Jordan:**

183.    Defendant Timothy Jordan is a Lieutenant at SCI-Coal Township where Smith is presently incarcerated.  (Smith Deposition, pp. 62, 63).

184. Defendant Lt. Jordan is accused of ordering Smith out of the infirmary when Smith was attempting to solve his medication issues. (Amended Complaint, (doc. 20), p. 7).

185. Defendant Lt. Jordan is also accused on falsifying reports claiming that Smith was a behavior problem. (Smith Deposition, p. 63).

186. Smith accuses Defendant Lt. Jordan of improperly placing him in a "hard cell" in retaliation for Smith exercising his First Amendment rights. (Amended Complaint (doc. 20), p.7).

**O.    Defendant John Learn:**

187. Defendant John Learn is a Corrections Officer I at SCI-Coal Township where Smith is presently incarcerated. (Smith Deposition, p. 59).

188. Smith accuses Defendant Learn of conspiring to deprive him of his right to health care on April 18, 2001. (Amended Complaint (doc. 20), pp. 6,7; Smith Deposition, p.60).

**P.    Defendant Wilma Sewell:**

189. Defendant Wilma J. Sewell is the Corrections Health Care Administrator at SCI-Coal Township where Smith is presently incarcerated. (Smith Deposition, p. 59).

190.  Smith accuses Defendant Sewell of having a policy that prohibited him from obtaining an accu-check on his blood sugar for Smith's diabetes condition. (Amended Complaint (doc. 20), p. 6).

### Q.     Defendant Angela Zimmerman:

191.  Defendant Angela Zimmerman is a Corrections Counselor II at SCI-Coal Township where Smith is presently incarcerated.

192.  Smith accuses Defendant Angela Zimmerman of improperly keeping him in the RHU based on improper institution misconduct.  (Amended Complaint (doc. 20), p.6).

### R.     Defendant Kandis Dascani:

193.  Defendant Kandis Dascani is the Assistant to the Superintendent and Grievance Coordinator at SCI-Coal Township where Smith is presently incarcerated.

194.  Smith accuses Defendant Dascani of improperly determining that he was not entitled to idle pay.  (Amended Complaint (doc. 20), p.7).

### S.     Defendant Voeckler:

195.  Defendant Voeckler is the Business Manager at SCI-Coal Township where Smith is presently incarcerated.  (Smith Deposition, p. 65).

196.  Smith accuses Defendant Voeckler of improperly assessing his inmate account relating to this Court's filing fee.  (Smith Deposition, p. 65).

Respectfully submitted,
Office of General Counsel


BY:     s/ John J. Talaber
Assistant Counsel
Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
Phone (717) 731-0444
Fax     (717) 975 2217
Jtalaber@state.pa.us
PA 83279

Dated:  April 21, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

KIM SMITH,                          :
                                    :
    Plaintiff,                  :
                                    :  No. 1:01-0817
                                    :
    v.                          : (Judge William W. Caldwell)
                                    :
JAMES MORGAN, et al.,               : (Magistrate Judge Malachy E. Mannion)
                                    :
    Defendants.                 :  Electronic Case Filing

## PROOF OF SERVICE

The undersigned hereby certifies that the Corrections Defendants' Statement

of Material Facts was served upon the person(s) in the manner indicated below.

Service by first-class mail
addressed as follows:                    Service by Electronic Case Filing:

Kim Smith (CT-2162)                      James D. Young, Esquire
SCI-Coal Township                        on April 21, 2003
1 Kelley Drive
Coal Township, PA 17866-1020
on April 22, 2003


                                         s/ John J. Talaber
                                         John J. Talaber
                                         Assistant Counsel

PA Department of Corrections
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:  April 21, 2003