IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kim Smith | :Civil Action No. 1:01-0817 |
| Plaintiff | : |
| | :(Judge William W. Caldwell) |
| v. | : |
| | :(Magistrate Judge Malachy E. Mannion) |
| James Morgan et, al., | : |
| Defendants | : |

FILED
SCRANTON

JUN 06 2003

PER _____
DEPUTY CLERK

## OBJECTION TO THE CORRECTION DEFENDANT MOTION FOR SUMMARY JUDGMENT
## FOR ACCESS TO THE COURT, AND DUE PROCESS
## CUREL AND UNUSUAL PUNISHMENT, AND EXCESSIVE FORCE
## AND EIGHTH AMENDMENT DELIBERATE INDIFFERENCE RELATING TO MEDICAL TREATMENT

AND NOW, comes Kim Smith a lay person not lettered in legal matters and without the aid of counsel prays this honorable court apply a less stringent standard to plaintiff's pro-se pleading and objection to the correction defendants motion for summary judgment, plaintiff avers the following:

1.    The Correction Defendants are practicing unconstitutional policy by the termination of power in the cells in RHU. That they knew of this condition and failed to abate it or correct the condition, depriving inmates housed in the RHU of minimal civilized measures of lifes necessities, such as power, in which to plug a devise if needed.  That they had knownlege of this unconstitutional condition yet failed to take any reasonable action to correct it, or abate those condition, and to this date this condition has not been addressed.  As plug sockets in RHU on F-2 are still so damaged that if a person was in need of use for power he had no place to plug in for its use.  Deliberate indifference to serious health need which require power in which to plug the devise.

2.    Access to Court Edward Mason denied plaintiff's legal mail from leaving the institution. So another inmate addressed an envelope to send legal mail to the attorney generals office for reason of filing and all parties must be informed of all filings. In this letter plaintiff informed this attorney generals office that Edward Mason was denying his legal mail from leaving the institution. The inmate in question used his free postage to send out plaintiff legal mail, the attorney generals office contacted Edward Mason and informed him of this action, in which they conspired to deprive plaintiff his access to court and issued a misconduct claiming that plaintiff used another inmates free postage. Since plaintiff did not sign this inmates name how could it be said that plaintiff used another inmates postage. An inmate should be able to request the help of another inmate in legal matters and if that inmate chooses to use his free postage to help an inmate in legal matters then the inmate he is helping should not be punished. Plaintiff was given 30 days in the whole. Had it not been for Edward Mason acts plaintiff would not have had to request the help of other inmates to get his legal mail out of the institution. They fact that the attorney generals office contacted the jail is a showing that they conspired to deprive plaintiff access to the court, and for plaintiff obtain access to the court by the means that were avaiable to him he was punished for this act, and given 30 days in the whole. Cruel and Unusual Punishment, denial of access to the court, due process violation, as it is plaintiff had an institutional job, and by due process and standards of law an inmate account can be placed in the red for legal postage, and Edward Mason went out of his way to deprive and deny plaintiff access to the court.

3.    July 4, 2001 while plaintiff was on the tolet he put up a curtesy curtain for privacy while on the tolet, plaintiff was instructed to take such down, he advised the officer that he was on tolet and would as soon as he was done. Second later a Lt. Wetlz and C.O. Putazak were at plaintiff's door ordering him to take down this curtesy curtain, plaintiff advised them that he was still on the tolet they open plaintiff's door and took down the paper or curtain then Lt. Weltz stood in plaintiff's door yelling at him that he needs to learn how to respect correction officers, and that he should learn how to talk to people. Plaintiff was still on the tolet and his door was wide open and this office stood their for a great amount of time looking at plaintiff while he was on the tolet. Them C.O. Putuzak states let me get a better look, due to the period of time these officers stood in plaintiff door after they took down the curtain, it appeared that plaintiff was knowingly and

intentionally being sexually harrassed by these two officers, in a private moment while on the tolet.

4.      When Lt. Jorden conspired with Nurse Burnas to justify the unconstitutional cutting of plaintiff diabetic medication, without doctors orders to do so.  That Lt. Jordon, Nurses Burnas, Wolfgang, Ambrose knowingly and intentionally support the abuse of Nurse Burnas when she took it upon her self to alter and cut medication without doctors orders to do so.  That at no time did doctor direct this nurse to cut plaintiff's medication on line one, doctor ordered the increase of this medication on med-line 3, and no cut in medication was directed at med-line 1.   That Nurse Burnas in her official, personal, and administrative capacity acting on her own and then in listed the help of other medical staff to inflict pain, and the denial of proscribed medication, claiming that this is the way things are done here.  That a call came into medical inmate down in mess hall and two nurse and a wheel chair went to get this person, then Nurse Burnas takes another wheel chair to go get the same inmate.  When she returns she has Lt. Jordon with her telling him see I told you, but never telling him the nature and reason for plaintiff's complaints and her action of cutting plaintiff's diabetic medication without authority.  Upon requesting to talk to Lt. Jordon about this issue he states he was busy, then tell plaintiff to leave medical, plaintiff attempted to get his pass to leave, and explain to Lt. Jordon that he was to do labs, but before plaintiff could get his pass Lt. Jordon put the hand cuffs, on plaintiff and issued a misconduct claiming plaintiff disobeyed his order.  Plaintiff showed Nurse Burnas in the doctors log book that at no time was she ever directed to cut medication on med-line 1 and that the doctor never ordered such action, then she claims this leave of abuse is the way things are done around here.  Plaintiff was taken to the hole and then place in a hard cell based on a claim that plaintiff had a attitude that was why he was place in a hard cell, but from plaintiff action and what was on tape would not support this form and level of abuse.  Having a bad attitude is something that takes place in these places and staff does not have the authority to punish a person because his attitude.  Last I heard having an attitude was not a punishable offense in state institution.  When considering plaintiff blood sugar was running high and the reason for increase in medication was to control it and to have his medication cut when their was no doctors orders to do such, and showing the nurse her error and she refused to correct it then goes and conspire with a number of staff to support her abuse, goes right to a level of cruel punishment.  This denial of plaintiff's prescribed medication put him at risk for serious diabetic related condition.  Lt. Gooler, and RHU counselor supported this abuse as well as the punishment, and the

Warden, and the Department of Correction, supported this abuse of punishment for an
non-existent attitude, and record does not support this punishment that they place on
petitioner while he was in the hole for the 45 days because Nurse Burnas cut plaintiff's
diabetic medication without doctors orders to do so, depriveing plaintiff of his
perscribed medication and to conspire with other to support this level of abuse is an
8 th. amendment violation, and it was cruel to punish plaintiff, when doctors orders
supported his claim that the doctor never ordered that plaintiff medication on med-line
one be cut.  Then the fact that plaintiff was placed in a hard cell based on an attitude,
does not support this abuse as their is nothing on tape to support the claim of Lt.'s
Jordon, and Gooler, and RHU counselor, and Ms. Dascani and Warden Gillis, and the
Department of Correction supported this level of cruel punishment and abuse, when
plaintiff's ehavior did not support this action by staff.

5.      When K. Allen denied plaintiff dressing for his open wound on his but, claiming
that it was a security issue.  If that was the case then plaintiff would have never been
issued this dressing in the first place.  That plaintiff was afforded the right to dress
his wound for 2 weeks then this dressing became a security issue supported by Captain
Glesny, this claimed policy place plaintiff at risk for serious illnesses and infection
as for 4 days plaintiff had to dress this open wound with tolet paper, as he was not
afforded the doctor ordered dressing.  Plaintiff filed a grievance, and Ms Sharon Burks
reply to such was that no doctor ordered dressing for this wound, supporting the abuse
of nurse Allen,  and Optian Glenny.  When their is no D.OC. policy that state a dressing
for open wounds are a security issue, the department of correction supported this abuse.
Soon their after plaintiff had to return to medical and show his but to medical staff
so that they could dress it.  Since plaintiff was permitted to dress this wound for the
first 2 weeks after the operation why all of a sudden was this dressing now a security
issue, in fact if it was a security issue then plaintiff should have never been given
such in the first place.  Moreover the operating doctor instructed plaintiff that he
would have drainage and would have to dress this wound, so Ms. Burks claim is a denial
of doctors orders and treatment, as at all times the doctors who treated plaintiff always
ordered that this wound be dressed.

6.      Plaintiff was transfered to county jail for pending case before he left the
institution he placed a request to have his cable cut off, as he was going out a writ
and had no idea when he would be returned.  Then plaintiff was informed of a policy while
out on writ that prohibited him from having his cable cut off.  But this policy was not

part of the contract he signed for cable, and the fact that he was not in the institution for that month and requested his cable cut off, they denied this request and charge plaintiff a month cable fee when he was not in the institution, and even after he requested it to be turned off. Mr. Mason, Ms. Judlocki, Ms. Burks, Warden Morgan, and the department of correction supported this abuse and the taking of plaintiff's money for a cable service he requested to be turned off, and that he did not get and was not in the institution at that time.

7.    C.O. Ersek in the denial of plaintiff's health care and interferring with prescribed medical treatment. That after he was directed by medical staff to turn over to plaintiff the C-Pap devise and return plaintiff to medical with it, this office took it upon him self to deny plaintiff his health care devise, then went on to threaten plaintiff and order him to return to medical and sign a medical refusal form. As it is plaintiff was not refusing medical treatment but being denied his medical treatment by this officer, who was with holding his health care devise. To support this abuse C.O. Whysong, and C.O. Ersek conspired and place a sign on the devise that stated not to issue. Upon investigation George Weaver Medical Staff stated that their was no sign on the devise, that he was the one that took it to the block to let officer get used to seeing it. At no time did he place a sign on the devise claiming not to issue. As it is C.O.'s Whysong, Ersek knowingly and intentionally denied plaintiff his health care with the wanton desire to inflict pain and injure plaintiff. The department of correction supported the abuse of these two officers. C.O. Whysong, went as far as signing an affidavit to the affect that their was a sign on the devise, and the person who delivered the devise to the block said their was not. More over after being directed by the medical department to turn this devise over to plaintiff this officer still refused to do such and as long as he was with holding plaintiff's health care devise he had no legal standing to direct plaintiff to sign a refusal form. Nor did he have the authority to issue a misconduct because plaintiff refused to sign a refusal form, plaintiff was punished by the act of this officer and placed on cell restriction by Mr. Norris, level of abuse and deliberate indifference by institutional staff, and the punishment issued to plaintiff is a showing of 8 th. amendment violation.

8.    C.O. Whysong knowingly and intentionally denied plaintiff his access to law library when plaintiff requested to go to his call out at law library, this officer states he felt plaintiff was not entitled to go, and stated nigger you have no right, plaintiff walked away calling this officer a fucking dick head, and then this officer

starts yelling out the bubble at plaintiff, and plaintiff told him what he thought of this officer, for calling him a nigger, and telling him he felt he had no right to go to his call out to the law library. A misconduct was issued and plaintiff was given 30 days in the hole. While in the hole Sgt. Henning claimed that plaintiff treaten this officer, which plaintiff did not, plaintiff did state that this officer had not messed with the right one, that he intended to do nothing to this officer but file paper work against him, for this act and the act with him and C.O. Ersek when they conspire to deny plaintiff his health care, by placing on plaintiff's C-PaP devised a note that stated Mr. Weaver C.H.C.A. said for these officers not to issue the devise. Nonetheless plaintiff was given another 60 days in the hole, by Mr. Norris. After hearing June 2000 during strip search plaintiff was subjected to the abuse of officers while dressing that every time plaintiff tried to put on his shoes an officer would push plaintiff causing him to hit his face and teeth on the wall this took place several times, and the resulted factor was plaintiff lost his let front tooth. This repeated act caused plaintiff to crack the root of his capped tooth and caused it to come out. Then after a number of visits to the dentist the root tip was taken out at which time the dentist stated the Dr. Long ordered her not to give any pain medication. Even though plaintiff had a hole in his gums that require 3 stiches to close the hole, and plaintiff was not given any medication for this pain. After serving 90 days plaintiff was place on AC status, then transfered to the control unit, with an explaination, that staff wanted to see how plaintiff would act if released to population. In the 5 years in this institution plaintiff never reflected a behavior that would make staff fear him, or a cause for this abuse. While on the control unit Ms. Angela Zimmerman asked plaintiff what his intentions were toward the officers, and plaintiff explained to her that he intended to file a civil action against them, then Ms. Zimmerman goes on to inflict more punishment, by claiming plaintiff would not co-operate with her, and placed plaintiff back in the hole on AC status, for another 60 days pending transfer. After plaintiff served his 90 days DC time Ms. Zimmerman, and staff at S.C.I. Smithfeild was not justified in the continued confinement of plaintiff, and their is no supported reason or action by plaintiff to support this level of abuse. It is plaintiff right to not co-operate with staff and not be punished for such, it is also his right to bring a civil action against those who may have injuried or violated his rights, and not be punished for such. This 7 month confinement in the hole and transfer is unsupported by record, and the foundation of the 8 th. amendment violation and cruel punishment, and such punishment is unfounded for a name calling thing, and Ms. Zimmerman acts were of the abusive nature set to deprive plaintiff from bringing his claim for wrongs done

him and the violation of his continued confindment in the hole.  As this counselor knew
or she should have known that while in the hole plaintiff would not get his perscribed
treatment, and that in the cell in the hole their was no power in which to use the
devise for this reason Angela Zimmimerman was part of the continued deprivation and
denial of health care.

9.     Business officer Edward Mason knowingly and intentionally denied plaintiff access
to the court, by failing to place plaintiff's account in the red for $ .35 for postage.
That this officer repeatedly denied plaintiff's legal mail to be sent to the attorney
generals office to meet a court file date.  Plaintiff was authorized by another inmate
that he could use one of his envelopes to send out his legal mail.  This inmate signed
his name and addressed the envelope.  Plaintiff informed the party the reason his legal
mail was coming to his office in this manner was that Edward Mason was denying plaintiff
access to the courts, and knowingly and intentionally doing so.  That it is D.O.C.
policy that an inmate can go $ 10.00 in the red for legal postage ever month, and
plaintiff's account was not in the red at this time, and their is no justification for
the denial of legal mail being sent out.  The attorney generals office and Mr. Mason
conspired to issue a misconduct and place plaintiff in the hole for 30 days, when in
fact Mr. Mason is the one that created this problem and denied plaintiff access to the
court.  Plaintiff did not use unauthorized mail, as inmate was aiding plaintiff in his
litigation, and sent out plaintiff's legal mail for him, and for this act plaintiff
should not be punished.  It took an affrimative by these parties set to deprive injury,
hinder, and oppress plaintiff in his litigational efforts, by the denial to mail out
legal mail.

10.    Ms. Sharon Burks supported these acts and knowingly and intentionally deprive
plaintiff of his due process rights, and should be held liable for the subordinate acts
of department of correction staff in their administration of their official duties, and
the failure to train can be said to be the cause and reason and nature of injury
sustained.  That she knew or should have known that officer Ersek should have been
trained to ahear to the request of medical staff and not take it upon himself to deprive
a inmate perscribed health care.  The same with C.O. Whysong, when inmates request to
go to their call outs or law library should not be subjected to this officers personal
opinion or determination and abridgement of inmates rights to law library, cause he felt
an inmate had no right to law library.  Failure to train this officer in his duties can
be said to be the cause and reason for injury sustaind.

## Dr. Berel B. Arrow

In his declaration on Hepatitis C and D.O.C. protocol does not address the issue in which Dr. Kort terminated Kim Smith's treatment in January 2001, or what D.O.C. protocol supports this termination. In his protocol it is stated that an inmate will get treatment for 90 days, and upon evaluation at the end of 90 days the termination would be made if this inmate is responding to treatment. Moreover most treatment is to last 6 months before any adequate development could be determined. When Kim Smith was given treatment Sept. 24, 2000 his viral load was 288,000, and when Dr. Kort terminated this treatment the viral load was 202,000 showing Kim Smith was responding to treatment, and their was no cause or supportive policy that would support this termination. That based on this false claim and a non-existent D.O.C. protocol Kim Smith was denied perscribe health care by Dr. Kort. This act was knowingly and intentionally done with a wanton desire to inflict pain, and with a malicious intent. The drop in viral load shows a significant response to this treatment. In or around June of 2001 after filing a grievance this treatment was reinstated, as their was no D.O.C. policy to support this termination, or the acts of Dr. Kort. When treatment was given back Kim Smith sustained a injury to his liver as this condition worsen from the treatment. At no time was Kim Smith advised that this treatment would make the condition worsen if treated properly. As it is the viral load jumped form 202,000 to 528,000, in less then 90 days. Hard treatment not been affected by Dr. Kort, Kim Smith stood a full chance to total recovery of this illness, instead he sustained a injury as this condition worsen from this treatment of the treatment that he was given at S.C.I. Coal Township.

Moreover the first step in treating hepatitis C was interferon, not interferon and ribavirin. And since Kim Smith viral load was 288,000 when starting this treatment threw Dr. Long he sustained an injury to his liver when given treatment back, as the pre-mature termination is the root and cause of injury sustained. If Dr. Kort's action was supported by D.O.C. policy then the D.O.C. would have never reinstated treatment. The failure to train Dr. Kort in the administration of D.O.C. protocol for treatment of this condition can be said to be the cause and reason for injury sustained. That this Dr. knowingly and intentionally with wanton desire to inflict pain and injure and with deliberate indifference terminated Kim Smith treatment without cause or reason to do so, nor was his act supported by the D.O.C. the contracted vendor or Dr. Kort did not ensure the quaility of treatment consistent with community standard, as treatment

would not be terminated based on a false claim or a non-existent policy

Why was Kim Smith not given interferon treatment first then the combination of interferon and ribavirin ?

Why was Kim Smith treatment terminated based on a non-existent protocol by Dr. Kort ?

Would not this show a response to treatment it a inmate starts treatment with a viral load of 288,000 and during the 90 days treatment was given the viral load dropped to 202,000 would this not show that the person was responding to treatment ? If so then why was Km Smith treatment terminated by a claim that he was not responding.

Could the termination of treatment pre-maturely be said to be the cause and reason for this condition worsening.

At no time was Kim Smith advised that if he was given this treatment that the condition would worsen if treated correctly.  And the D.O.C. can not now come and state that the termination in January 2001, was based on the high viral load of June 2001.

What Dr. Arrow states is good but it failed to address this issue, and can do be said to be material fact, to support the termination of treatment when Kim Smith was responding positively to treatment, or the injury sustained from the termination and reinstatement of treatment.  In his declaration at not time has he claimed that this treatment would worsen the condition.  It is my understanding that this treatment is to stop the condition from worsening, not make the condition worsen, and the material fact is Kim Smith viral load when starting treatment in Sept. 2000 of 288,000, and when terminated 202,000 showing a positive drop in this viral load, showing and making a clear showing of material fact that Kim Smith was responding to treatment.  Dr. Kort intervention and false action based on a non-existent D.O.C. policy terminated treatment.  The D.O.C. gave treatment back, and upon the reinstatement of treatment Kim Smith sustained an injure to his liver, as the viral load increased from 202,00 to over 528,000 in a 60 day period.  And it can be said that threw Dr. Kort acts of deliberate indifference to s serious medical condition Kim Smith sustained an injury to his liver. In Dr. Arrow exhibits at no time is it stated that this condition would worsen from this treatment, non-responsiveness can not be stated as the condition worsening, and if this treatment was to arrest this condition it should not have gotten worse.  If it did it was threw deliberate indifference and the wanton desire to inflect pain and injure. As it is a viral load of 288,000 is not that bad to warrant the level of treatment Kim Smith was subjected to.  If adequately treated at no time should this condition have

worsen. In all protocol provided it is clear that treatment is to be given for 3 months, if no signs of response treatment may be terminated, or consideration for other treatment. At no time is it stated if a drop in viral load appears that treatment would be terminated, and Dr. Kort action is not supported by the D.O.C. protocol, because of this act of deliberate indifference Kim Smith sustained an injury as policy states that no person should be terminated if they are responding to treatment and a 86,000 drop is viral load in a 90 day period is a clear showing of a response that is require to continue treatment, and to terminate based on a claim that an inmate was not responsive when his blood test clear show a positive response is a showing of deliberate indifference, and the injure sustained show that threw this act Kim Smith sustained a injure shorting his life expectancy. This act was knowingly and intentionally done. If it was not a false claim then the D.O.C. would not have directed the medical staff at S.C.I. Coal Township to reinstate treatment. The problem that now appears was what was the institutional medical staff injecting Kim Smith with to make this condition worsen, and was this reinstated treatment the correct treatment, or was it a deliberate act giving Kim Smith to much medication with the intent to injure of inflect death. It is hard to believe that if Kim Smith was given the same treatment that was terminated that the condition would worsen. Since the first treatment had a positive affect and showed a significant drop in viral load. Was this act a deliberate act by institutional staff at S.C.I. Coal Township. Even to this date a Nurse Bernas still states Kim Smith was non respondsive to treatment that was why he was terminated in January 2001. Whit this consistent projection by medical staff at this institution it is clear that Kim Smith is still being subjected to a level of deliberate indifference to his health care needs. If record reflect a positive response to treatment and medical staff is still claiming Kim Smith was not responsive to treatment. And the D.O.C. reinstated treatment show that Kim Smith was responsive, and for medical staff to continue in this claim is a showing of deliberate indifference, when a supervisorary componet staed their was a positive response and reinstated treatment, and then to still have the medical staff like Nurse Bernas still state that Kim Smith was not respondent to treatment show an intent that if at any time Kim Smith is seeking treatment he will be meet with this level of indifference. Even when their bosses show them that they are wrong they still believe they are right and step out side of protocol to inflict pain and injure and impose their own personal opinion about treatment and what the facts are. The rapid viral evolution ultimately resulted in chronic infection and this onslot was brought on by Dr. Kort wanton desire to inflict pain and his acts of deliberate indifference.

In Dr. Berel B. Arrow declaration he never addressed D.O.C. protocol or policy or procedure that authorized the termination of Hepatitis C treatment in 90 days if their was not a 50 % drop in viral load. Nor does he identify protocol that if their is a 38 % drop in viral load that this is not a positive response to treatment. As in this case at start of treatment Kim Smith viral load was 288,000, when treatment was terminated based on a non-existent protocol or D.O.C. policy his viral load was 202,000 in a 90 day period, that showed he was responding to treatment. Threw Dr. Korts administration treatment was terminated affecting the positive response to treatment, and when reinstated Kim Smith suffered an injury to his liver as when given treatment back he sustained injury due to Dr. Korts non-existent protocol, and policy to this serious illness projecting deliberate indifference. Any time that a medical professional terminates treatment based on a non-existent policy and false claim of a inmate responding to treatment when records clearly show a positive response to treatment this act was done with deliberate indifference and done to harm and injure an inmate. As D. Krt step outside of any all levels of professionalism, to deprive Kim Smith proscribed treatment and make a false claim to support his claim is done with deliberate indifferent intent, and knowingly and intentionally done with the intent to deprive inmate of adequate health care. Because the above Dr. state a non-existent policy and Ms. W. J. Sewell supported this abuse these parties were deliberate indifferent to Kim Smith health care. As the D.O.C. does not have a policy in which it is stated that if an inmate does not show a response to treatment, treatment will be terminated. When in fact Kim Smith blood test show a positive response and his viral load drop, and because of the drop and the amount of the drop their was no reason for the termination of this health care, and for what reason the have projected to justify this termination was cruel punishment and knowingly and intentionally done with the wanton desire to inflict pain and injury to inmates under this treatment. See petitioner 6 page exhibit regarding this treatment and to show grievance were filed and appeal were taken with the resulting fact that treatment was reinstated. That when treatment was reinstated Kim Smith condition worsen with even injection as his viral load went from 202,000, to 528,000 in a less then 90 day period. Due to the unreasonable termination and the delay in treatment Kim Smith sustained a injury to his liver. Because of the manner in which treatment was terminated, and the false claim of protocol and policy, it affect Kim Smith positive response to treatment, this disruptive act was the cause and reason for injury sustained, had this act not took place KIm Smith would have stayed on a positive response to this treatment. At present Kim Smith is not sure what he was being injected with that caused the condition to

worsen, or even if it was the same medication he was given when he first started this treatment.

Dr. Arrow is attempting to show this court that the failed response to this treatment was not affected buy the disruption of treatment or that a disruption ever took place. Under Dr. Kort and threw his acts of deliberate indifference and his false claim of a non-existent policy of the D.O.C., or Wexford Health, or what ever institutional health care provider was.

Robert S. Bitner declaration, per D.O.C. Policy 7.13.1-2 postage Section C inmates at this time were permitted to place their account in the red for legal postage. And no institutional staff under the color of law had the legal right to deny, hinder or impede an inmates legal mail from leaving the institution. It took an affirmative act set to deprive an inmate his access to the court and was knowingly and intentionally done with the wanton desire to affect and deny an inmate access to the court, and affect his litigational efforts. Mr. Mason knew or he should have known that to deny an inmate Kim Smith legal postage may cause him to lose his claim in court, as it is when filing a petition in court all parties must be informed and failure to inform these parties could result in the dismissal of the case. June 23, 1997 Policy, Policy no. 7.13.1-2, (C)(1)(2)(3)(4) of the defendants exhibit (E)(2) at no time does this policy state inmate must be indigent. When Kim Smith submitted legal mail to go out of the institution with a request slip and a cash slip it was his owned duty under policy and rights of inmate for him to mail this legal mail out. And to step outside of this duty was done with the intent to deprive access to the court. Because Kim Smith legal mail was being denied to leave institution. A Curtis Carr aided Kim Smith in his legal litigation, by signing his name and number to an envelope and permitting Kim Smith to send out his legal mail in his assistance to help Km Smith with his legal litigational efforts. That in this letter he explainted to Pia Taggart the reason that this legal mail was coming to her in this matter, that Mr. Mason was denying Kim Smith legal mail from leaving the institution. Upon this Ms. Taggart contacted Mr. Mason and he and her conspired to inflict pain injure and deny access to the court and to punish KIm Smith. A misconduct was issued, and even after Curtis Carr confessed that he authorized Kim Smith to use his envelope and that he signed it these parties had no consideration for this fact but went on to punish Kim Smith in a manner in which was not consistent with policy. When is it that a person state he authorized another person and that he signed his name giving that person that authority, could be considered a theft. Moreover if

Mr. Mason would have let Kim Smith legal mail leave the institution then their would have been no problem with Kim Smith access to the courts. Even by the defendants own admittance, it is clear that a knowingly and intentional affirmative act took place to deny Kim Smith legal mail from leaving the institution, and denying him access to the courts. Because of this act he had to request help of another inmate who authorized him to use his free postage to get his legal mail to the require parties, and at no time did Kim Smith steal this postage, as the inmate confessed that he authorized Smith to use his envelope as he signed his name giving authority to mail such and help Smith in his litigational efforts, as Smith was being denied his right to have legal mail leave the inetitution. When a inmate submits legal mail to go out of the institution it should go out unimpeded.

As for the defendants exhibits 1 thru 27 is a clear showing of deliberate indifference and the fact that Kim Smith exhausted all administrative remedies in this matter. As Kim Smith will address all grievance by number to express the denial and violation of his rights by institutional staff, and these violation have since continued and the oppressive state in which Smith is being subjected to.

1.    Grievance No. Smi. 030-00 The diabetes treatment and Kim Smith request to see a specialist for the treatment of this condition has since went unaddressed and Kim Smith is still being denied this specialized treatment. As the standard of care inmates should get should not be based on a HMO as what was told Kim Smith by institutional staff for reason to deny adequate care, as Kim Smith is not in a community and should not have this standard of care placed on him while he is incarcerated, and this manner of review for his health care condition. Most HMO are about curving the expenses of health care, and in such a place as I have seen, a inmate for a year has complainted about pains in his leg for over a year and this condition has went unaddressed for this period, and the condition worsen to a point that they had to take his leg off. Had this inmate been adequately treated when he went to medical he may not have lost his leg. This comes about threw the claimed HMO attempting to curve the medical expenses of incarcerated person. This act has made this person and many others like him a burden on society for life as after a leg, arm or what ever is taken off the chances of employment is slim, and society has to foot the expense for health care and to provide for this person, this comes at the cost to society, and the health care providers fruad to curve the expense on institutionalized persons health care. Because of the number of inmate who leave these institution lame due to inadequate health care can no long go

unaddressed as society should have an interest in the health care of person while incarcerated and so they are not a burden on society when released.

2.      Grievance no. 029-00 as it is at no time does the co-pay policy give G. Weaver, Medical Director, or health care providers the authority to determine what and when a condition becomes a chronic condition, and for what and when inmates are to be charged a co-pay for a visit to the medical department.  It is a professional medical practice, that if a condition last more then 6 months it is a chronic condition, nor does the co-pay policy support the charging of inmates for the renewing of medication from the initial visit.  DC-Adm. 820 effective May 1, 1998 under section VI (A) Fees (2) it states for what an inmate will not be charged: Under (g) Medical treatment for chronic disease or illness (j) long term treatment (k) medical referrals by health care professional employed by the DO.C. or its contractors; (p) medication prescription subsequent to the initial medication prescription provided to an inmate for the same illness or condition.  Kim Smith was subjected to pay for the visit and medication every time he went to renew his pain medication, and creams for his feet, and sores on his body, he was also subjected to and still is being subjected to every time he signs up for sick call he is subjected to pay for the same visit for the same conditions in which he has and still is being denied treatment for (v) eye glass for diabetic eye related condition.  Because this policy clearly states what an inmate is not to be charge and for what he is not to be charge, for the medical staff to step outside of this policy and knowingly and intentionally charge Kim Smith this fee was done with the intent to defraud Kim Smith and knowingly and intentionally done.  In as much because of the fact that the medical condition is never adequately addressed an inmate must repeatedly sign a sick call slip and repeatedly be subjected to pay a co-pay for the same condition that was not or had not been adequately treated, this is an act of deliberate indifference, to see a health care condition and refuse to adequately treat it correctly, and it may fall into levels of frusd as it is being knowingly and intentionally done with the sole desire to cut expense of health care to an incarcerated person, and this act does not meet the level of health care that would be provided a person if he was not incarcerated.  This inadequate standard of health care runs rapid in the state institution and inmates suffer as well as society as they must pay and foot the bill for those who become lames at the hands of health care providers trying to cut cost of health care, to a point the deny adequate health care to a point they end up having to cut off a person leg or worse that he dies form the neglent act of the medical staff.  For over 6 years Kim Smith has been subjected to this standard of abuse and inadequate

health care at the expense of cutting cost and has since been denied adequate health care for his illness and the fraud comes when the medical staff knows that the person will return because they did not adequately treat the person in the first place, so they can charge them again. As for many years I have been subjected to this form and level of abuse of this policy.

3.      Grievance no. 0005-00 employment and educational programs that G. Weaver, and DR. Johns knowingly and intentionally discriminated against Kim Smith from getting into educational programs and employment basing their concerns about a sleep disorder that they stated the D.O.C. was not obligated to treat, and Kim Smith apena in which he was not being treated for. This act of discrimination was done to deprive Kim Smith his ability to be trained for his release and find employment. As under law no one should be discriminated against a handicap person with a mental health condition such as a sleep disorder. To deprive Kim Smith the ability to further his education and employment based on a sleep disorder, is an act of discrimination that was knowingly and intentionally done, with the desire to deprive Kim Smith of his learning ability without provocation to do so or any support from the D.O.C.

4.      Grievance No. 005-00 on or about 2-1-00 I was called to medical by G. Weaver who instructed me that I would soon be getting the C-pap devise and that I would have to return to medical once a week for a security check of the devise. About 4 days later I was called to medical and instructed by nurse Fular that I was to bring the devise with me I advised her that I did not have the devise nor was I issued such. She then called F block and instructed C.O. Esek  to give Kim Smith the devise and return him to medical with it.  Upon returning to the block and requesting the devise from  c.o. Ersek, he refused, then went on to order Kim Smith to return to medical and sign a refusal form, that If Smith did not return he would issue a misconduct. As long as this person was knowingly and intentionally hindering and denying Kim Smith access to his proscribed health care, even after instructed by medical to turn over the devise to Kim Smith, it took an affirmative act set to deprive Kim Smith of his health care for this Corrections Officer to deny to give Kim Smith his health care devise.  Kim Smith was not obligated to obey his order and return to medical and sign a refusal form as it is Kim Smith was not refusing his health care, but being denied his health care by C.O. Ersek who was knowingly and intentionally with hold Kim Smith health care devise.  Since the devise was not turned over to Kim Smith he saw no need to return to medical and or sign a refusal form as he was ordered by C.O. Ersek.  As this officer had no authority to

with holds this devise after being instructed to turn over the devise and return Smith
back to medical, at no time was this officer instructed to order Smith to return to
medical and sign a refusal form. As this act was done in his individual capacity without
authority of knowledge of a learned medical professional. Moreover at no time did G.
Weaver place a note on the devise instructing block officers not to issue the devise.
That Officer Ersek and other parties nmaely C.O. Whysong conspired to deprive Kim Smith
of his proscribed health care, as G. Weaver C.H.C.A. did not place a note on the devise
instructing block officers not to issue the devise.

5.    Grievance no. 032-01 at all time Kim Smith has claimed that their was no power
in the RHU cell for the 7 months he was housed under AC, or Dc status in which he could
use the devise. And when Kim Smith was moved to the control unit all request were denied
based on the false claim of Pa. Bakers, and all attempts to get the devise failed and
was met with a level of indifference based on the claim that Kim Smith refused to use
the devise. Pa. Baker knowingly and intentionally filed a false report then went on to
make a false claim with the sole desire to inflect pain and injury to Kim Smith, this
act was done with a wanton desire to deprive Kim Smith of his proscribed health care.
As in RHU on H Block the issue of Pa. Baker was heard by cellmate, and he is a witness
to this deny and false statement by Pa. Baker, at not time did Kim Smith refuse to use
the devise. And that at all times their was not power in the cells in which to use the
devise. This cellmate was transfered to Green County, and record of whom this is can
be obtained form the D.O.C. if his testimony is need for material fact of the denial of
this health care. Because their was no power in the cell this goes to the condition of
confinement and 8 th amendment violation as it was cruel punishment to place Kim Smith
in a cell and exspect him to use a devise in which their was no power for its use. This
act also deprived Smith of his proscribed health care, and was knowingly and
intentionally done, as their at that time was not standing D.O.C. policy or protocol that
supports the termination of the power in the RHU, in S.C.I. Smithsfield. For the 7 months
Smith was in the RHU he was denied this health care, and for this period no repairs were
made to the plug sockets. As Pa. Baker knew or she should have known that to falsify
the record and make a false claim would deprive Kim Smith of his health care, and even
though Kim Smith is not housed in S.C.I. Smithsfield he is still being denied this health
care base on what took place in that institution. I'm not sure what would make a person
who knows or should have known that their was no power in the cells to falsify record,
unless it was their intent to harm and injury and deprive a person of adequate health
care. As the Correction Department is attempting to over look this fact that their is

no power in the RHU cell, and project by who's authority was this deprivation created, which question the condition of confinement, and it is cruel punishment to deny a person his health care based on institutional claimed security issue.

In Lisa Hollibaugh unsworn declaration number 6 On August 22, 2002 at my request Sandra House clerical supervisor reviewed the RHU visitors logbook to accertain whether the maintenance department had been to RHU.   In the 7 months that Kim Smith was housed in RHU they were not and it appeared that they had no intent to repair the plug sockets. At (9) Accordinly based on my investigation and the information provided by Ms. House there is no such policy and plaintiff did not submit any inmate request or file any grievance regarding the power being turned off in the RHU or the plug sockets in his cell.

(1)  if their was no such policy; terminating the power in the RHU cell was done by who's authority, and why was the power cut off, and who ever did such knew or they should have known that if the power was required for health care reason that they would be depriving a person proscribed health care, and that the failure to have power goes right to the condition of the confinement.

(2)  Kim Smith did submit request regarding damage plug sockets, and for the use of this devise and for 7 months he was denied this health care, due to their being no power in the cells from June 2000 to January 2001.

(3)    Kim Smith did file grievance on this issue; See Correction Defendants Exhibit 4 Grievance No. 032-01 Supporting Documents to their motion for summary judgment Volume 1.

Since Lias Hollibaugh made a declration of fact, is false as it is clear from the above listed grievance Kim Smith did exhaust administrative remedies.   And for Ms. Hollibaugh and Sandra House to make false statement of the fact was a knowingly and intentional act to continue the deprivation of Smith health care, with a wanton desire to inflict pain and injury from their acts.   It took an affirmative act set to deprive Kim Smith of his right to health care and proscribed treatment, violating Smith right to equal protection under law.   And these parties claim that they did not know can not be a defense for the injury sustained by their acts and the falsifing of the records that was knowingly and intentionally done, as these parties knew with certainity that the denial of health care is certain to follow or the continued to deny Kim Smith of this health care.   If either of these parties were not certain then they should have spoke on the subject if the were no correctly inform and their investigaation did product the evidence.   By the above listed exhibit the Correction Defendants attorney proves Lisa Hollibaugh and Sandra House declaration to be false.

Wherefore Pa. Bakers decision to falsify the record and deny Kim Smith his proscribed health care was done with the intent to harm and knowingly and intentionally done. Even though they claimed Kim Smith refused this treatment they can not show or provide of copy of a refusal form signed by Kim Smith. As their is no other reason to make a false claim unless it was that person desire to deprive another person of protected rights.

Like on 4-13-99 during a shake down a C.O. Ward pulls Kim Smith antena out of his radio breaking it, Smith filed a grievance and appealed to final review and the D.O.C. supported this level of abuse, and this is the same with Kim Smith T.V. that during a shake down he was not in his cell, and his cell mate must have place wire on the antena and while taking off the wire the C.O. broke Kim Smith T.V. and the D.O.C. supported this abuse and claimed that Kim Smith was stealing cable service which is impossible since all cable hook up are connected threw the guards station and a person in a cell can not steal cable by having a wire on their antena.

On 8-19-20-21, of 1999 after the state wide lock down Kim Smith was released to go to work in the kitchen on 8-19-99 at 1 P.M. his normal shift in the tray room he work for 3 days 24 hours and was not paid his hourly rate, and after filing a grievance the D.O.C. supported this level of abuse and denied to pay Kim Smith for his service, making a false claim. As it is it is a standing policy in the D.O.C. that if any inmate misses 3 days of work unauthorized the work supervisor will issue a misconduct. Even the work supervisor informed the employment office that I was at work and they still refused to pay me for the hours that I worked.

Like Kim Smith left the institution on writ June 18, 1999, and on June 17, 1999 he place a request to have his cable cut off as he did not know when he would be back from writ. The institutional staff refused to ahear to this request and continued to take cable fee for a cable service that Kim Smith did not get, then claimed that Smith was to late to have his cable cut off, and then went on to state that they breached the cable contract and added another manner in which to have cable cut off. The contract that Kim Smith signed stated in order to have cable cut off all an inmate must do is send a request to the business office which Kim Smith did and he was still charged for cable service that he did not get nor was he in the institution.

Jan. 1999 I request a toll call to family, may attorney by my counselor Mr. Ogershok

he contacted my attorney and their was no charge, he called family and claimed the number was disconnected, then he called another family member to check on my mother, he sat their talking to this party and refused to give me the phone, and continued on his level of aggervation and deprivation and denied me the call claiming that my family did not want to talk to me if that was the case why did he sit their talking to them, after being aggervated Kim Smith left the office, and made a mistake and left a signed cash slip on his counselor desk, in which his counselor signed an amount on the cash slip for a call that Kim Smith did not get, or was part of and Kim Smith should not have to pay for a call he did not get or have to deal with his counselor abusing his power and denying and interferring with Kim Smith access to his family. If his family did not want to talk to him, his counselor had no right to talk to them and then charge him for the call.

The correction defendants have in their error listed the exhibits in a wrong manner and it is very hard to follow them and address them in a correct manner but Kim Smith will do his best. But most of the grievances filed are self explanatory and state a claim on which relief can be granted, and 8 th amendment violation and the continue violation and denial of health care for condition that have cause Kim Smith pain, and other continued deprivation under the color of law and injury sustain such as from the non-existent D.O.C. protocol in which Kim Smith hepatitis C was terminated, and the injury sustained when treatment was given back that his viral load increased from 202,000 to 528,00 some 225 % from what the load was when this treatment started showing Km Smith sustained an injury, due to D. Korts interferance into proscribed health care, then terminating it base on a non-existent policy or protocol. As it is Km Smith was responding positively to treatment and should not have been terminated on a claim that he was not responding. As alot of time these medical profession knew or they should have known to cite non-existent policy would place a person at risk for injury. AS they know or should have known that an inmate is entitled to quality care, and they can not deny an inmate this care, and the failure to train can be said to be the cause and reason for any and all injury sustained from the acts of a person who is to apply health care to inmates. And the failure to train D. Kort, Dr. McGaulghlin, Ms. Sewell and other health care professional in the D.O.C. in their own duties and protocol can be said to be the cause and reason of injury sustained. And they can be held liable if they step outside of their authority for reason to deprive a person health care that is to meet a standard of health care that a person could get if he was not incarcerated. The law states with certainity that the failure to train can be the cause of injury sustained.

Grievance no. 0032-01, 0071-01, 0072-01, 0062-01, 0108-01, were still filed and denied due to defects in the filing process, nonetheless administrative remedies were sought and exhaustion made, as these grievances were denied. As for grievance no. 0071-01 administrative remedies were exhausted as hepatitis C treatment was reinstated at which time Kim Smith sustained an injury to his liver. As this treatment should have never been stopped based on the non-existent policy, or protocol stated by Dr. Kort as it is Kim Smith was having a positive repondse to treatment until this treatment was interupted by Dr. Kort's false claim. And Kim Smith has since been denied treatment or his painful shoulder condition or the 2 cyst behind his knee, that causes him pain, or his back condition or sores on his body.

6.    Grievance no. COA 0282-01 I requested to go to medical to get an accucek for my diabetes condition, and had D block officer Fornwald contact medical to see if I could come down, and Nurse Wolfgang instructed officer to send Kim Smith down. After taking an accuchek Nurse Wolfgang started to cite a non-existent D.O.C. policy that inmates with type 2 diabetes was prohibited from getting regular accucheks, Warden Gillis, Nurses Ambrose, Bernas, Ms. W. Sewell, Dr. Kort, Dr. Mcgluaghlin have all supported this claim, and abuse of health care for this condition. And if expense was at question it would be cheaper to have accucheks done daily, over having blood test done often and regularly. After getting accuchek Nurse Wolfgang then claims Smith was in an unauthorized area, and issued a misconduct. It was by her own request that Smith was present in the medical department in the first place, and he should not been given a misconduct for seek health care. After Nurse Wolfgang states this policy she issued a misconduct to justify her abuse of this health care, and to enforce her denial o adequate health care.

7.    Grievance no. COA - 0161-01 I tho Bureau of Health Care Services was reviewing Smith's case for continuation of hepatitis C treatment, why was it terminated in the first place if record showed that Smith was having a positive response to this treatment that warranted the Bureau of Health Care Services to review his file. If their was any fact to Dr. Korts claim Smith would not have been reinstated this treatment. As their is no D.O.C. policy or protocol to support the reasoning in which Dr. Kort denied Smith this treatment. And because of this act and interference with treatment Smith sustained an injury to his liver, as his viral load went from 202,000 to 528,000 in a 60 day period. This termination by Dr. Kort affected Smith positive response to treatment and can be considered the cause and reason or injury sustained. As D. Kort altered

proscribed medical treatment and terminated it base on a false policy or protocol that would not support the termination of this treatment.

When giving sick call staff all of Smith's complaints, they should have been addressed no matter how many or how few, when considering how long these condition have went unaddressed, or Smith given substandard treatment which can not be considered to meet the standards if Smith was not incarcerated. To refuse to treat anyones condition is a denial of health care which is a clear showing of deliberate indifference. And a inmate should not be aggervated, or threaten with a misconduct everytime he seeks health care by the medical staff. It is hard to cooperate with a medical staff that views an inmate threw eyes of indifference, and regards inmates with deliberately indifferently and eels that because you are an inmate you are not entitled to a standard of quality health care. As an inmate should not be forced to limit his their complaints when their is so many things wrong with them that has went unattended or years.

8.    Grievance no. COA-0062-01 and COA-0108-01 In Trees Joan response states Hep-C and shoulder condition as being appropriate. As the termination of Hep-C treatment on a non-existent policy or protocol is not an oppropriate means of health care and can not be considered such by any learned medical professional. Moreover this treatment would not have been terminated in this manner if Smith was in the Community. And neither is the treatment given Smith or if his shoulder condition as it is for 4 years now he has had to endure the pain in his right shoulder and left knee and no treatment has been given and he has even been told by medical staff that no treatment if forth coming. And this level of treatment can not be said to meet the standard of health care that is being provided in the community, or to a level of treatment that Smith would obtain if he was not incarcerated. And the C-pap use when their was no power in RHU cell to use the devise, back complaints, when inmate once ad a back brace, left knee condition and the 2 cyst behind the knee that are very painful and are being said to be benien by a Dr. who never took a tissue sample, has made a determination not to treat, and the medical staff, and Warden, Ms. Sewell, Dr. Breen, D.O.C. have since supported this level of abuse and denial o adequate health care and acts of deliberate indifference to serious painful medical conditions that has lasted over years, with little regard to inmate health care safety Smith has been denied adequate health care and because of the amount of pain he has had to endure for a four year period this is a wanton infliction of pain, done so to injury. And because of the delay and aggervation in the attempt to obtain health care or these painful condition it has come to a level of 8 th. amendment violation as it is cruel punishment to know of a painful health care condition and

refused to treat it.  These parties acts project pain and injury was certain to follow
their acts or was certain to follow, and if the condition worsen it would cause a life
long impairment.

9.      Grievance no's. 0163-01 on or about 2-25-01 or soon their after funds were taken
off my account for cable service. Cable was to be connected March 1, 2001 and for what
ever reason that is not supported by fealty cable wire Kim Smith did not get his cable
until March 6, 2001.  That Mr. Dunn, and Mr. Smith knowingly and intentionally deprive
Smith of his cable service, and with held this service without provocation based on a
false claim that the cable wire was damaged, as this being reason cable was not cut on.
As it is when Smith moved in that cell his cell mate had cable and both cable wires were
in service at the time and their was no damage to the cable wires as what is being
claimed by these two parties, and their is no justification for the delay in service
other then it was their intent to impose cruel punishment and defraud Smith out of his
cable service, as their is and was no cause for delay other then the knowing and
intentional acts to deprive Smith of this service.  Smith was not given a refund for the
days missed from his cable service or he was denied this service after he had paid.
These parties knowingly and intentionally denied Smith his cable service with the intent
to defraud him of his cable service and money's already paid for this service, and by
the denying him a refund.  This act of official oppression, deliberate indifference by
staff was knowingly and intentionally applied with the intent to inflict pain and injury
upon a person with the intent to deprive him of a paid service, based on a false  claim
that the wire was damaged when records show no repairs was ever made to the cable wire
in the cell in question.

10.    Grievance no. COA-0269-01 and COA-0342-01
 on 4-11-01 Smith was denied such for his diabetes based on a non-existent D.O.C. policy
that Nurse Wolfgang, Ambrose, Bernas, and Ms. Sewell claim, that the D.O.C. has a policy
that prohibited inmates with type 2 diabetes from having accucheks, and go on to state
that this is something that is practiced in the street and in the community, and this
claimed policy can not be said to be adequate treatment for this condition.  It is Smith
understanding form medical information that  any diabetic should check their blood sugar
regularly and often.  To knowingly and intentionally deny Smith this level of treatment
was done with the intent to deprive him adequate health care for this condition, and to
base it on a non-existent policy was knowingly and intentionally done, with deliberate
indifference to the health care of Smith, and with malice and a wanton desire to inflict

pain. This issue was addressed in court prior to Smith being placed in this institution and inmates with diabetes was to get accuchecks, not be denied this level of health care.

On 4-17-01 Smith saw a Doctor Adamson who increased Smith medication on med-line 3 and at no time was any of the medical staff instructed to cut Smith medication on med-line 1. On 4-18-01 at med-line 1 Smith was refused his proscribed diabetic medication. When showing Nurse Bernas her error, and that at no time did Dr. Adamson instruct medical staff to cut medication on med-line 1, Nurse Bernas stated that this is the way things are none around here. And it can be taken that the medical staff in this institution often alter a Doctors orders and impose their untrained opinion into the health care of inmate, why else would this Nurse make such a statement . Then a call comes into medical an inmate was down in the chow hall, 2 nurses left medical building with a wheel chair to care for this inmate about 10 minutes later Nurse Bernas leaves medical to see about the same inmate with a wheel chair. This act seemed funny that 3 nurses would leave medical with 2 wheel chairs to see about the same inmate. When the first two nurses returned to medical they had the inmate with them, and when Nurse Bernas returned to medical she had Lt. Jordan with her, claiming see I told you and direction Lt. Jordan attention to Smith, I no time was Lt. Jordan instructed as to the nature of such and told that Smith was being disruptive in the medical department and other lies I'm sure Nurse Bernas told him to support the level of abuse and the knowingly and intentionally altering of a doctor proscribed medical treatment for Smith, with a wanton desire to inflict pain and injury, and it was her intent when she lift medical to go  and get this person and conspire with them to issue a misconduct to justify her abuse and denial of proscribed health care. When Lt. Jordan comes into the medical lobby Smith requested to speak to him, he claimed he was busy, but at no time did he leave the lobby to check on the inmate, instead he orders Smith to leave the medical department, Smith told Lt. Jordan that he was to give blood, C.O. Learn, Nurses Wolfgang, Ambrose, Bernas and go on to state that Smith was not wanted in the medical building. Lt. Jordan ordered Smith to leave and before Smith could get his pass to leave Lt. Jordan hand cuff Smith claiming he did not obey his order, while Smith was in the process of leaving and obeying this order he was hand cuff, and taken to the hole. After being stripped searched, Smith was placed in a hard cell. And as the tape will show their was no cause to subject Smith to this cruel punishment as their was nothing to support that Smith had a behavior problem to support this level of abuse and 8 th. amendment violation he was being subjected to, by this staff, other then to inflect pain for not excepting the fact that Nurse Bernas took it upon her self to alter a Dr. orders and impose her own unlearned

brand of medical care upon Smith and to support this level of abuse she left medical to inlist the help of other staff to support her abuse, and unlearned level of professionalism, as at no time was this Nurse instructed to cut Smith diabetic medication on med-line 1, and not doctors orders direct this Nurse to make such a medical call that was unlearned. That C.O. Learn, Nurses Wolfgang, Ambrose, Bernas, conspired to deny Smith his proscribed health care namely a blood test by stating Smith was not wanted in medical. At hearing Smith was given 45 days D.C. time by Mr. Breon, to subject Smith to this kind of treatment because he was seeking adequate health care, and to show a nurse her error and that no doctor instructed her to cut his medication this was the kind of punishment he was subjected to. Nurse Bernas knew or she should have known that she had no authority to cut proscribed health care, and to do such could put a person at risk for serious injury, with little regard for inmate safety, and malice and malicious intent she inflected her own untrained judgment into Smith health care, and to support this denial she got the help of other medical staff and Lt. Jordan. This must have been a practice at this institution why else would this person state that this is the way things are done around her if she has not practiced in this act in the past, and for those who opposed this treatment they were punished by the act of Lt. Jordan to justify this abuse, and their is no justification for the abuse and punishment Smith was subjected to because of this issue.

Grievance no 0342-01 If Smith was receiving appropriate health care why was he still in pain in his right shoulder, pain in left knee, and sores still on his body, and lower back pain, and being denied his health care for his sleep apena based on a false claim that he refused this health care. By whoms standard is no treatment oppropriate. And if any oppropriate claimed treatment is given, request to see documentation of this treatment, it their is no ducumentation of any proscribed treatment then none was given. and what treatment that was given can not be deemed oppropriate treatment, and can not be deemed a level of treatment Smith would have gotten if he was not incarcerated, and the level of treatment given is not to the standard that would be in the community as proscribed by law for incarcerated persons. And what is considered in this institution as standardized health care of the level in the community is inadequate and falls short of any requirement for a person who is incarcerated. And because the D.O.C. supports this level of abuse and health care that is being applied to inmates they should be held accountable as they are part of the act and support this kind of inhuman treatment and violation of law as if an inmate does not have a right to adequate health care to a level that he has not to suffer or endure pain. Due to the ineffective application of health

Kim Smith has suffered unwanted pain and has to endure pain. And this level of health care can not be said to be the kind of health care that Smith would obtain if he was in the community.

11.     Grievance no. 1087-01 addresses the issue of the C-pap for Smith apena and the act of C.O. Ernek and Pa. Baker. As the correction defendants still have not produced adequate evidence of material fact regarding the power in the RHu plug sockets being turned off. If a request was made to a number of inmates that was housed in the RHU it will be found that their was no power in those cell, in the plug sockets and this has been a practice policy that they attempt to claim a security issue with very little regard to the condition of confinement or an inmates need for the power for health reason. Dr. McGlaughlin and Ms. Sewell claim their is no clinical or symptomatic evidence of this condition when this condition is well documented in Smith medical records, and to make such a statement was done with deliberate indifference to this health care condition. And threw no fault of his own Smith could not use this devise in the RHU at S.C.I.S. as their was no power in the cell and any inmate that was house on H block or J block in this institution can place an affidavit to this affect if requested for the period of June 2000 to January 2001 when Smith was housed in the RHU, and that because of such he could not use this devise. Since the correction defendants have not provided the court of petitioner with any signed refusal forms this claim that Smith refused this treatment should be moot, and Smith's claim of this health care should not be moot on S.C.I.S. since he is not their, it is because of what the medical staff place in Smith's medical records is the reasoning why he is still being denied this health care. This false claim can not be supported by record of material fact where is the fact to support the correction defendants claims that their was power in these cell, or that Smith signed a refuse. To make a claim then to fall short of proof to support this claim, is a deliberate act done with the wanton desire to inflict pain and punish and deprive adequate and proscribed health care.

12.     Grievance no. 1121-01  They never denied that the C.O. interfered with Smith health care, and knowingly and intentionally done so by claiming Smith refused his health care. The condition must have been a problem why else was Smith to see surgery consult, and to force the record unto Smith and over look this officers act of deliberate indifference C.O. Whipple knew or she should have known that Smith could not go to his appointment unless she open the door and to fail to do her assigned job, and then attempt to make a false claim that Smith refused this health care to support her

level of abuse was done with deliberate indifference and with the intent to delay Smiths
health care, and this knowingly and intentional act was done with the intent to deprive
hinder and deter Smith from seeking health care. This act comes without provocation
and reason as Smith should have be granted the right to see this doctor at the appointed
time without interference by the correction officers, who failed to do their appointed
duty. Then to state a lie and conspire with other medical staff to support this level
and form of abuse is beyond any own duty by C.O. Whipple, and to step outside of this
duty for reason to inflict pain and mental anguish was done with the intent to deprive
and it can be said the failure to train this officer in the administration of her duty
can be said to be the cause of any injury or delay in health care sustained, and a
inmate should not have to be subjected to this level of abuse because C.O. Whipple in
her personal opinion felt like an inmate should not get requested heath care. Why else
would she not open the door to give Smith access to his appointed health care, other
then to knowingly and intentionally deprive Smith his health care then falsify record
to support her claimed level of abuse.

13.    Grievance no. 0626-01 deals with the C-pap and the continued denial of this
health care without provocation or any evidence to support this claim. These parties
has consistently over looked the fact that their is no power in any of the State RHU
in which an inmate could use a health care devise, and instead of correcting this error
or creating a protocol which would permit inmates that have the need for power for
health care reason be permitted it seems it easer for them to formulate a false record
and claim instead of correcting the condition of this confinement. To make a false
claim that a person refused to use his health care devise, when they knew or should have
known that their was no power in the cells in which to plug the devise was done with
a deliberate intent then to come and claim that Smith did not use the devise for 7
months and that is why he is not permitted to get this health care now is done threw
acts of deliberate indifference. Moreover if Smith did not use the devise then it can
not be considered the foundation for the continued denial of health care now unless it
is being done with deliberate indifference.

14.    Grievance no. 15086 bakers cyst what appropriate care was given and what is
documented in record as being the care that Smith was given for this condition. And
how was it determined that these cyst were Baker cyst. I never saw Dr. Mayer about
these cyst. Only Dr. Breen Medical Director who stated these cyst were benie and no
treatment was forth coming and what elective procedure is this that was applied to this

condition that no treatment was given, or that petitioner would not see an orthopedic doctor for this condition, and has since no treatment given or concern about the amount of pain petitioner was in and all returns to sick call about this condition have went unaddressed. How can baker cysts be determined, it should not be left to a terminogly of what one has seen with out any medical evidence to support what the lumps were behind petitioner knee, and for the Warden and other medical staff to support this without first getting evidence that petitioner would not be subjected to pain of any additional injury from this denial to treat. Moreover if I was given a health care referral why was not I seen by the referred doctor, instead of left to Dr. Breen terminolgy of what this condition is, he is not an orthopedic doctor and should no make a determination based on what he thinks to a person health care condition.

On or about April 15, 2003 Dr. Breen requested to see petitioner on the claim that he met the requirements for Hepititis C treatment, that petitioner viral load was above 1,000,000. Petitioner stated that Sept. 2000 when he was given treatment his viral load was 288,000, and after 4 months of treatment his viral load was 202,000. That based on a non-existent policy Dr. Kort terminated treatment based on a false claim that petitioner was not responding. When blood test clearly showed a positive response and their was no reason for the termination of this treatment. Mrs. Swell, as well as Warden Gills supported this level of abuse and denial of health care for this serious illness. After filing a grievance treatment was given back, and after every injection the condition worsen, until 90 days later treatment was terminated, with a viral load of 528,000. At no time was petitioner told that this condition would worsen, and petitioner suspects that when treatment was reinstated he was not given the same treatment he was started on but given another kind of treatment as the condition worsen and has since continued to worsen as petitioner was told that his viral load has since went above 1,000,000. Since record will support petitioners decision to refuse treatment since from this treatment this condition worsen and he saw no reason to put himself at risk for additional risk to damage to his liver. As what ever the medical staff was injecting petitioner with only made the condition get progressively worse, and petitioner felt that their was no reason to get a treatment that would make a condition worsen. As it is when petitioner started this treatment his viral load was 288,000, and when treatment was ended it was over 1,000,000 which shows a injury from this treatment. And at no time was petitioner instructed by any medical staff that this treatment might make the condition worsen, as this being what took place and petitioner is not obligated to take any treatment that would make a condition worsen.

15.    Grievance no. COA-0342-01 and COA-0269-01 have been addressed in prior grievances.

16.    Grievance no. COA-0485-01 in order to support punishment a negative behavior must be supported by some evidence, other then the words of staff. If not evidence is presented to support a negative behavior then to punish for no reason is an 8th amendment violation. Because petitioner voiced his opinion, and showed the nurse that at no time did the doctor order a cut in my diabetic medication on med-line 1. At no time did the doctor proscribe the cutting of medication on this line, the doctor did increase medication on med-line 3. Nurse Bernas took it upon herself to cut proscribed medication, and when even showed her error she refused to correct it claiming this is the way that things are done in this institution, then went on to inlist the help of Lt. Jorden making false claims of the facts to support her level of abuse and the imposition of her personal idealism of health care for inmates. By Nurse Bernas stating this is the way things are done here shows a pattern of abuse implemented by medical staff in this institution that is supported by the D.O.C. - What is considered to be negative behavior by staff, is questioning the level of abuse, and by whoms authority did the nurse have the power to cut proscribed medication, and then when showed her error she refused to correct it, then claim this is the way things are done in this institution, then getting the support of a Lt. to support this level of abuse. Nurse Bernas cut Smith's diabetic medication on med-line 1 when the doctor ordered a increase in medication on med-line 3 and when showed Nurse Bernas her error she refused to correct it then went and got Lt. Jorden to support her abuse, and punish Smith for questioning the act of deliberate indifference in which this nurse cut diabetic medication. If Smith would have excepted this act he could have ended up like Mr. Hawkins when seeking treatment for his diabetic condition. And because of the questioning of this manner of health care Smith was punished, and this punishment was knowingly and intentionally done with the wanton desire to deny health care and Smith right of freedom of speech. As speaking ones opinion is not cause to punish them, and their is nothing on the tape or in Smith's behavior that would warrant the level of abuse he was subjected to by Lt. Jorden, and Lt. Cooler, who claimed that petitioner had a bad attitude, which changed to petitioner behavior, and none of this is supported by the tape and it appears these 2 person knowingly and intentionally imposed their own brand of justice for petitioner exercising his rights when confronted with a level of abuse by medical staff who did not have the authority to cut petitioners diabetic medication, and if this is the way things are done in this institution then it would account for the number of deaths, and the

heir is no justification for the 45 days of cruel punishment the petitioner was subjected
o at the hands of Nurse Bernas, Lt. Jorden, Lt. Gooler, Nurses Wolfgang, Ambrose, and
:.O.Learn, who knowingly and intentionally conspired to inflict pain and injury and
leprive petitioner of his health care when questioning Nurse Bernas about her error, as
10 doctor ordered medication on med-line 1 to be cut.

Like on or About April 16, 2003 a inmate Malcom Hawkins goes to medical and was tested
with a blood sugar level of over 800 and they gave him a shot and sent him back to the
block. Later that night after lock down, he had problem and rang the call botton and
their was no Guard on the block to hear him. Another inmate kicked his door, and that was
what got the guards attention that their was a problem, this act delayed medical staff from
getting to Mr. Hawkins to treat him. Later that night Mr. Hawkins
died. The institution claimed he had a heart attack. And the truth is that because his
blood sugar was so high and institutional medical staff did not take the step to secure
this inmates health safety, when he had a blood sugar level of 800 because of such it
resulted in his death. As no learned medical professional would return a inmate to the
block when his blood sugar was 800. When I had my onslot of this diabetic illness my blood
sugar was over 500 and I was place in the institutional hospital and had my blood sugar
checked every hour and given insulin until my blood sugar came within the normal range.
I can only speak on what has taken place in my condition and I would believe if a person
had a 800 blood sugar the same would have taken place in his case, and because of this,
this man died.

17.    Grievance no. Smi- 0288-97 it is clear 28 U.S.C. § 1915 informs apuperis status
and the 20 % deduction of income and to step outside of this statue by institutional staff
was an affirmative act set to impede, hinder a inmates litigational efforts. 28 U.S.C.
1915 (b)(1)(A)(B)(2)(3) and at no time does this statue claim that a personal gift is
income, and at not time is a filing fee to be taken when a inmate has less then $ 10.00
in his account, I have be subjsected this level of abuse and have had my account placed
in the red for the filing fee when I had no funds also (f)(2)(C) at no time shall cost
collected exceed the amount of the cost ordered by the court. Nor at any time dose this
statue instruct institutional staff to place an escrow account for the collection of funds,
ever time funds are deposited in inmate account. It is clear that what an inmate had
deposited in his account the prior month is what 20 % is to be deducted from, and it dose
not state that institution can set up their own policy that is violative of this statue.

18.    Grievance no. 3895  addressed in the above grievance.

19.    Grievance no. Smi-0418-97 end Smi-0419-98  Under D.O.C. Policy 870 Subsection VI
procedure A Fees 1-A-F  and VI -2 E C P of this directive in most medical books it is
clearly stated that a condition that last more the 6 month is to be considered chronic,
and petitioner has had condition that have lasted over 6 month and this condition are not
considered chronic by institutional staff.  Moreover they state that these condition that
have not went away are recurrent.  And at not time does this policy state that if a inmate
returns to medical for the same condition or renews medication given him from the first
treatment he is to be charge a fee for signing up for sick call and for each medication.
Every time petitioner renewed his medication he was charged, for his pain medication for
his chronic pain problem, foot cream, sperm treatment, diabetic medication and treatment,
every time petitioner returns to the medical department at S.C.I. Coal, and S.C.I.
Smithfeild he was subjected to a co-pay based on a unprofessional determination to deter
inmates from seeking adequate health care.  This is a practiced that I have endured and
subjected to fraud, as I would have to return several times to medical for the same
condition and never be adequately treated, and this is not a level of health care that I
would get if I was in the community.  All it would take in once and the correct test would
be taken and I Would  not be subjected to the repeated paying for the same condition, in
which I'm given substandard health care, it is questionable if a inmate is getting adequate
health care if he has to return to medical several times for the same condition.  And this
is a pattern of abuse by the Pa. and Doctors, that an inmate has to return to medical
several times before a condition clears ups, and every time they return to the medical
department they must pay a co — pay for each time for the same condition.  As in my
shoulder condition in  which I was given medication that made me sick, and told doctors
that I have a reaction to this medication, but he gives it any way, then I have to return
to medical and be charged only to be told their is no treatment that is forth coming.  This
is a abuse of the co — pay policy that might go to the level of fraud, and deliberate
indifference. As for a health care provider to see a condition and know how to correctly
treat it and to refuse to do so, is deliberate indifference for the reason to keep inmates
coming back to charge them a co — pay to generate funds for what ever reason.

20.    Grievance no. Smi-504-98 Same as above abuse of the co — pay policy.

21.    Grievance no. Smi-0029-00 same as above co — pay policy and its abuse and for
several years institutional staff has been placing their own opinion into what this policy
states.

22.     Grievance no. 250-01  cable service, that a Mr. Smith and Mr. Dunn knowingly and intentionally deprive petitioner of his cable service for 5 days after cable service was paid claiming a non-existent problem with the cable wire.  Prior to pay for cable both cable wires were in service when I moved into that cell and their was no problem with the cable wire to justify he acts of these person.  That they knowingly and intentionally deprive petitioner of his cable service with deliberate indifference and a wanton desire to inflict pain and injury and to aggravate petitioner and create a mental injury as their was no justification why the cable service was not turned on on
the first of the month, after fee was paid, their was nothing wrong with the cable wire other then these parties inflicting their deliberate indifference upon petitioner without reason of cause to do so.  And the refuse to reimburse petitioner for the days lost due to their acts.

23.     Grievance no. Smi-0063-00  the denial of art supplies based on non - existent policy and a deprivation of petitioners right to secure personal property to rehab. himself and train himself in the skills of art, and to apply his 18 month training in the art feild, he was denied such based on personal opinion of staff and a criteria that was not policy.


        Also that C.O. Ersek with held my health care devise and knowingly and intentionally did so with the intent to deprive petitioner his proscribed health care.  Even after he was instructed to turn over such to petitioner by medical staff and return petitioner to medical.  This officer refused to turn over this devise then goes on to order petitioner to return to medical and sign a refusal form, at no time was petitioner refusing his health care but being deprived and denied his health care by this officer.  This officer had no standing to order petitioner to sign a refusal form and a inmate has the right to refuse any health care, and to sign a refusal form.  At no time was petitioner refusing health care, and he should not have had to be subjected to the abuse and opinion of this officer when seeking health care, that this officer knowingly and intentionally inferferred with proscribed health care with the intent to bring petitioner harm.  Since he was instructed to turn the devise over to petitioner and refused to do so he had no standing to order petitioner to sign a refusal form as long as he was the one depriving health care.  Nor did he have  a legal standing to punish petition for seeking health care, and refusing to sign a refusal form.  Petitioner was issued a misconduct because of such and given 30 days cell restriction because he sought adequate health care and the C.O. knowingly and

intentionallt interferred with proscribed health care. And this level of abuse has been supported by institutional staff and the D.O.C. as if petitioner Smith had no right to refuse an order by an officer who knwingly and intentionally was with holding Smith's health care devise. As long as C.O. Ersek was with holding Smith's health care devise he could not order Smith to sign a refusal form, as at no time was Smith refusing health care, and to subject Smith to this level of abuse was intentionally done, and for institutional staff to support this kind of abuse goes against any known standard, and is the nexus and the link that connect all underline parties to the event, and then to punish Smith because he would not obey and order that would ultimely hinder his health care can be said to show deliberate indifference to Smith health care. As C.O. Ersek was not a learn medical professional but he in his own determined Smith was refusing this health care. Even after he was instructed to turn the devise over to Smith and return him to medical, he refused to do so but then ordered Smith to sign a refusal as it is at no time was Smith refusing this health care and Smith should not be obligated to comply with a order that may bring him harm.

24. Grievance no. Smi-0030-00 specialist for diabeties, it should be require, and if Smith was on the street he would have seen a diabetic specialist and he should have been granted this right as this type of treatment for diabetes would be exspected if Smith was in the community and he was not requesting anything out of the normal standard for health care for this condition. As Dr. Long is not lettered in the specialist care of diabetes, even though he may be trained he is not trained in diabetes care and is issuing diabetic treatment to inmates when he is not certified in diabetic care. And an inmate and even inmate Smith should have a right to a second opinion of his health care, to leave Smith treatment solely in the hands of one doctor that does not have specialized training in the field of these illness can be said to be a level of deliberate indifference, and all person should be afforded the right to a second opinion for their health care, and this should be a right and to deny such a right is deliberate indifference, as it appears an inmate has no say so of what kind of health care he is give. It must be understood that not all inmates have a working knowledge of the health care profession, but if an inmate, such as Smith has lived threw treatment for a condition on the street he would exspect the same kind of treatment when he was incarcerated. Living experences can be said to have given a person specialized knowledge of a certain condition. Like Smith work related back injury in which he was in a taylor brace from Dec. 1983 until June 1987, threw a Doctor S. Bailey Forbes Metro Hospital and knows with certainty that his back is anything but normal as what is being claimed by the medical staff at S.C.I. Coal.

Moreover since Smith was given a back brace by Dr. Long at S.C.I.
Smithfield then x-rays showed a condition. This coupled with the past history of Smith
back condition and the fact that he had to wear a taylor brace for several years, supports
the fact that he has a back condition, and for medical staff at S.C.I. Coal to state the
x-rays are normal when it is well documented that Smith has a back condition namely
slipage at L-5, S-1, is a clear showing of deliberate indifference, and Ms. Swell as well
as Dr. Breen, Dr. Kort, Dr. McGlughlen, to determine that these x-rays were normal is the
nexus and the link needed to show the abuse and deliberate indifference, and for the
Warden to support show shows he a part of, and the failure to train can be said to be the
cause and reason for any injury sustained.

C-Pap these parties have made a false claim that Smith signed refusal forms for this
treatment, if he did Smith request this court to issue a order directing the defendants
to provide the court and Smith with a copy of these refusal, to support their claim of
material fact, for the denial of the use of the C-pap devise while in RHU at S.C.I.
Smithfield, to make a claim about evidence and never show this so called evidence show
part of the standard of abuse, as they attempt to get away from the issue as to why their
was no power in the RHU cell at S.C.I. Smithfield, as Smith could not use the devise if
their was no power. Moreover if Smith was on the top bunk the devise could not safely
be used. I'm not sure of the diamaters of the cells in RHU but I'm sure a 6 foot cord
was not enough. It is also requested that the cell be measured against the cord length
for this devise. Because their was not power in the cell and the Warden, Ms. Burks,
Geroge Weaver, D. Long, M. Baker knew or they should have known that their was not power
in the cell before they committed themselves to make false reports and claim that Smith
refused to use this devise. As they knew that their was no power in the RHU cells, and
has not been for some time and then to make a false claim to support their abuse can be
said to be deliberate indifference, and this act goes to the condition of the confinement
while Smith was in the RHU. The fact that it has been a working practice in all state
institution, and these parties knew of this fact, as their is not D.O.C. policy that
permits the termination of power can not be over looked as this relates to the condition
of confinement and this fact is present in every institution, and whether the D.O.C knows
of such I have no idea, but the Warden at institution acts as a policy maker and impliment
a practice that violates a person rights and is cruel punishment to have a inmate in a
cell where their is no power when power is required for the use of a health care devise.
Their is a link between all parties as they supported the termination of power in the RHU,
with very little concern for inmate safety. That C.O. Ersek and Whysong

entered into a conspiracy to justify his abuse by claiming that Mr. Weaver put a note on
the devise stating not to issue the devise to Smith, what was the reason for these parties
bring the devise to the block in the first place, if they were to instruct the officers
not to issue the devise. The link needed to show deliberate indifference is apparent from
the act of these officers in an attempt to deprive Smith of his proscribed health care
as they went to the limits to justify their abuse, and support the abuse of C.O. Ersek.
The issue here is did this C.O. have the authority to order Smith to sign a refusal form
when he was with holding Smiths health care devise.

Grievance no. Smi-005-00 the act of discrimination base on a disability and a sleep
disorder does not support the denial for night shift cool school and bake shop by Mr.
Weaver, or Dr. Johns, as it is not a requirement that Smith or any inmate have regular
sleep hours before being considered for a educational program. Moreover these parties
also claim that the D.O.C. is not required to treat inmates with such condition. The
nexus and the link needed to support the claim of discrimination, deliberate indifference,
is their and the fact that they based their decision on solely discriminatory acts as
their is not justification for discriminating against a desabed person, and it is not
supported by the policy of the D.O.C., as it is a rehab. policy and Smith should have been
presented the right to be trained in a markedable field, and not be turned now because
of his health condition which would not affect his work proformance. Smith should not
be require to met the standard of Mr. Weaver and met a regular sleep pattern before being
considered for night shift cook school. If present work supervisor in the kitchen
supported Smith for this school based on his proformance then Mr. Weaver and Dr. Johns
no standing to deny Smith such based on a sleep disorder that they refused to treat.

25.     Grievance no. 37516  employment on the day in question Smith was directed by work
support visor to make corn chowder and Smith ask instructor for his help and ask a number
of other work supervisor how to do such and none of them would direct Smith in how to cook
such so Smith took it upon himself to do the best he could. Upon requesting Neff help
as to why the pots were not heating up at that time did work supervisor take attention
in Smith, because Smith was left to his own interpatation he did not cook the sliced
potatoes, that were to have been diced potatoes before mixing them. Supervisor Neff them
blamed Smith claim he did not follow direction, as it is their was no one directing Smith
so how could he follow direction if he was not given none. Then Neff send Smith back to
the block and goes on to make false claims about Smith work proformance, Smith work
proformance was at question he would not have been at a $ .38 per hour rate, as all raise

come due to work proformance. Because of this act Smith was demoted, and his pay was taken based on this false claim, as inmates are to be supervised at all times, and because I was not supervised I made an error because of this error I should not be punished in the manner in which I was, more over having to eat the food her a great number of time it was a retalatory act, or and act of discrimination, as I have seen several pots of food being thrown away and no inmate was punished or demoted, so why was I based on an false claim, and if I was being directed by staff then this corn chowder would have been okay. When inmate are doing their job it is the duty of institutional staff to instruct inmates at all time, and at no time in any of the papers that were submitted did it state that inmate Smith was being supervised, nor does it state who was supervising him. Smith should not have had to pay for the incompentence of the food service staff in the administration of their duties and over seeing the inmates in the performance of their jobs. If Smith failed to follow direction, who was to be directing Smith, that he had to go to the hear supervisor to ask questions.

26.    Grievance no. Smi-0082-99 phone call in which Smith did not talk to anyone and his Counselor Ogershok denied Smith the right to talk to the people he was calling, Smith left a signed case slip in his office in which this counselor knowingly and intentionally defrauded Smith out of funds for a phone call that Smith never got. This act was knowingly and intentionally done with the intent to deprive Smith on his monies, if this person knew Smith did not make a call what right did he have to take Smiths funds for a service Smith did not get. And institutional staff supported this level of abuse and the act of defrauding Smith of his funds for a service he did not get.

27.    Grievance no. Smi-0413-00 and Smi-0417-00 none the less these grievances were appealed and if their was a defect in the filing the administrative remedies were exhausted.

ON the day in question while requesting to go to my call out in law library C.O. Whysong determined that Smith did not have a right to go to the law library and went on to state that he felt that Smith had no right to go to the library and then went on to call Smith a nigger, Smith walked away from the bubble and C.O. Whysong comes to the window as states what did you say nigger, Smith stated your a fucking dick head, Whysong issued a misconduct. What this officer should have done was upon request by Smith to go to his call out this officer should have permitted Smith to go to his call out to law library unimpeded and without hinderence. Smith was given 30 days in the hole, then a

Sgt. Henning makes false claim that Smith threaten this office, what Smith told Sgt. Henning was that this officer is going to mess with the right person and they are going to split his wig. At no time did Smith state that he was he one going to do this and how could what Smith state be twisted into he was the one that said such unless this Sgt. had ill intent set to punish Smith, by making a false claim. Smith was issued a misconduct and given 60 additional days in the hole.

After he did his D.C. time, Smith counselor ask Smith what his intention were towards this office Smith stated he intended to file a suit against him and the institution. Angela Zimmerman place Smith on the control unit based on this stating she wanted to see what Smith would do if released to population. Without provocation or adequate reasoning Smith was placed on the control unit. Angela Zimmerman stated this was due to Smith failure to cooperate with her and tell her his intent towards this officer. Smith did and stated his intention was to file suit and for this reason Angela Zimmerman saw if fit to punish Smith for exercising his right and taking this issue into court. After 45 days on the Control unit Smith was returned to RHU on A.C. status pending an administrative transfer. After 7 month in RHU, 4 of which was after he served his D.C. time and without reasoning he was treansferred to S.C.I. Coal Township January 10, 2001. A under D.O.C. policy their is no policy that would support this level of abuse or the reasoning Smith was subjected to this level of abuse. After Smith completed his D.C. time and was place on A.C. status he should have been given allowance and was cited a non-existent D.O.C. policy that prohibited inmates on A.C. status form getting allowance. As Smiths confinement on A.C. status was due to staffs intervention and on a false claim as Smith told Angela Zimmerman his intent and because of such she saw if fit to punish Smith. Also at that time their was no D.O.C. policy or institutional policy that would support the denial of allowance to inmate on A.C. status. Moreover when Smith was placed on A.C. status he was denied his T.V. Radio, and other property, this being the reason that their was no power in the cells. Which in this institution was a policy that deprived inmates of the basic needs, and the condition of confinement, as no cell should be with out power in them in the plug sockets, and the link to all parties is that the new of this act and refused to correct it, and practiced in the violation of inmates rights by terminating the power in RHU cells. For 4 months Smith was denied his allowance, this being the period of time in which he was on A.C. status.

Grievance no. Smi-417-00 on June 14, 2000 or soon their after Smith was issued a misconduct by a C.O. Whysong, when Smith requested to go to his call out at the law

library this C.O. imposed his personal opinion and stated he felt that Smith had no right to go to the law library, then went on to call Smith a nigger. Smith walked away from the bible and this C.O. comes to the window yelling what did you say so I told him, he issued a misconduct, Smith was given 30 days in the hole, the an additional 60 days with 45 days on the control unit, the transfered to S.C.I. Coal Township. This comes after an on slot of abuse by institutional staff after a female food service supervisor was beaten and rapped in the kitchen. Smith was a cook at this time and had early days and late days, on the day in question it was one of his late days and did not have to go to work until 1 P.M. and feel that the acts of the staff was a retalatory act set to deprive Smith and a discriminatory act. Act staff discriminated against any inmate who was convicted of a sex offense. As Smith was never convicted of a sex offense, nor was he act work the time this offense took place but staff still felt the need to punish and inflict injury by their act upon Smith. Even though he was not at work or was a part of this offense staff still saw it fit to impose their level of indifference upon Smith no matter what the fact were even the fact that Smith was in his call sleep at the time of offense staff still saw it fit to try and blame him for this act. If the institution would have enforced the policy and had a correction officer in the kitchen as approved then this offense may not have taken place, and Smith should not have been subjected to this level of abuse. The issues of this grievance was addressed at grievance 413-00.

Their is more then a casual link needed to support this claim as all parties were actor in all of the claimed violation and deprivation under the color of law, and a suportive actor of the violation. They knew or should have known to support the termination of the power in the RHU would deprive inmate who needed this power for health reason, and would question the condition of confinement. That these parties knew of the act and refused and failed to correct it. The also knew that the plug socket in the RHU cells were so damaged that they could not have been used this being in part the reason why the power was cut off, as all parties knew or the should have known. This is the reason why Smith was denied his C-Pap devise, as their was no power in which to use the deviso, and all parties knew of this fact and failed to correct it, and even have went on to claim that Smith signed several refusal forms but have failed to produce even one signed refusal form to support this claim, and because they have not provided such nor was such in discovery all parties are part of and acted under the same intent, and continue to act under this concurt and part of the same deprivation as the reason Smith is still being denied this health care is based on

a false claim known to be false that he signed a refusal form. The Correction Defendants have made this claim now prove it as mere statement of an alledged fact and not supported by record can not be considered material fact for the reason of this motion. If they have no evidence to support the claim it falls short of the level require for material fact. And the failure to provide such can be said to be the instrument of the fruits of the same tree, and all parties are supporting actor, and the connection and link is their as they support and claim the same false evidence. Namely that Smith signed refusal forms, Smith got 30 days cell restriction because he would not sign a refusal form based on a claim he refused an order, and no untrained C.O. has the authority to threaten, and issue a misconduct to force an inmate to do something he is not willing to do, or refuse a treatment he is not willingly refusing. And for the D.O.C. to support this level of abuse shows that they were part of the ultimate violation and deprivation of health care, as they knew or should have known that no Correction Officer has the authroity, to force an inmate to sign a refusal form, the misconduct states for itself, and is well stated. The reason why Smith was issued a misconduct was that he would not obey C.O. Ersek order and return to medical and sign a refusal form. As long as this officer was knowingly and intentionally with hold Smith health care devise he had no standing to threaten or order Smith to sign a refusal form, even after being instructed by medical staff to turn over the devise to Smith and return him to medical, to refuse to do such was knowingly and intentionally done with the intent to deprive, and all parties who supported this act were part of the violation, and the link is apperant that is required for this Claim. As these parties knew or they should have known that a Correction officer has no standing to order inmate to sign a refusal form for health care when he was deliberately interferring with proscribed health care even after being instrcuted to turn over such to inmate Smith was done with deliberate indifferacne. And the failure to train can be said to be the cause and reason for any injury sustained and a nexus is not required to link all parties if the are party to the same action, and make the same false claim of policy and procedure and were part of the same violation and support any deprivation under the color of law. Even though it is clear that all parties new that their was no power in the RHU cells, the link was created when they failed to correct this condition then go on to make false claims of Smith refusing his health care without any supportive evidence to support this claim and then attempt to paint a picture of material fact. I would believe if their was any signed refusal forms by Smith claiming to refuse this health care the would have been present in Wexford Health motion for summary judgment, and also in the Correction Dfendants motion when they make a claim of material fact where is the

fact that Smith signed a refusal form, and all records point to the fact that their is none, and the reason Smith was denied this health care was their was no power in the cells this is a fact and is still present in the RHU in the state institution and this goes directly to the condition of confinement and is not acceptable by society.

It is clear from the pleading of the defendants, that they knowingly and intentionally and with deliberate indifferance deprived Smith his health care, and have not presented any material fact to support the granting of a motion for summary judgment, and to grant this motion is to state that the United States Constitution supports these kinds of violation in state institution, and that if abuse an inmate does not have a course of action for redress for these violation. What the defendants have submitted shows a genuine issue of material fact of abuse, it is not about comfort as Smith well knows and what has been done to Smith goes beyond any known standard for a civilzed society, and does not met the standard acceptable by any community. By their own admitance they have shown material facts of abuse, and for Smith to file the number of grievance he has on the number of issues shows that something is not right and this abuse can not be supported by this court or any other court, and their is enough information presented by the defendants to set this issue for a jury to decide.

Attached are petitioner exhibits and additional exhibits of a pattern of abuse that has since continued, and the continued violation of federal statue and constitution under the color of law.

Respectfully Submitted

Date: _____               _____

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Kim Smith                                    :Civil Action No. 1:01-0817
        Plaintiff                            :
                                             :(Judge William W. Caldwell)
        v.                                   :
                                             :(Magistrate Judge Malachy E. Mannion)
James Morgan et, al.,                        :
            Defendants                       :
                                             :
                                             :
                                             :
                                             :

## CERTIFICATE OF SERVICE

I Kim Smith plaintiff do hereby certify that on the _____ day of _____,
2003 I turned over to D block officers an envelope containing plaintiff's objection
and supportive brief to forward to Mr. Voeckler to mail first class mail and to place
plaintiff account in the red for legal postage, for prepaid postage to the below
listed parties by way of first class mail.

Office of the Clerk
United States District Court
Middle District of Pennsylvania

John Talaber Esq.
Correct Defendants Counsel

James D. Young Esq.
Wexford Health Counsel

_____    Date: _____
Kim Smith CT-2162/ Plaintiff
1 Kelley Dr. Coal Township Pa. 17866-1021